**KUTAK ROCK LLP**
Loc Pfeiffer, VSB #39632
Alison Feehan, VSB #35225
1111 East Main Street, Suite 800
Richmond, Virginia 23219
804-644-1700
Loc.Pfeiffer@KutakRock.com
Alison.Feehan@KutakRock.com
*Counsel for Bruce Robinson, Trustee*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

IN RE:  WILLIAM ANDREW KARO,                    Case No. 13-33011
                                                                          Chapter 7
                                  Debtor.

**MOTION FOR SANCTIONS FOR FAILURE TO COMPLY WITH ORDER
REQUIRING PRODUCTION OF DOCUMENTARY EVIDENCE,
MOTION TO COMPEL DEBTOR'S PRIOR COUNSEL TO COMPLY WITH
SUBPOENAS AND 11 U.S.C. §542(e), AND MOTION TO EXAMINE
PRIOR COUNSEL PURSUANT TO RULE 2004**

Bruce E. Robinson (the "Trustee"), Trustee for the Bankruptcy Estate of William A. Karo

(the "Debtor" or "Karo"), by counsel, moves for the following relief: (i) for sanctions against the

Debtor and his wife, Page Karo, for their willful failure to comply with this Court's Order of

April 4, 2014; (ii) to compel Debtor's former counsel, Bowles Affiliates P.C. (formerly known as

Bowles & Whitehead, P.C.) ("Bowles") and Canfield, Baer & Heller, LLP (formerly known as

Canfield Baer LLP) ("Canfield") to comply with subpoenas issued by the Trustee; and (iii) to

examine Bowles and Canfield pursuant to Rule 2004 of the Federal Rules of Bankruptcy

Procedure.  The Trustee states:

## Introduction

1.     The Trustee has been trying to examine the Debtor's financial affairs.  Among the assets that may be recovered for the benefit of creditors are certain trust assets transferred to the Debtor's son and/or his wife for no consideration.  There is no dispute that the Debtor was a beneficiary under a family trust and that he attempted to transfer the trust assets to his son and/or wife for no consideration.   The Trustee seeks to determine whether he has the right to recover the Trust assets for the benefit of creditors.

2.     Moreover, the Debtor's disclosures raised many concerns.  Both the Trustee and the United States Trustee have asked the Debtor and his bankruptcy counsel to amend the schedules and to provide additional information.  The Debtor and his counsel have refused to comply with ordinary requests.  They take the position that they have done what they were supposed to do and that they need not cooperate further.  For example, several assets were not disclosed, but the Debtor and his counsel insist they did not have to disclose them because the value of such assets was *de minimus*.  Although they were told that disclosure must be made regardless of their view on the value of the specific asset, the Debtor and his counsel have mocked the inquiries as needless, and steadfastly refused to cooperate, and even challenged the United States Trustee to object to the discharge.  The Trustee again needs the Court's help to compel the Debtor to cooperate.

3.     On April 4, 2014, this Court ordered the Debtor and Page Karo to "produce all documentary evidence in its actual or constructive possession (or provide a written response to counsel explaining the effort to locate the documents, the reason for the lack of production and the location or disposition of the documents to the extent documents cannot be produced)  . . . ." [Dkt. 57] (emphasis added) (the "2004 Order").

4.     Despite the 2004 Order, the Trustee has been stonewalled by the Debtor, Page Karo, and their attorneys.  As detailed below, the Debtor has refused to produce *any* documents to the Trustee.  The Debtor previously produced his 2012 federal tax return and five bank statements to the U.S. Trustee's Office.  The Debtor maintains that he has no other documents to provide as a result of his personal separation from his wife.  The Debtor refuses to carry out simple requests such as instructing his prior attorneys to turn over the case files relating to the litigation involving the family trust.  The Debtor wants the benefit of a discharge but refuses to carry out even the simplest request to cooperate.

5.     Furthermore, the production by the Debtor's wife has also been deficient.  Her documents are scattered and produced haphazardly with numerous missing pages.  Despite being represented by counsel and an accountant, Page Karo has not produced a complete set of financial statements as to any of her 18+ accounts, and she has not produced all of her responsive emails.

6.     Moreover, the law firms who were involved with representing the Debtor during the relevant time periods have also refused to cooperate.  The Trustee has served subpoenas to Bowles and Canfield, but they refused to cooperate on the grounds of privilege even though they also refused to produce a privilege log or to explain how the privilege applies.  Thus, the Trustee seeks to compel them to produce their case files as subpoenaed.  Further, the Trustee seeks to examine these firms to determine how they were involved in the Debtor's pre-petition financial affairs, including their role in the trust litigation and the disposition of the trust and its assets.

## **Factual and Procedural Background**

### **A.   *The Karo Trust***

7.      Rosalie   Schwarzschild   Karo   ("Rosalie")   was   the   daughter   of   Henry
Schwarzschild III, a founder of the Central National Bank ("CNB") in Richmond, Virginia.
When her father died, Rosalie inherited a large number of shares in CNB, which she used to fund
a trust (the "Karo Trust" or the "Trust") for the benefit of her husband, Andrew T. Karo ("Toney
Karo") and her descendants.   **Exhibit No. 1**; *see also Karo v. Wachovia Bank*, 712 F. Supp. 2d
476, 479 (E.D. Va. 2010) (Opinion attached hereto as **Exhibit No. 2**).

8.      The Trust originally established Central National Bank (which later became
Wachovia Bank and now Wells Fargo Bank) (the "Bank") and Toney Karo as co-trustees.
**Exhibit No. 1**.

9.      The Trust agreement directed the trustees to pay Toney Karo for his lifetime all
net trust income.   *Id.*   The Trust agreement also authorized the corporate trustee to make
distributions from the Trust's corpus to any of Rosalie Karo's issue for "such issue's general
welfare and comfort."   *Id.*   The Trust agreement further provided that upon Toney Karo's death,
the Trust terminated and the corpus of the Trust was to be distributed to Rosalie Karo's "then
living issue per stirpes."   *Id.*

10.     The Debtor was Rosalie's only child.   The Debtor married Page Karo and they
had one child, born in 1998.   **Exhibit No. 3** at 3.   The Debtor and his son are the only living issue
of Rosalie and Toney Karo.   **Exhibit No. 2**, at 479.

11.     As Toney Karo's only child, the Debtor was the presumptive taker of the Trust
and his minor son would receive the remainder only if the Debtor died before Toney Karo and
the Debtor's minor son survived both the Debtor and Toney Karo.   **Exhibit No. 1**.

12.     The Debtor requested and received significant income and principal distributions from the Trust over many years, including borrowing over $100,000 from the Trust in 1995 to purchase a home.  **Exhibit No. 3** at 4; *see also* **Exhibit No. 2**, at 486 (the Bank issued "$200,000 in trust distributions to Drew, which were apparently used to reduce his personal debt"); W.A.K. II's Memo. in Support of Motion for Partial Summary Judgment, Case 3:09-cv-00575, Dkt 51 ("The Trust distributed $400,000 through May, 2008 to assist Drew with paying down his debts.").  The Debtor also signed various letters of retention approving the Trust's retention of Bank stock over the years, which letters contained express indemnification provisions in favor of the Bank.  *Karo v. Wachovia*, 2010 WL 2976518 (E.D. Va. July 19, 2010) (attached as **Exhibit No. 4**).

### B.   *Bowles' and Canfield's Representation of the Debtor*

13.     On August 13, 2008, the Debtor attempted to terminate the Trust by having his counsel, Bowles, deliver a "disclaimer" to the Bank using a power of attorney that his father had given him.  August 13, 2008 disclaimer and cover letter, attached as **Exhibit No. 5** (the "August 13, 2008 disclaimer").  The August 13, 2008 disclaimer purported to disclaim Toney Karo's interest in the Trust, more than 40 years after the creation of the Trust.

14.     When the Bank refused to accept the August 13, 2008 disclaimer, the Debtor, represented by Bowles, sued in the Circuit Court for the City of Richmond (the "state court") under the style *William Karo v. Wachovia Bank, N.A.* (Case No. CL08-4650-4) to force the Bank to terminate the Trust and deliver the assets to the Debtor.  **Exhibit 3** at B-5 (Complaint signed by Bowles as counsel for the Debtor).  The Debtor lost and the case was dismissed with prejudice with a specific finding that the attempted August 13, 2008 disclaimer was invalid.  *See*

November 25, 2008 Order, attached as **Exhibit No. 6** (signed by Bowles as counsel for the Debtor).

15.     On January 6, 2009 the state court entered another order at Bowles' request, as counsel for the Debtor, to modify the Trust to permit distributions of principal to Toney Karo, while adding a spendthrift provision to protect the beneficiaries' interests in the Trust from creditors.  The spendthrift clause provides in part: "the beneficiaries hereunder shall have no right to anticipate, to pledge or in any manner to alienate their interest either the income arising from or the corpus of any trust created hereunder. . . ." **Exhibit No. 3**, at B-1 (Consent Order).

16.     On or about February 20, 2009, three weeks after the state court modified the Trust, the Debtor, again represented by Bowles, attempted to disclaim _his_ interest in the Trust to his son (the "February 20, 2009 disclaimer").  The February 20, 2009 disclaimer attempted to disclaim the Debtor's contingent remainder interest in the corpus of the Trust.  The February 20, 2009 disclaimer did not purport to disclaim the Debtor's present right to receive discretionary distributions of principal and, in fact, the Debtor continued to request and to receive principal distributions from the Trust.  **Exhibit No. 3**, at 5.

17.     At the time of the February 20, 2009 disclaimer, the Debtor faced pressure from his creditors.  _See_ Bowles' June 18, 2009 memorandum to file, attached as **Exhibit No. 7**. Specifically, the Debtor owed significant debts to the Bank and the February 20, 2009 disclaimer would eliminate assets that could be used to satisfy the Bank's debts.  In the words of the Debtor's wife (as represented by Bowles and co-counsel) in her Memorandum of Law filed with the United States District Court for the Eastern District of Virginia: "_In January, 2009, with the Bank stock virtually worthless, and Drew's debts seriously unsecured, to protect from his creditors what little assets remained, Drew disclaimed his Trust remainder in favor of his son, WAK. Thus, these mischaracterized "maneuvers" were not for Drew personally, but rather to_

6

*secure assets to assist his father and protect his son's future."* **Exhibit No. 8**, at 7 (emphasis added). In Bowles' words, *". . . upon Toney's death . . . it is anticipated Trust assets will not be subject to Drew's debts."* **Exhibit No. 7**, at 5 (emphasis added).

18.    On August 13, 2009, Bowles brought suit against the Bank again—this time in the son's name (and based on the assumption that the February 20, 2009 disclaimer was valid)—for the loss of significant value suffered by the Trust. **Exhibit No. 2**, at 480. The case was brought in state court under the style *W.A.K. II v. Wachovia Bank, et al.* (Case No. CL09-3754-4) with Bowles representing the Debtor's son and wife as guardian. *Id.*

19.    The case was removed to the United States District Court for the Eastern District of Virginia (the "District Court") on September 14, 2009. **Exhibit No. 2**. At some point, as evidenced by the pleadings, it appears that the Canfield law firm undertook representation of the Debtor. **Exhibit No. 3**. The Bank prevailed when the District Court entered summary judgment on May 12, 2010 and awarded the Bank's legal fees on August 5, 2010. *W.A.K., II v. Wachovia*, 2010 WL 3074393 (E.D. Va. Aug. 5, 2010) (attached as **Exhibit No. 9**).

20.    On May 16, 2010, four days after the District Court granted summary judgment, the Debtor's father, Toney Karo, died, causing all remainder interests to vest in the Debtor. *Id.* At that point, all of the Trust's assets now belonged to the Debtor. An appeal was noticed to the Fourth Circuit Court of Appeals (the "Fourth Circuit"), and the Bank moved to dismiss the appeal as moot on the grounds the Debtor's February 20, 2009 disclaimer was invalid or barred as a matter of law and the Trust assets belonged to the Debtor, not his minor son. **Exhibit No. 3**. The Fourth Circuit dismissed the appeal as moot. **Exhibit No. 10**. While the order does not explicitly state the reason for the dismissal, it appears the Fourth Circuit agreed with the Bank's legal position that the February 20, 2009 disclaimer was invalid or barred as a matter of law. March 31 2011 Order attached hereto as **Exhibit No. 11**. Copies of the pleadings and order

docketed in the appeal are attached as **Exhibit No. 3** (motion); **Exhibit No. 12** (response);

**Exhibit No. 13** (reply); **Exhibit No. 11** (order); and **Exhibit No. 10** (petition for rehearing).

### C.   The Bankruptcy and the Trustee's Efforts to Obtain Debtor's Property

21.    On May 31, 2013 the Debtor filed a voluntary petition for bankruptcy under

Chapter 7 [Dkt. 1].  Because the Debtor claims he does not know anything about the disposition

of the Trust, even though it was his source of income for most of his life, the Trustee moved to

examine the Debtor and his wife regarding the disposition of the Trust and its assets [Dkt. 38].

22.    On April 4, 2014, this Court granted the Trustee's motion and ordered the Debtor

and his wife to produce documents "within 28 days of entry of this Order" [Dkt. 57] (the "2004

Order").  Although ordered by the Court to produce documents, the Debtor has to date refused to

produce *any* documents to the Trustee.  The Debtor previously produced his 2012 federal tax

return and five bank statements to the U.S. Trustee's Office.  The Debtor maintains that he has

no other documents to provide as a result of his personal separation from his wife.  *See* May 5,

2014 correspondence to Mr. Krumbein from Trustee's counsel and May 27, 2014 response from

Mr. Krumbein, attached as **Exhibit No. 15**.

23.    Likewise, although ordered by the Court to produce documents, Page Karo has

failed to date to make a complete production.  The financial records that she produced were

incomplete as to every single financial institution and account, as detailed in the May 15, 2014

letter from Trustee's counsel attached as **Exhibit No. 16**.   Moreover, the pages produced were

frequently jumbled, out of order and included 106 entirely blank pages.  *Id.*

### D.   *Bowles Refuses to Turnover Debtor's Files*

24.    Following the Debtor's failure to comply with the 2004 Order, the Trustee sent Bowles a subpoena to produce "[y]our entire file, including all emails and other documents, relating to your representation of the Debtor through and including April 1, 2011." *See* Bowles Subpoena, attached as **Exhibit No. 19**.  Bowles has failed to date to produce any documents in response to the Subpoena, nor has it produced a privilege log.  *See* Bowles' Objection to Subpoena, attached as **Exhibit No. 20**.

25.    In its Objection, Bowles acknowledges that it represented the Debtor "from August 2008 through early 2009." *Id.*  However, Bowles refuses to produce any of its file, claiming that "[m]uch information concerns the Rosalie S. Karo Trust, not personal information concerning Mr. Karo" and further claiming that the documents are protected by the attorney-client privilege and work-product protections.  *Id.*


### E.   *Canfield Refuses to Turnover Debtor's Files*

26.    Following the Debtor's failure to comply with the 2004 Order, the Trustee sent Canfield a subpoena to produce "[y]our entire file, including all emails and other documents, relating to your representation of the Debtor through and including April 1, 2011." *See* Canfield Subpoena, attached as **Exhibit No. 21**.  Canfield has failed to date to produce any documents in response to the Subpoena, nor has it produced a privilege log.  *See* Canfield May 12, 2014 correspondence, attached as **Exhibit No. 22**.

27.    In its response, Canfield stated: "As our firm does not represent the debtor, we have no documents to produce.  Further, your request asks for privileged information that would not be produced eve[sic] if it were in our possession, which it is not." *Id.*

28.    When pressed further by Trustee's counsel regarding the past representation of

the Debtor, evidenced by numerous pleadings in both federal and state court, Canfield responded

that Paul Curley, Esq., an attorney no longer with Canfield, took all of the files with him when he

left the firm.  *See* email correspondence attached as **Exhibit No. 23**.  When asked about the

status of emails on the Canfield server, Canfield denied that any existed, in spite of the fact that

Mr. Curley used an Canfield email address.  *Id.*  Canfield refuses to provide any further response

or explanation.  *Id.*

### Argument

### A.   *The Court Should Impose Sanctions Upon the Debtor and His Wife For Their Willful Failure to Comply with the 2004 Order*

29.    The 2004 Order requires the Debtor and his wife to "*produce all documentary*

*evidence in its actual or constructive possession (or provide a written response to counsel*

*explaining the effort to locate the documents, the reason for the lack of production and the*

*location or disposition of the documents to the extent documents cannot be produced)  . . . .*"

[Dkt. 57] (emphasis added).  Here the Debtor has done nothing to comply with the 2004 Order.

The Debtor failed to produce a single document.  When the Trustee asked about the Debtor's

efforts to obtain the documents, counsel for the Debtor simply repeated his assertion that his

client had no documents to produce.  When counsel for the Trustee asked whether the Debtor

had instructed his prior counsel to turnover their case files, counsel for the Debtor said his client

did not know "who" represented him.  The Trustee was told that no documents would be

produced and that no effort would be exerted to get the documents.  The Debtor blames his

inability to make any effort to comply with the 2004 Order on his separation with his wife.

While his personal separation from his wife is unfortunate, the Debtor is seeking to discharge his

debts and, accordingly, must take affirmative steps to obtain and provide information regarding his financial affairs.

30.     Page Karo was likewise unresponsive.  While Mrs. Karo produced documents, the production was incomplete and deficient.  Despite being represented by counsel and an accountant, Page Karo has not produced a complete set of financial statements as to any of her 18+ accounts.  She has also refused to produce all of her responsive emails.  In response to multiple requests from Trustee's counsel and Trustee's counsel's detailed list of missing financial records, Page Karo's counsel simply stated: "Ms. Karo has produced everything that she could locate." June 4, 2014 letter from Page Karo's counsel attached as **Exhibit No. 17**.  A later email from Page Karo's counsel stated: "Ms. Karo is not obligated to request copies of the documentation, only to provide what she has.  She has done this.  Ms. Karo does not know where the missing documents are.  If we knew where they were, we would have sent them."  *See* June 11, 2014 email from Page Karo's counsel, attached as **Exhibit No. 18**.

31.     The 2004 Order requires Page Karo to "provide a written response to counsel explaining the effort to locate the documents, the reason for the lack of production and the location or disposition of the documents to the extent documents cannot be produced . . . ."  In spite of the 2004 Order, it does not appear Page Karo made any effort to request copies of her bank statements, not even when the missing bank and incomplete bank statements were itemized for her.  Nor does it appear that Mrs. Karo attempted to produce all of her emails.

**B.  *The Court Should Compel Counsel to Comply with Subpoenas and to Order Turnover Pursuant to 11 U.S.C. §542(e).***

      **1.  *The Trustee has the Right to Obtain the Debtor's Client Files as the Successor in Interest to the Debtor and Sole Holder of the Debtor's Privilege.***

32.    In the subpoenas, the Trustee sought turnover of the Debtor's client files in the possession, custody or control of Bowles and Canfield pursuant to Section 542(e) of the Bankruptcy Code.  That section provides:

> Subject to any applicable privilege, after notice and a hearing, the court may order an attorney . . . that holds recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs, to turn over or disclose such recorded information to the trustee.

11 U.S.C.A. § 542(e) (emphasis added).  The Trustee is the successor-in-interest to Debtor.  As such, the Trustee has the right to obtain property of Debtor (i.e., files relating to representation of Debtor in the possession of its former counsel).  *See, e.g., In re Equaphor, Inc.*, No. 10-20490, 2012 WL 1682583, at *5 (Bankr. E.D. Va. May 14, 2012).  In *Equaphor*, the Chapter 7 Trustee sought turnover of the litigation files from the law firm representing the debtor in a shareholder derivative suit.  The *Equaphor* court ordered the law firm to turn over the files to the Trustee:

> [T]his is not a discovery dispute in the ordinary sense of the term.  It is a motion to compel the turnover of the law firm's files under 11 U.S.C. § 542(e) to the party who now stands in the shoes of the former client, the Debtor.  Under these circumstances, the courts have been uniform in holding that the work product doctrine does not prevent the turnover of the files.  [The law firm] will be ordered to turn over its entire files, notwithstanding any claim or assertion of work product.

*Id.* (citations omitted) (emphasis added).

33.    Here, as in *Equaphor,* the Trustee stands in the Debtor's shoes.  As such, the Trustee becomes the client of Bowles and Canfield and is merely asking for his own files.  The Trustee has the right to obtain privileged documents as the successor in interest to the Debtor and the sole holder of the Debtor's attorney-client privilege.  The privileged documents are just as

much property of the Debtor as nonprivileged documents and are equally subject to the Trustee's

statutory right under Section 542(e).


### 2. *Bowles, Canfield, the Debtor and his Wife Fail to Satisfy their Burden of Establishing the Applicability of the Attorney-Client Privilege.*

34.     As the parties seeking to assert the attorney-client privilege, Bowles, Canfield, the

Debtor and his wife have the burden of demonstrating its applicability.  *See United States v.*

*Jones*, 696 F.2d 1069, 1072 (4th Cir. 1982) (per curiam).   In claiming the attorney-client

privilege, Bowles, Canfield, the Debtor and his wife must satisfy procedural and substantive

criteria.   Procedurally, they must "expressly make the claim" and "describe the nature of the

documents . . . in a manner that, without revealing information itself privileged or protected, will

enable other parties to assess the claim."  Fed. R. Civ. P. 26(a)(5)(A).  Substantively, they must

show that:

> (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or is his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

*Jones*, 696 F.2d at 1072 (citations omitted).  And if they are claiming the work-product privilege,

they must demonstrate that the documents in question were created "in preparation for

litigation."  *In re Grand Jury Proceedings*, 33 F.3d 342, 348 (4th Cir. 1994) (citing *Hickman v.*

*Taylor*, 329 U.S. 495, 509-14 (1947)).

35.     Here, Bowles, Canfield, the Debtor and his wife have refused to provide a privilege log[1] or to otherwise substantiate their privilege claims in any way, other than a bald assertion that the documents may be protected by the attorney-client and work-product protections.   **Exhibit No. 20**.   Indeed, the Debtor has represented through his counsel that Bowles was not his lawyer.  *See* May 12, 2014 email from Mr. Krumbein, attached as **Exhibit No. 24**.  And, Canfield asserts that he does not represent the Debtor.  **Exhibit No. 22**.  These responses falls far short of their burden to establish that the documents that they attempt to shield from discovery are in fact privileged.  Moreover, as discussed below, the right of a party to assert the attorney-client privilege is not absolute.

### 3.     The "Crime-Fraud" Exception to the Attorney-Client Privilege Abrogates any Claimed Privilege.

36.     The crime-fraud exception to the attorney-client privilege has been recognized in this country for many years.  *See Clark v. United States*, 289 U.S. 1 (1933); *In re Grand Jury Proceedings*, 727 F.2d 1352, 1355 (4th Cir. 1984).  As the Supreme Court held, "[a] client who consults an attorney for advice that will serve him in commission of a fraud will have no help from the law.  He must let the truth be told."  *Clark*, 289 U.S. at 15.  The crime-fraud exception to the attorney-client privilege holds that a communication made between an attorney and his client is not privileged if it involves a continuing or contemplated crime or fraud.   *See In re Grand Jury Subpoena*, 884 F.2d 124, 127 (4th Cir. 1989).  The purpose of this exception is to assure "that the 'seal of secrecy' between lawyer and client does not extend to communications

---

[1] Page Karo provided a short "privilege log" regarding five emails from 2014, see log attached as **Exhibit No. 25**. This "log" falls far short both as to the documents contained therein, and also critically fails to justify her failure to produce all documents or a privilege log for any documents prior to April 2014.

'made for the purpose of getting advice for the commission of a fraud' or crime." *United States v. Zolin*, 491 U.S. 554, 563 (1989) (citation omitted).

37.     An attorney's knowledge of the client's wrongful intent is irrelevant.  *Clark*, 289 U.S. at 15; *see also United States v. Ballard*, 779 F.2d 287, 292-93 (5th Cir.), *cert. denied*, 475 U.S. 1109 (1986).

38.     In order to invoke the crime-fraud exception, the movant must make a prima facie showing that the communications were either made for an unlawful purpose or that the communications reflect ongoing or future unlawful activity.  *X Corp. v. Doe*, 805 F. Supp. 1298, 1306 (E.D. Va. 1992), *aff'd sub nom. Under Seal v. Under Seal*, 17 F.3d 1435 (4th Cir. 1994). The movant does not have to conclusively prove the elements of the purported crime or fraud, *X Corp.*, 805 F. Supp. at 1307, but the movant must show that the client possessed the requisite intent.  *Indus. Clearinghouse, Inc. v. Browning Mfg.*, 953 F.2d 1004, 1008 (5th Cir. 1992).

39.     "Because proof of actual intent [of fraudulent transfers to hinder, delay or defraud creditors] is often unavailable through direct evidence, courts have traditionally relied upon certain well-defined badges or indicia of fraud to presume fraudulent intent."  *In re Warner*, 87 B.R. 199, 202 (Bankr. M.D. Fla. 1988).   The indicia include: (1) a relationship between the debtor and the transferee; (2) lack of consideration for the conveyance; (3) debtor's insolvency or indebtedness; (4) transfer of debtor's entire estate; (5) reservation of benefits, control or dominion by the debtor; (6) secrecy or concealment of the transaction; and (7) pendency or threat of litigation at the time of transfer.  *See In re Warner*, 87 B.R. at 202; *In re Porter*, 37 B.R. 56, 60-61 (Bankr. E.D. Va. 1984).

40.     This Court examined an analogous situation in *In re Andrews*, 186 B.R. 219 (Bankr. E.D. Va. 1995).   In *Andrews*, the Chapter 7 debtor's attorney moved for a protective order to preclude taking of attorney's deposition, on ground that communications were protected

by attorney-client privilege.  This Court held "[a]lthough plaintiffs have not yet proven debtor's intent in regard to the questioned transactions, plaintiffs have raised through the indicia of fraud the inference that the transfers may have been fraudulent.  This prima facie showing of fraud is sufficient to warrant applying the crime/fraud exception to the attorney-client privilege."  *Id.* at 224 (citing *In re Warner*, 87 B.R. at 203).

41.    In the instant case, the Debtor has transferred significant Trust assets representing essentially all of the estate to his minor son or his wife for no consideration.   The Debtor engaged in protracted legal maneuvering and two invalid or legally barred disclaimers in order to effect this transfer (one by his father and the other in favor of his son).   In the words of the Debtor's wife, the Debtor attempted to disclaim the Trust "to protect from his creditors what little assets remained."  **Exhibit No. 8**, at 7.  In the words of Debtor's counsel, the Debtor attempted to disclaim the Trust "in consideration of [his] substantial bank debt," while his father's health was "in decline" and "*upon Toney's death . . . It is anticipated trust assets will not be subject to Drew's debts.*"  **Exhibit No. 7**, at 5 (emphasis added).   Bowles also examined whether a bankruptcy court could attach the Debtor's interest, concluding (three years prior to the Debtor's bankruptcy filing) that the disclaimed property should not be part of a bankruptcy case because the Debtor "disclaimed prior to taking bankruptcy."  **Exhibit No. 14,** at 4.

42.    In an internal memorandum dated February 17, 2010, while the case was still pending before the District Court, Bowles appears to acknowledge that the February 20, 2009 disclaimer was in fact "barred" – as the Bank ultimately argued successfully on appeal.  *See* February 17, 2010 memorandum, attached as **Exhibit No. 14.**

43.    As argued successfully by the Bank before the Fourth Circuit, *see* **Exhibit No. 3**, the February 20, 2009 disclaimer was "barred" under Virginia law because the Debtor previously accepted and consistently evidenced his intent to accept the same interest that he later sought to

disclaim. A disclaimer is "the refusal to accept an interest in or power over property." Va. Code Ann. § 64.1-196.1. Virginia law bars a disclaimer if, before the disclaimer becomes effective, the disclaimant "accepts the interest sought to be disclaimed" or "the disclaimant voluntarily assigns, conveys, encumbers, pledges, or transfers the interest sought to be disclaimed or contracts to do so." Va. Code Ann. § 64.1-196.12(B)(i)-(ii).

44.    It is undisputed that the Debtor had been receiving Trust income for many years and that the Debtor requested and received distributions of principal from the Trust both before and after the February 20, 2009 disclaimer. *See, e.g.*, **Exhibit No. 3** at 4; *see also* **Exhibit No. 2**, at 486. By requesting and received distributions of principal from the Trust, the Debtor "accepted" the very assets he later sought to disclaim. The Debtor also "accepted" these assets by bringing the first suit (in which he was represented by Bowles) to obtain outright ownership of the same assets. *Id.* The February 20, 2009 disclaimer was also barred as a result of the Debtor's voluntary encumbrance in obtaining a loan from the Trust and entering into indemnification agreements related to the Trust. *Id.*

45.    Since the February 20, 2009 disclaimer was "barred" by Va. Code Ann. § 64.1-196.12(B)(i)-(ii), it constituted an improper attempt to "transfer" assets to the Debtor's minor son in violation of the spendthrift provision of the Trust. *See* Va. Code Ann. § 64.1-196.12(F) ("a disclaimer of an interest in property, which is barred by this section, takes effect as a transfer of the interest disclaimed. . . ."); and Va. Code Ann. § 55-545.02 ("A beneficiary may not transfer an interest in a trust in violation of a valid spendthrift provision."). In support of these assertions, the Trustee has proffered to the Court both Orders and pleadings from the Fourth Circuit. As in *Andrews*, this prima facie showing of fraud is sufficient to warrant applying the crime-fraud exception to the attorney-client privilege.

**4.** ***The Trustee has the Right to Waive the Attorney-Client Privilege for any Communications Incurred in the Debtor's Representation.***

46.     *Even though it does not choose to do so now*, the Trustee may waive the attorney-client privilege for any communications incurred in the Debtor's representation.  To hold otherwise would allow the Debtor to shield communications and prevent the Trustee from accessing the information that it needs to perform its duties and recover hidden assets.   In *Commodity Futures Trading Commission v. Weintraub*, the Supreme Court of the United States held that a trustee in bankruptcy has the power to assert or waive a corporate debtor's attorney-client privilege.  *See Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 352-54 (1985).  The rationale behind the *Weintraub* decision supports the conclusion that a trustee also controls an individual's attorney-client privilege.   Numerous bankruptcy court decisions rendered after *Weintraub* have extended the decision to include the control of an individual debtor's attorney-client privilege by a bankruptcy trustee.  The weight of authority holds that a trustee succeeds to the attorney-client privilege of an individual debtor, either as a matter of law or where the communications relate either to the administration of the debtor's estate or to an asset of the debtor or her estate.  *See, e.g.*, *In re Smith*, 24 B.R. 3, 5 (Bankr. S.D. Fla. 1982) ("Any attorney-client privilege which the debtor had passes by operation of law to the bankruptcy trustee.").

47.     A number of courts have held that the attorney-client privilege passes to the Chapter 7 trustee in the case of an individual debtor, where, as here, the inquiry concerns the recovery, disposition or compromise of an estate asset.  *See, e.g.*, *In re Bame*, 251 B.R. 367, 375 (Bankr. D. Minn. 2000) (". . . I find that the attorney-client privilege has passed to the Trustee with respect to . . . all matters having to do with administration of the estate, including, in particular, disclosure and recovery of assets."); *In re Bazemore*, 216 B.R. 1020, 1025 (Bankr.

S.D. Ga. 1998) ("when the trustee seeks to determine whether the bankruptcy estate holds a cause of action . . . the trustee holds the right to waive the attorney-client privilege."); *In re Williams*, 152 B.R. 123, 129 (Bankr. N.D. Tex. 1992) ("the liquidating trustee succeeds to control over the evidentiary privileges in connection with the . . . causes of action"); *In re Fairbanks*, 135 B.R. 717, 724 (Bankr. D.N.H. 1991) ("the attorney-client privilege here asserted, is on the unique facts of this case held by the trustee in bankruptcy and that the privilege has been waived by the trustee in seeking turnover of the records in question.").

48.     Some federal courts since *Weintraub* have developed a balancing test to determine waiver in individual bankruptcies.  That test weighs the harm to the debtor with the interests the trustee serves through disclosure.  One of the leading cases adopting this view is *In re Bazemore* where the bankruptcy court applied a balancing test to determine if a trustee was entitled to succeed to the debtor's attorney-client privilege, concluding:

> The inquiry [of whether a trustee can waive the attorney-client privilege] requires balancing the interests of a full and frank discussion in the attorney-client relationship and the harm to the debtor upon a disclosure with *the trustee's duty to maximize the value of the debtor's estate and represent the interests of the estate.*

*Moore v. Easton (In re Bazemore)*, 216 B.R. 1020, 1023-24 (Bankr. S.D. Ga. 1998) (emphasis added) (citing *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343 (1985)). *Bazemore* held that where there is no harm to the debtor, the policies against finding that trustees have waiver power do not exist.  *Id.* at 1024; *see also Foster v. Hill (In re Foster)*, 188 F.3d 1259, 1265-66 (10th Cir. 1999); *In re Rice*, 224 B.R. 464, 469 (Bankr. D. Or. 1998); *In re Eddy*, 304 B.R. 591, 598 (Bankr. D. Mass. 2004) (holding that determination of a trustee's control over the attorney-client privilege should be based upon a comparison of the harm to the debtor against the trustee's need for information).  Indeed, *In re Bazemore* observed that courts that have found that a trustee could not waive a debtor's attorney-client privilege, generally "focus on [the]

personal harm to our control over the debtor and the impeding of attorney-client communication." *In re Bazemore*, 216 B.R. at 1024.

49.     Here, it appears significant assets were transferred to the Debtor's minor son or his wife for no consideration by invalid or barred legal instruments.  The Trustee is seeking to uncover possibly wrongfully diverted assets and to determine whether the estate holds a cause of action regarding these assets.  There is no harm to the Debtor.  At most, the Debtor is Bowles' and Canfield's former client and no current attorney-client relationship would be impeded by production of the file.  The Estate stands to increase the funds to distribute to its creditors. Therefore, under any balancing test or as a matter of law, disclosure is clearly warranted.

50.     In conclusion, the Trustee is entitled to the files it requests.  There has been no showing that the attorney-client privilege is applicable.  No privilege log has been produced to support the privilege and, indeed, the Debtor has denied that an attorney-client relationship exists at all.  Even if the privilege were applicable, the Trustee owns the privilege and is entitled to waive it at its election either as a matter of law or under an application of the balancing test.  The documents sought by the Trustee here relate directly to the transfer of assets by the Debtor through a series of invalid or barred disclaimers, first a purported disclaimer of his father's assets (which was ruled invalid by the courts) and second a purported disclaimer in favor of his minor son (which by Debtor's counsel's own description was "barred").

## C.   *The Court Should Order the Examination of Bowles and Canfield.*

51.     The Trustee moves to examine Bowles and Canfield pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure.  The Trustee seeks to examine these firms to determine how they were involved in the Debtor's pre-petition financial affairs, including their role in the trust litigation and the disposition of the trust and its assets.  As evidenced by the legal record in

state and federal court, the Debtor engaged in protracted legal maneuvering and two invalid or legally barred disclaimers in order to effect a transfer of the Trust assets.

52.     Bowles previously opined that "*upon Toney's death . . . It is anticipated trust assets will not be subject to Drew's debts.*" **Exhibit No. 7**, at 5 (emphasis added).   Bowles appears to acknowledge in an internal memorandum, that the February 20, 2009 disclaimer was "barred."  *See* **Exhibit No. 14.**  Bowles also examined whether a bankruptcy court could attach the Debtor's interest, concluding (three years prior to the Debtor's bankruptcy filing) that the disclaimed property should not be part of a bankruptcy case because the Debtor "disclaimed prior to taking bankruptcy." *Id.* at 4.

53.     The Trustee served subpoenas to Bowles and Canfield, but they refused to cooperate on the grounds of privilege even though they also refused to produce a privilege log or to explain how the privilege applies.

54.     When counsel for the Trustee asked whether the Debtor had instructed his prior counsel to turnover their case files, counsel for the Debtor said his client did not know "who" represented him.

55.     The Debtor has represented through his counsel that Bowles was not his lawyer, *see* **Exhibit No. 24,** in spite of numerous pleadings filed in state and federal court by Bowles on the Debtor's behalf.  And, Canfield likewise asserts that he does not represent the Debtor. **Exhibit No. 22**.

56.     When pressed regarding the past representation of the Debtor, Canfield responded that Paul Curley, Esq., an attorney no longer with Canfield took all of the files with him when he left.  *See* email correspondence attached as **Exhibit No. 23**.  When asked about the status of emails on the Canfield server, Canfield denied that any existed, in spite of the fact that Mr. Curley used as Canfield email address.  *Id.*

57.     The Trustee needs the Court's help to compel Bowles and Canfield to cooperate. The Trustee submits the issues raised above are matters relating directly to the acts, conduct or property of the Debtor and the liabilities and financial condition of the Debtor.  Further, these issues affect the administration of the Debtor's estate.

WHEREFORE, the Trustee respectfully requests the Court to (i) hold the Debtor and his wife, Page Karo, in contempt for their willful failure to comply with the Court's order; (ii) compel Bowles and Canfield to turnover their files pursuant to the subpoenas issued by the Trustee; (iii) examine Bowles and Canfield pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure; and (iv) to award any further relief the Court deems proper.

**BRUCE ROBINSON, TRUSTEE**

/s/ Alison Feehan

**KUTAK ROCK LLP**
Loc Pfeiffer, VSB #39632
Alison Feehan, VSB #35225
1111 East Main Street, Suite 800
Richmond, Virginia 23219
804-644-1700
Loc.Pfeiffer@KutakRock.com
Alison.Feehan@KutakRock.com
*Counsel for Bruce Robinson, Trustee*

## CERTIFICATE OF SERVICE

Pursuant to the Local Rules of this Court, I certify under penalty of perjury that a copy of this document was served by regular mail and/or via ECF on July 21, 2014 as follows:

William A. Karo
430 North Parham Road
Henrico, VA  23229

Page S. Karo
430 North Parham Road
Henrico, VA  23229

Charles A. Krumbein, Esquire
(via ECF)
Counsel for William A. Karo

Robert A. Canfield, Esquire
(via ECF)
Counsel for Page S. Karo

Churchill G. Bowles, Esquire
P.O. Box 12085
Richmond, VA  23241

/s/ Alison Feehan
Counsel