Westlaw.

Not Reported in F.Supp.2d, 2010 WL 2976518 (E.D.Va.)
**(Cite as: 2010 WL 2976518 (E.D.Va.))**

**H**

Only the Westlaw citation is currently available.

United States District Court, E.D. Virginia,
Richmond Division.
W.A.K., II, a Minor, by Page S. KARO, His Next
Friend, Natural Guardian and Mother, Plaintiff,
v.
WACHOVIA BANK, N.A. et al., Defendants.

Civil Action No. 3:09CV575–HEH.
July 19, 2010.

Churchill G. Bowles, Bowles Affiliates PC, Joseph
Earl Blackburn, Jr., Blackburn Conte Schilling &
Click PC, Richmond, VA, for Plaintiff.

William Paul Childress, III, David Alan Rudlin,
Hunton & Williams LLP, Richmond, VA, for Defendants.

### *MEMORANDUM OPINION*
### (Cross Motions for Summary Judgment on Third–Party Claims; Motion for Determination of Recoverability of Attorneys' Fees)

HENRY E. HUDSON, District Judge.

**\*1** This case involves the alleged mismanagement of an inter vivos trust. In the underlying claim, Plaintiff W.A.K. II ("W.A.K."), a minor and remainderman under the trust agreement, sought to recover damages from Defendant/Third–Party Plaintiff Wachovia Bank N.A. ("Wachovia"), a co-trustee, for a perceived breach of fiduciary duty. On November 17, 2009, Wachovia filed a third-party complaint against William A. Karo ("Drew Karo"), W.A.K.'s father, seeking indemnification, contribution, and equitable recovery in the event damages were awarded in the underlying claim. Wachovia and Drew Karo have each filed cross motions for summary judgment on the third-party complaint. Also before the Court is a motion for determination of recoverability of fees, costs, and expenses filed by Wachovia.

On May 12, 2010, the Court granted summary judgment on the underlying claims in favor of Wachovia. In its Memorandum Opinion, the Court reserved judgment on the cross-motions for summary judgment on the third-party complaint, which are presently before the Court. The parties have submitted memoranda of law in support of their respective positions and provided supplemental briefing after the Court's previous summary judgment ruling. The Court will dispense with oral argument because the facts and legal contentions are adequately presented in the materials presently before the Court and argument would not aid in the decisional process. For the reasons stated herein, Third–Party Plaintiff Wachovia's motion is granted, and Third–Party Defendant Drew Karo's motion is denied.

### I.

On October 18, 1966, Rosalie S. Karo established the Karo Inter Vivos Residual Trust ("Trust") for the benefit of her husband, Andrew T. Karo ("Toney Karo"), and her descendants. Drew Karo and W.A.K. are the couple's only living issue. The Trust originally designated Central National Bank ("CNB") and Toney Karo as co-trustees. Following a series of mergers, Wachovia currently serves as the corporate trustee.

Mrs. Karo established the Trust with a number of assets, but predominately CNB common stock, which over time was converted into Wachovia stock. In the underlying complaint, W.A.K. alleged that Wachovia breached its fiduciary duties of prudence and loyalty by failing to diversify the Trust portfolio, failing to assume control and act as the sole trustee, allowing Drew Karo to act as a co-trustee, making improper distributions, improperly soliciting disclosure letters,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.



EXHIBIT
4

Not Reported in F.Supp.2d, 2010 WL 2976518 (E.D.Va.)
**(Cite as: 2010 WL 2976518 (E.D.Va.))**

and failing to monitor or warn about the declining value of the Wachovia stock. In granting Wachovia's motion for summary judgment, the Court found that the terms of the Trust effectively waived the Prudent Investor Rule and that Toney, as co-trustee, repeatedly declined to consent to the sale of Wachovia stock through endorsement of numerous letters of retention (LORs). The Court did not reach Wachovia's contention that Drew's endorsements of LORs directing Wachovia to retain the stock were binding on his minor son, W.A.K. The Court further found that Wachovia did not breach the fiduciary duty of loyalty under any of W .A.K.'s various theories of liability. Toney Karo passed away on May 16, 2010.

**\*2** Count I of the third-party complaint seeks indemnification from Drew Karo for any judgment, costs, and expenses incurred in the underlying litigation as a result of the letters of retention signed by Drew. Count II alleges that Wachovia is entitled to contribution from Drew for any liability found in the underlying suit. Count III asks for equitable recovery of distributions made from trust funds to Drew between 2006 and 2008. Wachovia concedes that, as a result of the Court's May 12, 2010, Memorandum Opinion, that Counts II and III of the third-party complaint are both moot. Only Count I, contractual indemnification, is presently before the Court.

## II.

The court may grant summary judgment only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c)(2). The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion" and "demonstrat[ing] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553 (1986). A genuine issue of material fact exists under Rule 56 "if the evidence is such that a reasonable jury could return a verdict for

the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510 (1986). When evaluating a motion under Rule 56, the Court must construe all "facts and inferences to be drawn from the facts ... in the light most favorable to the non-moving part." *Miller v. Leathers,* 913 F.2d 1085, 1087 (4th Cir.1990) (internal quotations omitted).

## III.

Drew signed LORs approving the Trust's retention of Wachovia stock in 2004, 2005, and 2007. Drew signed them each as a beneficiary and signed the 2007 LOR additionally on behalf of Toney, his father, pursuant to a durable power of attorney. Drew's signature on these letters was significant because a beneficiary can authorize a trustee to engage in an otherwise prohibited transaction. § 55–548.02(B)(4).

The LORs stated, in relevant part:

You hereby indemnify Wachovia, in both its corporate and fiduciary capacities, from and against any and all actions, suits, proceedings, losses, liabilities, claims, demands, damages, judgments, costs and expenses of every kind and nature (including but not limited to attorney fees), which Wachovia may at any time or from time to time suffer or incur as a result of the retention of the Securities.

Exs. 15–17 to Def. Mot. for Summ. J.

"An express indemnity agreement reflects the loss distribution agreed to by the contracting parties." *Safeway, Inc. v. DPI Midatlantic, Inc.,* 270 Va. 285, 289, 619 S.E.2d 76, 79 (2005) (internal quotations omitted). "The general rules which govern the construction and interpretation of other contracts apply in construing a contract of indemnity and in determining the rights and liabilities of the parties thereunder." *Seaboard Air Line R.R. Co. v. Richmond–Petersburg Tpk. Auth.,* 202 Va. 1029, 1033, 121 S.E.2d 499, 503

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 2976518 (E.D.Va.)
**(Cite as: 2010 WL 2976518 (E.D.Va.))**

(1961) (citing 42 C.J.S. *Indemnity* § 8a).

**\*3** The gravamen of Drew's argument opposing Wachovia's indemnification claim was addressed in the Court's May 12, 2010, Memorandum Opinion. Drew's primary argument was that the LORs were not enforceable for several reasons similar to those raised by W.A.K. in the underlying case. In granting summary judgment dismissing Drew's claims, the Court found that the LORs waived the duty of prudence, that the LORs were not misleading or self-serving, and that Wachovia was not required to seek the aid of a Court in administering the Trust. Drew appears to have abandoned these arguments in his supplemental briefing. These questions having been resolved, the Court sees no need to revisit them and will instead focus on Drew's remaining opposition to the indemnity claim.

The first of Drew's remaining claims is that the LORs are not enforceable because they lack consideration. "Consideration is, in effect, the price bargained for and paid for a promise." *Brewer v. First Nat. Bank of Danville,* 202 Va. 807, 815, 120 S.E.2d 273, 279 (1961). The LORs here represented an agreement between Wachovia, Toney, and Drew. In exchange for Wachovia's agreement to retain the stock, against the bank's advice, Toney and Drew agreed to indemnify Wachovia. As such, the agreement was not lacking consideration.

Next Drew argues that the LORs are unenforceable because they facilitated Wachovia's mismanagement of the Trust. This argument appears to infer that the LORs should be found invalid as against public policy. As stated in the Court's previous Memorandum Opinion on summary judgment, Wachovia's actions in administering the Trust did not constitute mismanagement. Therefore, Drew's argument, as presented, fails. There is no basis for a finding that the LORs permitted Wachovia to mismanage the Trust.

Drew's remaining arguments are more procedural than substantive. Drew argues that if Wachovia is allowed to recover its attorneys' fees, they should be paid out of the Trust rather than by the parties. Wachovia has filed a motion for determination of recoverability of attorneys' fees from the Trust under Rule 54(d)(2) and Virginia Code section 55–550.04. This motion is discussed below.

Drew additionally argues that permitting Wachovia to recover attorneys' fees from him will allow for "double-dipping" and argues that Wachovia should file a separate suit against Drew for any uncovered fees. The selection of remedies is a decision which resides with Wachovia. Wachovia neither seeks nor will the Court permit a double recovery.

For these reasons, the Court finds that the LORs constituted a valid indemnification agreement. Taking the facts in the light most favorable to Drew, the Court finds that there is no genuine dispute as to any material fact and that judgment as a matter of law in favor of Wachovia is appropriate on its contractual indemnification claim. Accordingly, Wachovia's motion for summary judgment is granted as to Count I of the third-party complaint. Drew Karo's motion for summary judgment is denied. Wachovia must first seek its fees from the Trust, pursuant to the Court's decision below. To the extent they are not recoverable from the Trust, Drew is contractually liable for any remaining costs, expenses, and fees that the Court determines are recoverable at a hearing to be scheduled at a later date.

*IV.*

**\*4** The Court will now turn to Wachovia's motion for determination and award of fees. Wachovia seeks to recover from the Trust the fees, costs, and expenses of defending this action against W.A.K.

Virginia has long recognized an exception in trust cases to the "American Rule" that litigants bear their

Not Reported in F.Supp.2d, 2010 WL 2976518 (E.D.Va.)
**(Cite as: 2010 WL 2976518 (E.D.Va.))**

own costs of litigation. *Stepp v. Foster,* 259 Va. 210, 217, 524 S.E.2d 866, 870 (2000). Virginia codified this common law exception in 2006 with the adoption of the Uniform Trust Code. Va.Code § 55–550.04. This statute provides that, in a case involving trust administration, a court may award "costs and expenses, including reasonable attorneys' fees" to any party from another party or from the trust at issue. *Id.* The Code provides no guidance other than a court may award costs "as justice and equity may require," *id.,* and no reported cases from Virginia have applied this statute. Given this lack of guidance, the Court finds the Virginia common law cases decided before the enactment of this statute instructive. In *Ward v. NationsBank, N.A.,* 256 Va. 427, 507 S.E.2d 616 (1998), the Supreme Court of Virginia stated:

> a trustee, who has the duty to defend the actions challenged as detrimental to the trust, is entitled to attorney's fees when he has been called on to defend himself against a charge of dereliction of duty and there is neither substantial evidence that the trustee wasted or mismanaged the trust nor evidence of any conduct warranting the removal of the trustee.

*Id.* at 441, 507 S.E.2d at 624. For the reasons stated in the Court's May 12, 2010, Memorandum Opinion, this case falls within the rule articulated by the Virginia Supreme Court. The suit by W.A.K. accused Wachovia of dereliction of duty through allegations of breach of the duties of loyalty and prudence. After a hearing and a thorough review of the record, the Court concluded that Wachovia's actions were grounded in good faith and based on waivers provided by the Trust language, waivers by co-trustees, and disclosures by Wachovia. The Court found that judgment as a matter of law in favor of Wachovia was appropriate.

The Court finds that an award of Wachovia's costs and expenses, including reasonable attorney's fees, from the Trust is warranted, subject to review by the Court as to amount.[FN1] The Court will conduct a

hearing at a later date to determine the amount of award appropriate.

> FN1. W.A.K. argues that Wachovia's motion is time-barred. This argument is without merit. Rule 54(d)(2)(B) provides that such a motion must be filed "no later than 14 days after the entry of judgment." Judgment is an "order from which an appeal lies," Fed.R.Civ.P. 54(a), and the Court has issued no such order in this matter.

An appropriate Order will accompany this Memorandum Opinion.

E.D.Va.,2010.
W.A.K., II ex rel. Karo v. Wachovia Bank, N.A.
Not Reported in F.Supp.2d, 2010 WL 2976518 (E.D.Va.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 13-33011-KRH Doc 78-2 Filed 07/21/14 Entered 07/21/14 14:39:57 Desc
Case 3.09-cv-00575-HEH Document 301 Filed 11/17/08 Page 1 of 4 PageID# 486
Exhibit(s) 4 - 25 Page 5 of 130



LAW OFFICES

### BOWLES & WHITEHEAD
A PROFESSIONAL CORPORATION
P. O. BOX 12085
RICHMOND, VIRGINIA 23241

BOWLMAN T. BOWLES, JR.
DAVID W. WHITEHEAD
————
CHURCHILL G. BOWLES

404 WEST FRANKLIN STREET
( 804) 780·0238
FAX (804) 780·9134

August 13, 2008

Ms. Faye K. Harris, Vice President
Wachovia Trust
102 E. Cary Street
Richmond, Virginia 23219

      Re: <u>Disclaimer of Karo Trust</u>

Dear Ms. Harris:

      On behalf of Andrew T. Karo and his son, ███████, I enclose for delivery and filing with Wachovia Trust a Disclaimer (with various attachments) of Mr. Karo's income interest in the Karo Residual Trust pursuant to Va. Code §64.1-196.12.F

      My clients request that should you have any legal, asset distribution, and/or other implementation questions, please call either me or my partner, David Whitehead. Please also acknowledge receipt of these materials.

      Thank you in advance for your cooperation and assistance, I am,

               Very truly yours,

               Bowlman T. Bowles, Jr.

BTBjr:rtv
Enclosures
cc: William A. Karo
     Andrew T. Karo

**EXHIBIT**
**5**

████████████████

Richmond, Virginia  23226
August 13, 2008

Ms. Faye K. Harris, Vice President
Wachovia Trust
102 E. Cary Street
Richmond, Virginia 23219

            Re:    Disclaimer of Karo Trust

Dear Ms. Harris:

        I enclose for filing with Wachovia Trust, as Co-Trustee of the 1966 Karo Residual
Trust (#5019014385), a disclaimer for my father of his income interest therein, and executed
by me, for him and at his direction, August 13, 2008.

        Please acknowledge receipt of this letter and disclaimer.

                                        Very truly yours,

                                        *William A Karo*

                                        William A. Karo

Received August 13, 2008

WACHOVIA TRUST

By *Linda Sirmon*

## DISCLAIMER

THIS DISCLAIMER, made this 13th day of August, 2008, by ANDREW T. KARO (at his request, by his agent and power of attorney, William A. Karo) ("Disclaimant"), of Henrico County and Richmond, Virginia;

WHEREAS, Rosalie S. Karo ("Grantor") died in 1974, having created on October 10, 1966 an Intervivos Residual Trust (Trust) f/b/o Andrew T. Karo, et al, with Wachovia Bank (formerly Central National Bank) and Andrew T. Karo, as Co-Trustees;

WHERAS, pursuant to Article I, Clause 4(c) of the Trust, the Disclaimant was granted a life income interest, and upon his death the Trust passes to Grantor's then living issue, per stirpes, who at this time is her son, William A. Karo (who has one (1) child, ▆▆▆▆▆▆▆

WHEREAS, the Trust has a present value of approximately $2,500,000;

WHERAS, Andrew T. Karo on August 18, 2006 executed a Durable Power of Attorney to his Son, William A. Karo, and in paragraph 15 empowered him: "To disclaim, in whole or in part, in my agent's sole discretion, my right or succession to, power over or interest in any property, whether by testamentary instrument, non-testamentary instrument, descent or distribution or any other means...";

WHEREAS, pursuant to Chapter 8 of Title 64.1 of the Code of Virginia (1950, as amended) the Disclaimant has the right to disclaim in whole or in part the succession to any property, real or personal, or interest therein which would otherwise pass to him under the Trust; and

NOW, THEREFORE, the Disclaimant desires to exercise his right to disclaim his interest in and right to said Trust income, and does so as follows:

1.      The Disclaimant hereby, for himself, his estate and his legal representatives, irrevocably disclaims and declines to accept any further income distribution and right to continue as an income beneficiary of said Residual Trust, and further disclaims and refuses to accept any other interests in said Trust.

2.      The Disclaimant has previously accepted, but does not now and will not in the future, accept any further income and/or other interests in said Residual Trust.

3.      While this disclaimer would otherwise be barred by Disclaimant's previous acceptance of income payments from said Trust, it is nevertheless his intention (pursuant to Va. Code §64.1-196.12.F) that such disclaimer take effect as a transfer of such income interest to the Trust remainderman who would have taken such interest if such disclaimer had not been otherwise barred under Va. Code §64.1-196.12.

Case 3:09-cv-00575-HEH   Document 30-1   Filed 11/17/09   Page 14 of 43 PageID# 480
Case 13-33011-KRH   Doc 78-2   Filed 07/21/14   Entered 07/21/14 13:59:17   Desc
Exhibit(s) 4 - 25    Page 8 of 130

4.      The Disclaimant certifies he has personally delivered a copy of this Disclaimer to Andrew T. Karo, and Wachovia Bank, Co-Trustees, on the date of the execution hereof.

IN WITNESS WHEREOF, the Disclaimant has hereunto set his hand and seal this 13th day of August, 2008.

ANDREW T. KARO

*Andrew T. Karo by*

*William A. Karo P.A.*(SEAL)

By:  William A. Karo,
Power of Attorney and Agent

STATE OF VIRGINIA

CITY OF RICHMOND, to-wit:

I, the undersigned, a Notary Public in and for the jurisdiction aforesaid do hereby certify that WILLIAM A. KARO, acting as agent and power of attorney for, Andrew T. Karo, whose name is signed to the above Disclaimer, has acknowledged his signature before me this 13th day of August, 2008.

*Janet V. Tray*
Notary Public

My commission expires: *October 31, 2011* .

My registration number is: *222755* .

2

VIRGINIA:

IN THE CIRCUIT COURT OF THE CITY OF RICHMOND

WILLIAM A. KARO,                          )
                                          )
                    Plaintiff,            )
                                          )
v.                                        )      Case No.:  CL08-4650  — 4
                                          )
WACHOVIA BANK, NATIONAL ASSOCIATION       )
Co-Trustee of the Rosalie S. Karo         )
Intervivos Trust u/a December 18, 1966,   )
                                          )
                    Defendant.            )

## FINAL ORDER

On this day, the parties, by counsel, appeared regarding William A. Karo's Complaint for

Declaratory Judgment relief pursuant to Virginia Code §8.01-184, et seq., concerning the validity

and effect of a disclaimer filed by Andrew T. Karo pursuant to Virginia Code §64.1-196, et seq.,

and

Based upon the pleadings filed in this case, the agreement of counsel, and applicable law,

The Court FINDS and ORDERS that the disclaimer is invalid for all purposes under the

Uniform Disclaimer of Property Interest Act, Virginia Code §64.1-196, et seq. and any other

applicable authority.  Accordingly, the Court finds that the attempted disclaimer has no validity

and no effect in any manner and, therefore, this case is hereby dismissed, with prejudice and the

case is stricken from the active docket.

The Clerk is directed to send copies teste to counsel of record upon entry.

ENTERED: 11, 25, 08

Judge Margaret Spencer

A Copy,
Teste:  BEVILL M. DEAN, CLERK

BY: _____ D.C.

EXHIBIT
6

We ask for this:

Bowlman T. Bowles, Jr. (VSB #05268)
Churchill G. Bowles (VSB #42619)
BOWLES & WHITEHEAD, P.C.
P. O. Box 12085
Richmond, Virginia  23241
Telephone:    (804) 780-0236
Fax:          (804) 780-9134
        *Counsel for William A. Karo*

Date:  November 21, 2008

Seen and agreed:

Matthew M. Farley, Esquire
Armstrong, Bristow, Farley
   & Schwarzchild, PLC
1807 Libbie Avenue, Suite 200
Richmond, Virginia  23226
Telephone:    (804) 282-6170
Fax:          (804) 282-6175
        *Counsel for Wachovia Bank, N.A.*

Date:  November 21, 2008

Paul M. Curley, Esquire
Canfield, Baer, LLP
2201 Libbie Avenue, Suite 200
Richmond, Virginia  23230
Telephone:  (804) 673-6600
Fax:        (804) 673-6604
        *Counsel for* ▓▓▓▓▓▓ *a minor*

Date:  November 21, 2008

Robin M. Morgan, Esquire
Blackburn, Conte, Schilling & Click, P.C.
300 West Main Street
Richmond, Virginia 23220
Telephone:   (804) 782-1111
Fax:          (804) 648-3914
        *Counsel for Andrew T. Karo*

Date:   November 21, 2008

# MEMORANDUM

TO:          Karo Trust File

FROM:     Churchill G. Bowles

DATE:     June 18, 2009

RE:          Karo Trust Background Facts

---

Rosalie S. Karo died in 1974, having created the Karo Intervivos Residual Trust ("Trust") on December 18, 1966 for the benefit of her husband, Andrew T. Karo (Tony) and her issue, with Central National Bank and Tony as co-trustees.  Article I(4)(c) provides that Tony receive lifetime income (only) with the remainder passing at his death to "Grantor's then living issue, per stirpes." Rosalie S. Karo and Tony had one living son, Drew, who has one living child, Andrew.

Drew and Andrew are discretionary principal distributees of Trust funds for their "welfare and comfort." Tony became a permissible principal distributee by a 2009 Court order.

Rosalie S. Karo was of the Schwartzchild family, a founding and partly controlling member of Central National Bank.  Tony began working at the Bank after his marriage to Rosalie, with limited duties and responsibilities.  In appointing Tony and the Bank co-trustees, Rosalie relied primarily on the skill and expertise of Central National Bank given Mr. Karo's lack of experience and knowledge in financial or fiduciary affairs.  The Trust provides no commission to Tony.  The Trust was funded with seventeen stocks of which only Wachovia, Honeywell and Bristol Myers remained as of October, 2007.



EXHIBIT

7

Article III, clause 1 allows retention of original Trust investments, but does not contain an exculpatory provision for holding an overconcentration of stocks.

The Marital Trust was funded following Mrs. Karo's death but Tony withdrew all marital funds. Tony's primary support during the last twenty-five years has been the Trust. Mr. Karo moved to Beth Shalom Assisted Living Facility in 2005, being too frail (and showing signs of dementia) to live on his own. In 2002 Dr. Cohen opined that Mr. Karo's advancing Alzheimer's prevented him form handling his affairs. Trust income was sufficient to pay for Beth Shalom until the fall, 2008 when Wachovia stock collapsed, also necessitating amending the Trust to allow for principal invasion to Tony because of reduced Trust income.

Drew inherited 60,000 shares of Wachovia stock from his mother. He also owned an interest in the Schwartzchild Jeweler buildings at 4th and Broad, which interest was sold a few years ago. Drew has worked for the past twenty years, the Karo Trust and his Wachovia stock being his primary source of income.

In the late 1980's, the Bank granted a personal credit line for Drew. In the early '90's, Drew received a $100,000 loan from the Trust to help finance the purchase of a house. That loan was paid off sometime in 2001 when he bought his new home on Greenway upon a loan extended not from the Trust but from the commercial side of Wachovia Bank. Presently, Drew owes $350,000 on his Florida condo, $650,000 on his credit line, and $700,000 on his Greenway Lane home. The Florida property is for sale at $350,000, but is not moving.

Day to day administrative Trust management is handled by the Bank. Tony was consulted only on general administrative issues. Distribution requests by Drew were approved by the Bank, with occasional input from Mr. Karo.

2

The Bank recommended as early as the 1980's that the Bank stock be sold/diversified but Tony and Drew resisted.    At least as early as 2002 the Bank prepared exculpation and indemnification letters concerning continued holding of Wachovia stock.  In those letters, Wachovia states it "cannot offer opinions" regarding Wachovia presumably because it is deemed to have insider-information of Wachovia.  The letter also says because it may be impossible to obtain a release from all beneficiaries (e.g.-minors) those "individuals requesting" retention should indemnify the Bank.   Initial letters were signed by Tony while subsequent letters were signed by Tony and Drew.  The last (2007) letter was signed by Drew individually, and as POA for Mr. Karo, as trustee. No provision of the letter purports to bind Andrew.

Wachovia was informed of Mr. Karo's move to Beth Shalom and his increased inability to handle his affairs as early as 2006.  Based upon available records, the Bank communicated almost exclusively with Drew regarding Trust matters, culminating in Drew signing the exculpation letter on October 17, 2007, individually and for Tony as co-trustee, under his POA.  Wachovia did not question such signature by Drew nor did they go visit Mr. Karo at Beth Shalom or otherwise inquire as to his capacity, apparently from 2006 forward.  An experienced fiduciary such as Wachovia should know fiduciary duties are non-delegable.

J. Mctijajes

By 2001, Drew's equity line and commercial loans increased and were $1.7 million as of January, 2009.  The commercial and personal loans were secured by Drew's personal Wachovia ($60,000) stock holdings.  The number of collateral shares increased as Drew's debt increased but significantly accelerated at Wachovia's insistence in 2007 & 2008 as the Wachovia stock began its drop.

In 2006, The Bank set in place a wealth manager to interface between Drew and the Bank on all fronts, and in particular his Trust relationship with the Bank and his commercial loans.

3

Collusion of the Bank trust and commercial functions is illustrated in communications sent from investment officer, John Stoddard, to Drew by email with Faye Harris and Fred Hall copied. The email includes investment recommendations for the Trust, a new Trust fee schedule, and Drew's debt summary at the end of October, 2006. The debt summary was prepared by the Bank and was used at a meeting attended by Drew, Faye Harris, John Stoddard (investments) and Fred Hall. Fred Hall was the wealth manager/face person for Drew's Bank relationships. Faye Harris and the others represented the Trust and Commercial sides respectively. At the meeting, the Trust investments and related items were reviewed and Drew's debt summary was put before him with a stated need for him to bring the balance down or increase collateral. Drew was asked to do so through a disbursement from the Trust and a letter drawn by and to Faye Harris on November 15, 2006 requesting an invasion of $100,000 from the Trust to "curtail several credit card balances and credit lines that I have with Wachovia." The October 31, 2006 debt summary is attached. The letter also mentions this is a first step in a "graduated plan to curtail my overall debt which you, Fred Hall and I have discussed." There was also $200,000 of Wachovia Brokerage margin debt (Ken Wiles Charlotte), paid from the Trust in similar fashion. Thus, the commercial side worked directly with the Trust side regarding Drew's debt and payments from the Trust to reduce debts.

A later interrelation between the commercial and Trust side is illustrated in 2008 where Mary Beth Brugh (commercial) requests by email that Faye Harris and the Trust provide funds to bring Drew back within collateral compliance with his debts, which again was followed by a written request from Drew to Faye to request such amount. Drew points out that whenever he would ask for these loans to be made by the Karo Trust, the trust side would deny them and he would be pushed to the commercial side where they wanted new business, especially an overcollateralized creamputf loan such as this.

4

Because the collusion/interrelation of the Bank's trust and commercial operations regarding Drew's debts, we feel the Bank has a fiduciary duty to Drew/Family in both instances, the remedy on the commercial side of being a recession of the debt (but with credit for interest paid).

During the fall of 2008, Tony tried to disclaim his income interest (so Trust assets could pass outright to Drew), but the Bank resisted; and in light of Drew's substantial debt to the Bank, Tony's disclaimer was withdrawn. During the spring of 2009, also in consideration of Drew's substantial Bank debt, Drew disclaimed his Trust remainder (that would come to him upon Tony's death). Tony's health in recent month's has been in decline. Thus, Andrew (through his Trust until age 45) becomes the reamainderman of the Trust upon Tony's death, and it is anticipated Trust assets will not be subject to Drew's debts.

Late 2006 began a decline in financial markets which culminated with Wachovia stock value collapsing and a hastily arranged sale at $2.00 per share in 2008 to Wells Fargo. As late as January, 2008 Wachovia sold as high as $40 per share. During that time, the Wachovia dividend was cut twice and the stock fell from 40 to 3 with no communications to Drew or his father regarding the propriety of selling Wachovia or any other stocks.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

### (Richmond Division)

| | | |
|---|---|---|
| W.A.K., II, a minor, who sues by Page S. Karo his next friend, natural guardian and mother, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No: 3:09CV00575 (HEH) |
| | ) | |
| WACHOVIA BANK, N.A., Individually and as co-Trustee of the Rosalie S. Karo Trust u/a October 18, 1966, | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S MEMORANDUM OF LAW IN RESPONSE TO THE MOTION FOR SUMMARY JUDGMENT FILED BY WACHOVIA BANK, N.A.

The Plaintiff, WAK, II, a minor, files this Memorandum in Response to Defendant's Motion for Summary Judgment in this matter. WAK separately responds to matters raised in Wachovia's Motions in the following sections.

## I.    WACHOVIA'S ALLEGED FACTS CONTESTED BY WAK

### Gravamen of the Case.

Wachovia's recited facts attempt to place responsibility on Drew and Page Karo, and overlooks the Bank's fiduciary obligations to WAK. This effort to shift responsibility and focus on Drew and Page obfuscates its failure to diversify Wachovia stock after it deemed it prudent to do so. If WAK were an adult, no doubt Wachovia would attempt to paint him culpable.

The proper focus is Wachovia's: (1) failure to prudently administer the Trust for all beneficiaries; and, (2) WAK's Trust interest which Wachovia failed to monitor and protect.



**Rosalie S. Karo's Intent.**

Wachovia hypothesizes unsubstantiated facts regarding Rosalie's intent. The Bank says Trust Article 3, Clause 1 grants "unfettered" discretion over the Trust investments. "Unfettered" is nowhere in the Trust. The co-trustees had the power to retain original investments as they "deemed advisable", yet Defendant does not mention that "deemed advisable" is mentioned in the Trust seventeen times. After the First Union merger in 2001, the Defendant did not deem it advisable to retain concentrated stocks and began portfolio diversification. All Bank witnesses agreed the Bank did not deem it advisable to continue holding the concentration of Wachovia stock. Thus, Rosalie did not grant unfettered discretion. She allowed the concentration only until the Bank deemed it not advisable. For example, the 2007 LOR affirmed again the Bank no longer deemed retention advisable, and thereafter had a duty to reduce the concentration, diversify and it breached is diversification duty in not doing so.

Rosalie's father was the founder of Central National Bank. She trusted the Bank and named it as co-trustee because of her trust and her expectation that the Bank would properly perform its duties as Trustee. This trust and confidence was violated by the Bank holding a 60% concentration of its stock while it fell from $3.1 million to $350,000.

The Defendant also claims Rosalie's intent was to "give Toney a decisive vote in the investment decisions..." Nowhere does the Trust do this. Wachovia also asserts Toney was given a "decisive vote" because Rosalie elected "not to provide in her Trust a method to defeat Toney's consent in the event of disagreements with the corporate Trustee." Putting aside the futility of trying to prove a negative, Rosalie's silence on a possible deadlock proves nothing. It also asserts that Rosalie's intent "was to condition any investment action on the unanimous

3

decision of the Trustees." Not true. Nowhere does the Trust say "unanimous", nor did Rosalie express to the Bank that "Toney was to have complete control." Rosalie's 1969 letter was found by Drew in his attic (after this action was brought) and was therefore not relied upon by the Bank. It was produced in discovery by the Plaintiff, not the Bank. It appears to be only a "feel good" letter intended to assuage Toney's hurt feelings over the Bank being appointed co-trustee with Toney. It has no legal affect and the Bank cannot claim reliance on it when it did not have possession of it until this litigation.

The defendant also claims that the Trust did "not impose a duty on the co-Trustees to seek guidance if they disagreed." This also attempts to prove a negative, and it does not relieve the Trustee's duty to seek aid and guidance upon a deadlock.

### Drew, A Sophisticated Investor.

The defendant asserts Drew was a "sophisticated investor." To earn this sobriquet in today's difficult investment times, only one qualification suffices: results, and Drew had none. One would think Drew was Richmond's Warren Buffett reading the defendant's affidavits and assertion of facts. Fred Hall was Drew's primary Bank contact and instrumental in having Drew sign the LOR in 2005. In response to questions by Wachovia's counsel, he testified without hesitation that Drew did not understand the risk of stock over-concentration. A sophisticated investor may understand this risk, yet elect to gamble; however, one who does not understand this risk is not a sophisticated investor. Defendants affidavits and assertion in their memorandum that Drew was a "sophisticated investor" is contrary to Hall's testimony, and Hall's affidavit is contrary to his own sworn testimony. Since the Bank knew Drew was not a competent investor, this is all the more reason it should have rejected his direction and moved to diversify.

4

**Years 1998 to 2007.**

The Bank failed to properly communicate with Toney and assume responsibility to act as sole fiduciary since Toney was clearly an "unavailable" co-trustee (Va. Code § 55-547.03(d)). The Bank characterized Toney as "reclusive and shy", and communicated with him only through "numerous signed documents". This lack of proper communication breaches the Bank's duty to act "unanimously" under Va. Code § 547.03(A), and is illustrated by: (a) permitting Drew to act as "liaison", but the Bank didn't confirm this or otherwise ascertain Toney in fact signed the documents; (b) the fact that of the documents returned, only fifteen were signed over a twenty year period, though many more requests were made (and unsigned); and, (c) Toney's erratic community behavior caused Wachovia to know (or it should have known) they were dealing with an "unresponsive" or "unavailable" co-Trustee, and yet they did nothing. Va. Code § 55-547.03(d) requires a remaining co-trustee to act under these circumstances.

**The Period 2008-09: Supporting and Protecting Toney.**

The Bank seriously mischaracterizes the 2008-09 developments. By August, 2008, Wachovia's dividend was significantly reduced and later eliminated, and its stock fell from $3.1 million to $350,000. The Bank characterizes developments during this period as an attempt by Drew to seize assets personally from the Trust. This mischaracterizes Drew's attempts to support his father, as clearly shown in the documents Drew and the Bank exchanged during this period. *See* Exhibit D-88, at p. 166 of Wachovia's Summary Judgment Memorandum Appendix.

By August, 2008, Drew Karo's lifestyle was not the problem; rather, it was the Trust which could no longer support Toney. After the Bank's August rejection of the disclaimer, the Bank and Drew proposed in September to terminate the Trust to obtain assets for Toney's

5

support. There was then no Trust principal distribution power for Toney. While the Bank suggested large principal distributions to Drew for Toney's support, this was rejected in favor of an informal settlement agreement to terminate the Trust so Drew could have assets to support his father.

This proposed agreement had recitals which clearly acknowledge Toney's support needs, and at paragraph 6 stated: "Because the Trust terms prohibit principal distributions for the father, current Trust income will not meet his annual health care and support needs." The agreement also stated that Drew acted as his father's power of attorney, and under Va. Code § 20-88 he was required to support him. To characterize the Agreement as an attempt by Drew to obtain Trust assets personally is contrary to the facts recited in these documents.

The proposed agreement also recited that an order would continue Drew's fiduciary and legal support obligations regarding Toney's support, and such order would insure Wachovia had no liability for terminating the Trust. Paragraph 4 placed Drew in a continuing fiduciary position for his father's support, and acknowledged a legal and fiduciary obligation under Va. Code § 20-88 to support Toney with Trust assets. This agreement was not about obtaining Trust assets for Drew personally.

Virtual representation for WAK was proposed in the Agreement, but declined by the Bank both then and in a later December proceeding to amend the Trust for spendthrift and discretionary distribution provisions, the Bank insisting on separate representation for WAK, and not relying on virtual representation.

### December, 2008 Trust Modifications.

By December, 2008, Wachovia stock had virtually collapsed and there was concern about Drew's financial liability to the Bank. Drew and the Bank then agreed to amend the Trust to provide for spendthrift and distribution provisions to support Toney, the Bank again insisting that WAK have separate counsel, and that it would not be appropriate to have Drew represent WAK by virtual representation. Unborn and unascertained beneficiaries were virtually represented, the agreement reciting that those interests were substantially identical to Drew's interests; implying that Drew and WAK did not have substantially identical interests or that there was a conflict between them. *See* Exhibit D-90, at p. 180, 189-90 of Wachovia's Summary Judgment Memorandum Appendix.

### January, 2009 Disclaimer.

In January, 2009, with the Bank stock virtually worthless, and Drew's debts seriously unsecured, to protect from his creditors what little assets remained, Drew disclaimed his Trust remainder in favor of his son, WAK. Thus, these mischaracterized "maneuvers" were not for Drew personally, but rather to secure assets to assist his father and protect his son's future. His efforts were not about lifestyle, but rather to care for and protect his father and son.

### The Bank's Financial Benefit from Drew's Discretionary Distributions.

The Bank asserts it did not benefit from discretionary distributions for Drew to pay his Bank loans. Drew's Bank loans were collateralized by his Bank stock. When the Bank stock dropped, his loans were not adequately collateralized. Mary Beth Brugh, a loan officer, notified Faye Harris of this by e-mail. Drew's loans became riskier with inadequate collateral. To say

7

that the Bank received no financial benefit by payment of loans with Trust distributions defies logic and is untrue.

The Bank says all distributions deposited to Drew's account were under his control and direction and not conditional on their use to pay Drew's debt. This is not true. Linda Simon, a trust department employee wrote an email to Mary Beth Brugh and Martha Belcher of the commercial lending side of the Bank on May 8, 2008. (D-42, attached). She writes she has scheduled a $100,000 payment for Drew's checking account and "you should see the funds in the account ready for transfer for the Clas loan" (the commercial loan). Belcher wrote Drew the next day (D-43, attached) saying that the $100,000 was deposited into his checking account. She then writes "we then debited from checking $100,000 and applied it to the $450,000 line of credit." That transaction is shown on the Trust account statement for that day (D-35, attached). The Bank controlled the transaction from start to finish. Drew never had any control of the money throughout this transaction.

**Toney as Co-Trustee.**

The Bank claims Toney acted as co-Trustee even though no one talked to or saw him after the year 2000. The Bank characterizes him as a "reclusive and shy man". The Bank concedes that a co-Trustee's duties cannot be delegated, yet it cites Va. Code §§ 25-45.10 and 55-548.07 authorizing a trustee to utilize agents which must be carefully selected and properly monitored. Agents under this statute would include lawyers, accountants, and investment advisors but the authority does not include delegation of fiduciary judgment authority. *See Restatement (Second) of Trusts*, §187 (1959) cmt. h. Drew acted as co-trustee and the Bank acquiesced. Hall and Harris referenced him in writing as being the co-trustee as explained in

8

Plaintiff's Memorandum for Partial Summary Judgment.  D-8A, D-25, D-44.  He signed the 2005 investment policy statement calling for a risky investment strategy and was even named as the client in that document.  The Bank claims Toney knew and approved of everything, but there is no proof.  In any event, this would constitute an improper delegation of Toney's co-trustee duties to Drew.  The defendant during the last ten years acquiesced in permitting a gambler to instruct the bank on investments.  It collected commissions for the last ten years by acquiescing to Drew's wishes, knowing it was wrong in doing so, and failing to administer the trust as it "deemed advisable."  It now wants to shift responsibility for its failed responsibilities by asking this court to find that Drew virtually represented WAK in promoting a breach of trust.  No case cited by the plaintiff extends the doctrine of virtual representation in a transactional setting such as this.

### Speculative Damages.

The defendant next claims damages are speculative because a Virginia court might not override the "clear choices of two adult men."  Not so.  As a matter of law a Virginia court would find a 60% Trust concentration of Wachovia stock was not proper.  Had the Bank asked for aid and guidance and had the interests of WAK properly represented in such proceeding, a Virginia court would not condone such a severe violation of not only the prudent investor rule, but investment industry standards.  Also, Bank employees agreed a stock concentration in excess of 10% was improper.

### Impartial Treatment of WAK's Trust Interest.

Wachovia does not clearly identify Drew and WAK's interests in the Trust.  Until Drew's 2009 disclaimer, Drew was the primary remainderman and WAK was contingent remainderman.

9

Drew and WAK were also permissible distributees of Trust corpus, with WAK preferring conservative, diversified investing to safeguard future distributions but Drew, in conflict to this, preferring risky concentrated investing to maximize his presumed remainder. Consequently, the Bank had a duty of impartiality to balance these interests, including: (1) WAK's interest in preserving corpus into the future; and, (2) proper consideration of distributions to pay Drew's debt. Payment of Drew's debts incurred for his previous investment mistakes was of no benefit to WAK, and such indirect extension of credit to Drew only compounded the family's financial problems.

**Affidavits.**

Wachovia's summary judgment motion contains no deposition testimony by its employees, rather the Bank uses affidavits obtained on the last day of discovery after its employees were deposed. To the extent Wachovia uses in its motion affidavits to create conflicting versions of employees' testimony, the deposition testimony must prevail. *See Barwick v. Celotex Corp.*, 736 F.2d 946 (4th Cir. 1984), (explaining that the utility of summary judgment would be greatly diminished if a party who is examined at length could raise an issue of fact by submitting an affidavit contradicting his own prior testimony). Plaintiff used no affidavits and relies only on deposition testimony.

## II.   BREACH OF FIDUCIARY DUTY OF PRUDENCE

### A.   Uniform Prudent Investor Act Waiver

Rosalie Karo expanded the prudent investor rule to only permit retention of original investments so long as the Bank deemed retention advisable. *See Uniform Prudent Investor Act,* *Va. Code* § 26-45.3(B). The Karo Trust does not waive the prudent investor act as suggested by

10

Wachovia's reference to *Hoffman v. First Va. Bank of Tidewater*, 220 Va. 834, 263 S.E.2d 402 (1980). The Karo Trust powers provisions are far more restrictive than those in *Hoffman*.

In *Hoffman*, the testamentary trustee and executor were empowered to invest "without being restricted to those investments authorized by the statute in Virginia for the investment of trust funds" and to retain investments made by the grantor during her lifetime "as they may deem advisable."

The trustee alone was then further authorized to invest in any real or personal property "regardless of diversification" and without liability, for depreciation in value. The trustee sold some original assets and invested in real estate investment trusts (REITs) which became worthless. The beneficiaries sued the trustee for failing to invest prudently.

The Supreme Court upheld the trial court's demurrer, finding that the trust language waived the prudent investor rule. The court first noted that the executor and trustee powers authorized investment beyond Virginia's statutory list of authorized investments. However, the court found that the separate and exclusive grant to the trustee alone of the power to invest "regardless of diversification" was a "clear intent" to waive the prudent investor rule.

Once waived, the court noted that "to impose liability . . . it must be alleged and proved that the fiduciary acted dishonestly or in bad faith or abused the discretion vested in it." Importantly, the court noted that there could be no abuse of discretion because the trustees merely exercised the authorization expressly granted by the grantor in investing in REITs and otherwise not diversifying. The Court further noted that there was no allegation of a conflict of interest.

11

*Hoffman* is inapplicable to the facts of this case for the following four reasons discussed below: (1) the Karo Trust does not contain waiver language or the intent to waive; (2) *Hoffman* preceded the Uniform Prudent Investor Act and its provisions; (3) Wachovia abused its discretion by not selling Wachovia stock when it deemed it advisable to do so; and (4) it allowed a conflict of interest to affect its fiduciary duties to monitor, warn and protect the Trust.

First, the first clause of the Karo Trust investment powers (Article 3, Clause 1) identifies twelve separate powers. The first is the power to retain original investments. Unlike *Hoffman*, "diversification" is not mentioned nor is other language required to effect a waiver under the Prudent Investor Act (e.g., "speculative" investments). Therefore, that clause has limited application to the retention of original assets as long as the trustees consider retention advisable.

The next Karo Trust investment power clause authorizes the trustees to invest without being confined to investments "lawful through statute" in the state of Virginia. Like the executor and trustee powers in *Hoffman*, this only authorizes the trustees to invest beyond Virginia's legal list. The remaining investment language of that clause does not mention diversification or speculative investments, and, therefore, does not waive the prudent man rule. The remaining ten investment clauses give the trustees further authority over Karo Trust property but do not mention diversification or other language necessary to waive the prudent investor rule.

If Rosalie Karo had intended to waive the requirement for the trustee to diversify once original investment were sold, she could have directly referenced "diversification" or "speculative" investments but she did not. *See Wood v. U.S. Bank*, 828 N.E.2d 1072, 1077-80 (Ohio, 2005) (refusing to find a Uniform Prudent Investor Act waiver of the duty to diversify where the trust permitted the bank trustee to hold its own stock and did not mention

12

diversification). Therefore, the Karo Trust investment powers language only manifests an intention to expand the prudent investor rule to permit retention of original investments, not waive the rule entirely.

Second, Virginia adopted the Uniform Prudent Investor Act in 1999. It specifically permits a fiduciary to modify, expand or eliminate the prudent investor rule. As noted in the first clause of the Karo Trust, Rosalie Karo intended to merely modify the prudent manual to permit retention of original investments. As noted in authority cited by WAK in his summary judgment motion, this interpretation is supported in other case law concerning original investment retention. Therefore, Wachovia could retain an original investment so long as it deemed retention advisable. However, once it considered retention imprudent, it had a duty to diversify.

Third, Rosalie Karo's intent was to authorize the trustees to retain original investments so long as they deemed retention advisable. Therefore, Wachovia had discretion to retain such investment so long as it deemed it advisable to do so. Unlike the *Hoffman* trustee, Wachovia determined it was not prudent or advisable to continue holding the Wachovia stock concentration (60%) in 2001. Continuing to hold Wachovia stock under such circumstances and attempting to shift liability to the beneficiaries represented actions in a state of mind not contemplated by Rosalie S. Karo. *See Restatement (Third) of Trusts*, § 229 (1992) cmt. d (stating that a trustee's grant of discretion will not allow the trustee to act in a state of mind not contemplated by the settlor); *See Restatement (Third) of Trusts*, § 228 (1992) cmt. g.; *Restatement (Second) of Trusts* § 187 (1959) cmts. d, h, i and j (comment h states that a court will interpose where the trustee instead of exercising his judgment delegates the matter to the judgment of another). Therefore, Wachovia abused its discretion as trustee in failing to act according to its belief that it was in the

13

best interest of the Trust to sell the Wachovia concentration. *See Rinkers v. Simpson*, 159 Va. 612, 166 S.E. 546 (1932)(finding an abuse of discretion where a trustee refused to distribute funds for a beneficiary in necessitous circumstances from a trust established for exclusively for her needs); *see also Dillard v. Dillard*, 937 Va. 434, 34 S.E. 60 (1899).

Wachovia's memorandum at page 18 describes a higher standard for a finding of abuse of discretion (fraud, dishonesty and bad faith). However, the above authorities clearly state that a trustee, like Wachovia, abuses its discretion when it acts contrary to the intent of the settlor (Rosalie Karo) in not disposing of an asset (Wachovia stock) when it deemed it advisable to do so.

Fourth, Wachovia acknowledges a conflict of interest in the LORs in connection with the retention of Wachovia stock. As a result, it did not offer advice regarding the stock or otherwise monitor the stock and sought to shift responsibility for the stock holding to the beneficiaries. As stated in WAK's summary judgment memorandum, Wachovia had an over-arching duty to be prudent in connection with the holding of all assets in the Trust, including Wachovia stock. Further, Wachovia's incorrect understanding of its trustee duties to monitor, warn and protect in connection with Wachovia stock caused it to improperly shift all responsibility for the Wachovia stock to the beneficiaries. Therefore, *Hoffman* is inapplicable to the facts of this case. Even if there were a waiver, the Supreme Court states in *Hoffman* that a waiver will not protect against an abuse of discretion or conflict of interest.

Wachovia also suggests its reasonable reliance on the retention clause protects it from liability. *See Va. Code* §§ 26-45.3(B) and 55-550.06. There is no "reasonable reliance" on the Karo Trust retention language because Wachovia acted in direct contradiction of the Trust

14

language when it deemed it advisable to sell Wachovia stock but did not. Acting contrary to the grantor's intent cannot be the foundation for reasonable reliance. If the Bank relied in "good faith" on the retention clause, then why did it see the need to obtain LORs, which purportedly shielded it from liability, misrepresent its legal duties concerning Wachovia stock and seek indemnification against unborn beneficiaries from future claims?

**B.    Hirsh**

i.    <u>Facts and Holding</u>.    In *Hirsh*, trustees filed for aid and guidance to see if it was proper to continue holding a stock in light of a future merger of the underlying company. 209 Va. 630, 166 S.E.2d 286 (1969). The Trust prohibited the trustees from "selling, transferring or exchanging" the stock without beneficiary approval. The Trustees requested the Court to rule (1) that the sales restriction was inapplicable to the stock, and (2) the trustees had the authority to sell the stock as they deemed in the best interest of the beneficiaries. The lower court ruled that the stock in the new company was not substantially equivalent to the old and, therefore, the restriction on sale was no longer applicable and the trustees could sell the new stock as they deemed in the best interest of the beneficiaries. Two beneficiaries appealed.

In a case of first impression in Virginia, the Court adopted the New York case of *Mertz v. Guarantee Trust Company of New York* that a trustee is ordinarily under a duty to receive and retain new shares of a company following a merger that are subject to an authorization or direction to retain if they are substantially equivalent to the old ones. 274 N.Y. 137, 159 N.E. 888 (1928). *See also* Cross, Annotation, Construction and Effect of Instrument Authorizing or Directing Trustee or Executor to Return Investments Received under Such Instrument, 47 ALR 2d 176, § 12, p. 244 (citing *Mertz* as representative of New York's "reluctance to sanction the

retention of substituted securities"). The Court then reviewed the company changes from trust inception through the anticipated merger changes (a five year period) as follows: products and services, mergers and acquisitions, geographic areas of operation, capital structure (value of preferred stock, common stock and long term debt), number of stock holders, price to earnings and book value, directors and family control.

The Court found that the original stock was not substantially equivalent to the merged stock and that the testator's restriction on sale, transfer exchange is "not applicable" to the new stock.

Therefore, the Supreme Court upheld the lower court's finding that the trust sale restriction no longer applied and the trustees had the authority to sell the stock "as they may deem to be in the best interest of the beneficiaries of the trust." Therefore, in *Hirsh* the trustees took affirmative action in advance of a merger concerning the continued applicability of a stock trust retention direction clause. Unlike the *Hirsh* trustees, Wachovia took no affirmative action to determine if the retention clause continued to apply to Wachovia stock after the Wachovia/First Union merger.

      ii.    Application of *Hirsh*. Central National Bank in 1966 had the following characteristics: the products and services were limited to a trust department, local commercial lending, checking accounts, personal bank deposit products, and some credit extensions (Attached Exhibit 1, p. 7, 8, 9, 20), and the Bank had no credit card program (Attached Exhibit 2, WAK 1868); it operated ten branches in the City of Richmond and Henrico County (Ex. 2, WAK 1867, 1872); it had less than 1,750 shareholders (Ex. 2, WAK 1847); it had approximately 720,000 shares of capital stock outstanding, carried no long term debt and had no preferred stock

shares issued (Ex. 1, pp. 2, 6, 16-18 and Ex. 2, WAK 1847, 1857, 1859, 1861); the gross income was less than $10 million, net income less than $1.5 million, deposits were approximately $151,500,000, shareholder equity/capital accounts were approximately $18 million (Ex. 1, pp. 2, 6-7).[1]

Following the 2001 merger of First Union and Wachovia (Attached Exhibit 3, p. 18), the new Wachovia had the following characteristics: it offered general banking services, capital management, wealth management, corporate and investment banking, high yield debt and derivative products, operated one of the largest asset management and retail brokerage firms in the country, was the third largest provider of insurance annuities (Ex. 3, pp. 2, 4, 5-10); as the nation's fourth largest banking company, it operated 2,800 full service banking offices and 4,700 ATM machines in 11 east coast states and Washington, D.C. (Ex. 3, pp. 2, 3, 4, 11); as the fifth largest full service retail broker, the company offered full service brokerage in 49 states and global services in more than 30 international offices (Ex. 3, p. 2, 11); it had long term debt of $42 billion with additional note issuance of up to $45 billion for senior and subordinated notes (Ex. 3, pp. 3, 14-15) ; 1.4 billion common shares were outstanding with a shareholder equity of $28 billion and 96 million shares of preferred stock was outstanding for the fair value of $23 million (Ex. 3, pp. 14, 15, 17); it engaged in off balance sheet transactions consisting of derivatives, lending commitments and other asset securitization and credit facilities amounting to $228 billion (Ex. 3, pp. 15, 16); it had $14 billion in revenue, $1.6 billion in net income (Ex. 3, p. 3); it

---

[1] Attached Exhibits 1-3 are the 1966, 1969 and 2001 (portions) annual reports for Central National Bank, Central National Corporation and Wachovia Bank which are stipulated to by the parties. Wachovia admits at pp. 2-3 of its Memorandum that Central National Bank became Wachovia in a "number of mergers" so the merger history is not repeated.

had total deposits of $187 billion and $227 billion in assets under management (Ex. 3, p. 3, 9).
(Referenced pages of the 2001 Wachovia Annual Report are attached as Exhibit 3. However, the
full text of the report can be found on the internet at
http://www.Wachovia.com/common_files/2001AnnualReport.pdf )

The above banking information for 1966 and 2001 reveal that Wachovia was not
substantially equivalent to Central National Bank in 1966 in any manner. Therefore, as of the
September, 2001 merger, the retention clause no longer applied to the Wachovia stock. The
Bank had a duty to administer the stock under the Uniform Prudent Investor Act without
exception, thereby making its actions subject to the lesser breach of fiduciary duty standard, not
abuse of discretion. This included the duty to diversify the stock unless there were special
circumstances not to  which better served the Trust. *See Va. Code* § 26-45.5. Because
Wachovia thought it was proper and prudent to diversify the Trust and did so in 2001, including
the reduction of concentrations, it had a duty to sell the Wachovia stock and it breached its
fiduciary duty to the Trust and its beneficiaries by not doing so. Further, to the extent Wachovia
allegedly relied on the retention clause past 2001, its failure to properly inform Drew and Toney
Karo of the inapplicability of the retention clause negates any LOR signed by them.

3.   *Hirsh* Inapplicable by Trust Language and State and Federal Statutory
Law.

Recognizing that Wachovia stock is not substantially equivalent under Virginia
law nor is it  "now existing" as stated by Rosalie S. Karo in the Trust instrument, Wachovia
seeks to bootstrap its argument by saying that the Trust authorization to purchase stock in the
corporate trustee negates both the intention of the retention clause and *Hirsh*. To permit such a
purchase authorization to override Rosalie S. Karo's intent that only "now existing" investments

18

be retained would lead to an absurd result. Further, it would permit the continued retention of any Bank stock where the Bank succeeded in the role as Trustee, also a contrary intent to Rosalie S. Karo's wishes that only "non-existing" investments be retained. Such an interpretation is also contrary to *Hirsh* and its holding a direction to retain stock inapplicable. Wachovia's argument on this point fails as absurd and contrary to the Trust instrument and applicable law.

Wachovia reliance on the National Banking Act, 12 U.S.C. § 215a(e) and Va. Code § 6.1-36 are likewise inapplicable to obviate the Supreme Court's holding in *Hirsh*. Wachovia cites only one case, *Cannon v. Dixon*, 115 Fed. 2d 913, 915 (4th Cir. 1940) for the proposition that federal law somehow trumps *Hirsh* to make any bank stock investment a continued proper investment after a national bank merger. However, Wachovia's own authority (3 William F. Fratcher, Scott on Trusts, § 231.4 at 547 (4th Ed. 1988)) cites *Cannon* in footnote 2 for the proposition that new securities can only be held if they are substantially equivalent to the old ones.

In *Cannon*, a trustee failed to object or sell bank stock following a merger with a national bank. Thereafter, the stockholders were assessed under federal law and the trustee tried to avoid the assessment by arguing that state law did not permit the holding of the bank stock part merger because it was a change of investment in a trust fund which can only be approved by the trust instrument or court order.

The court noted that the trustee's "failure to object to the merger" and its "acceptance of the stock in the new bank" did not constitute a new investment, but continued the investment already held by the estate. Therefore, the trustee was a proper holder of the bank stock for purposes of federal liability of stockholders in national banks. The case does not stand

for the proposition that the bank stock was a proper investment under the trust at issue or that
South Carolina law might have required the trustee to sell the stock prior to the merger.  It only
applies to stockholder liability under federal statute.  Similar to Wachovia, the trustee in *Cannon*
might later have been found liable for not divesting the trust of the bank stock prior to the merger
or otherwise having a plan to dispose of the stock when it was no longer prudent to hold.

      The federal and state authority cited by Wachovia addresses whether a newly
merged institution may exercise the fiduciary powers held by the predecessor institution,
including rights of the previous institution as trustee where it is specifically named in trust
documents.  *See* IIA William F. Fratcher, *Scott on Trusts*, § 96.7 at 38, 41 (4th Ed. 1988) (see
footnote 3 identifying *Va. Code* § 6.1-33 to 6.1-44 as authorizing the merged bank to assume all
fiduciary relationships of the first bank).  Such statutes are not meant to override state common
law or the intent of a testator regarding the retention of specific investments nor has Wachovia
cited any case to that end.

## III.    BREACH OF FIDUCIARY DUTY OF LOYALTY

      WAK responds as follows regarding Wachovia's breach of fiduciary duty loyalty
allegations.

      **A.    Discretionary Distributions to Drew Karo**.  WAK alleges discretionary
distributions to Drew violate Wachovia's duty of loyalty and because distributions went to pay
down Wachovia debt and originated from communications with a "wealth manager" Fred Hall
who worked for the commercial and trust sides of the Bank and thereby owed a fiduciary duty to
Drew and the Trust. *See e.g., Conte v. U.S. Alliance*, 303 F. Supp. 220, 226-29 (D. Conn 2004)
(noting that a fiduciary relationship can develop where a bank employs "dual employees" who

work for different bank departments). The start of principal distributions to pay down Drew's Wachovia debt coincidentally occurred shortly after his 2006 meeting with Fred Hall, where Fred Hall for the first time learned that Drew could request principal distributions from the Trust. By placing itself in a position where its commercial interests (payments on its loans) conflicted with the interest of a beneficiary such as WAK, Wachovia violated its duty of loyalty to the Trust and the burden shifts to it to show it receive no benefit from the transaction. *See Rowland v. Kable*, 174 Va. 3434, 65 E. 2d 633 (1940); *Ledbetter v. First State Bank & Trust Co.*, 85 F.3d 1537 (1996). However, the facts referenced by WAK in his summary judgment memorandum clearly state Wachovia received an advantage in the pay down of its loans and thereby engaged in self-dealing with Trust property.

**B.     Toney Karo as Participating Co-Trustee.** Wachovia cites no documents or other information stating that it met face to face with Toney Karo over the last thirty years. During the 1980s and 1990s, Wachovia attaches only three documents signed by Toney Karo. From 2000 to present, Wachovia identifies thirteen documents signed by Toney Karo, all obtained by Drew at the request of the Bank. Faye Harris is the only Wachovia employee to speak with Toney Karo since 2000, that being one occasion when Toney Karo had a problem with the oil in his home. The Bank did not communicate directly with Toney regarding his understanding of documents he signed. Wachovia relied exclusively on Drew Karo concerning such understanding. It is disingenuous for Wachovia to now claim that Toney was a participating trustee in a meaningful and knowledgeable fashion. Toney's signature was only obtained because Drew Karo was requested to obtain it. Therefore, Wachovia failed to exercise the level of care and diligence required of a professional co-trustee in communicating and managing trust

21

administration matters with the co-trustee and thereby breached its fiduciary duty of loyalty to the Trust.

C.    **Conflict from Holding Wachovia Stock.**  WAK does not allege that Wachovia breached its duty of loyalty by holding Wachovia stock or that it had a duty to provide "insider information" about the Wachovia stock.  It is Wachovia's representations that it could not provide information regarding the Wachovia stock or monitor, advise or warn concerning the stock and its actual failure to monitor, advise and warn  that results in its breaching its fiduciary duty of loyalty to the Trust.  *See Loring, A Trustees Handbook*, § 6.1.3.2 (describing the affect of factual and legal misrepresentation by the Trustee concerning retention of its own stock).  As stated by WAK in his summary judgment memorandum, a trustee has an over-arching duty to be prudent and to monitor, warn and protect the Trust even if it holds its own stock.  *See Va. Code* §§ 55-548.01, -548.04 and 548.06; *Restatement (Second) of Trusts* § 173; *Loring, A Trustee's Handbook* § 6.1.3.2 (2009 ed.); *Scott and Asher on Trusts* §§ 19.3.2, 19.3.3 (5th ed.); *Robertson v. Central Jersey Bank & Trust Co.*, 47 F.3d 1268, 1279-1276 (1995) (bank trustee is required to exercise due diligence regarding retention of its own stock in trust even if a trust inception asset); *Spragins*, 515 So.2d at 964-65 (considering the trustee's duty of loyalty of a trust containing its own stock).  Thus, express language in the governing instrument authorizing the trustee to retain its own stock as an "inception asset" cannot relieve the trustee of its duty to monitor the investment and attempt to prevent a breach of trust.  *Accord, Rollins v. BB&T*, 56 Va. Cir. 147 (2001). If Wachovia thought that it had or developed at some point a conflict of interest that prevented it from administering Wachovia stock, it should have resigned.  It was inappropriate and legally incorrect to represent to Drew in the LOR that it could not monitor or manage the

22

Trust's Wachovia stock. Therefore, because the LORs are premised on misrepresentations to trust beneficiaries and seek to shift liability/responsibility to the beneficiaries based upon such misrepresentation, they are void and should be set aside. *See* Faye Harris affidavit, paragraph 27 found at page 206 of Wachovia's Appendix to its Memorandum in Support of Summary Judgment. (stating that she explained to Drew in connection with the LOR's "that the corporate trustee could not monitor or provide advice about" Wachovia). Interestingly, Wachovia states "it is fundamental that a corporate trustee has a duty not to offer advice on the fundamentals of its own stock", yet it offers no cases in support.

D.    **Failure to Act as Sole Trustee.** The Karo Trust provides in Article 4, Clause 3 that at any time a trustee should fail or cease to act, the other trustee is possessed with all trustee duties alone. Except for three signatures in the 1980s and 1990s, Wachovia knew Toney Karo was not and would not participate as co-trustee. Notwithstanding its use of Drew to obtain Toney's signature since 2000, Wachovia has been acting as sole trustee since 2000 based upon Toney's failure to act. It alone bears responsibility for the loss of Wachovia stock value.

E.    **Failure to Seek Aid and Guidance.** Wachovia states that it could "only act to diversify the account to the extent Toney agreed." That is incorrect. Like the *Gray* case, Wachovia could have gone to court to obtain guidance regarding its belief that it was imprudent to continue holding Wachovia stock. It did not do so. Further, like the trustees in *Hirsh*, Wachovia could have voluntarily gone to court in advance of an anticipated problem such as the continued applicability of a stock retention clause following a merger. Again, it did not. Wachovia states there is no authority obligating it to go to court, yet it cited the *Restatement (Second) Trusts* § 184, cmt. c for authority obligating it to go to Court in the *Gray* case. *See*

23

*Gray* complaint, Ex. D-2A, paragraph 12, to WAK's summary judgment memorandum. It is estopped to now take a contrary position.

A fiduciary who acquiesces to a co-trustee's failure or refusal to act is liable for any resulting loss. *See First & Merchants v. Bank of Waverly*, 170 Va. 496, 197 S.E. 462 (1938); 19 *Michies Juris, Trusts and Trustees*, § 108 (1991). Finally, Wachovia cites *In re Trust of Emanual Rosenfeld*, 2004 Phila. Ct. com. Pl. Lexis 130 (Ct. Com. Pl. May 19, 2004) for the proposition that a trustee does not have to seek aid and guidance because it did not have authority to override a deadlock with co-trustees. There, Wachovia was co-trustee with three other trustees under a trust instrument that specifically required majority vote for the exercise of certain powers. Because the settlor required a majority, the normal deadlock provisions did not apply. Here, because Wachovia was one of only two trustees, it was in a deadlock situation and had a duty to go to court as it did in the *Gray* case.

Wachovia's Karo Trust administration was insensitive to its duty of loyalty for the following reasons: (1) it engaged in self dealing by "discretionary distributions" to/through Drew Karo for payment of the Bank's debt; (2) it failed to communicate with its co-trustee; (3) it improperly delegated Toney's co-trustee functions and matters of judgment to Drew, an inexperienced and self-interested beneficiary; (4) it treated Drew as co-trustee; (5) it misrepresented its fiduciary duties to the beneficiaries in LORs seeking a release and indemnification based thereon; (6) it failed to seek court guidance upon its deadlock with Toney concerning investments; (7) it failed to consider and balance WAK's Trust interest in investment matters, diversifying out of Wachovia stock; and, (8) failed to consider/develop an investment plan for the Trust for twenty years (leaving the Trust in six stocks), and when developed, it failed

24

to diversify the Wachovia stock (60% of the Trust). The Bank's continuous actions in placing its interests before the Trust, and failure to otherwise properly administer the Trust constitute a breach of its duty of loyalty.

## IV.    VIRTUAL REPRESENTATION

### Introduction.

This matter concerns failure of the Bank's fiduciary responsibilities, not the carefully considered planning by Drew and his family in late 2008. As explained previously, Drew agreed with the Bank to either terminate and/or amend the Trust to obtain assets for the support of his father; and he later executed disclaimers to minimize creditors' seizure of future Trust assets for his son, WAK. These sound planning steps were not "bootstrap maneuvers", "attempted cleverness" or an attempt to "subvert equity". In many respects, they were occasioned by Wachovia's massive business failure, and were suggested and/or participated in by the Bank and its attorneys.

### Doctrine of Virtual Representation.

The Bank defines the doctrine of virtual representation (doctrine), but it must be remembered and emphasized that for the doctrine to apply under *Va. Code* § 55-543.03 or .04 there must be no conflict of interest between the representor and representee. *Va. Code* § 55-543.01 explains the affect of the rule, not the rule itself. The Bank's reference to *Restatement (Third) of Trusts* § 97, Draft No. 5, 2009 adds little to the beneficiary waiver/release doctrine, and appears a logical extension to add virtual representation. It is a draft proposal (2009), and must obtain approval by various professional groups over the next two to three years. The rule

now is only a draft/suggestion. The Bank says the doctrine existed at common law, but this was so only in litigation proceedings, not in a transactional context.

## Conflict/Hostility Between Drew and WAK.

The Bank speculates Drew "had every economic incentive" to protect both his and WAK's interests, but overlooks the fact that Drew did not protect WAK. By advocating and insisting the Trust maintain a severe over-concentration he acted diametrically opposite to the reasonable position of a remainderman who would want diversification. It is not enough to analyze whether the representor has "an incentive to act" for the representee. As all cases cited by the Bank make clear, it is the actual existence of a conflict that determines applicability of the doctrine.

Plaintiff maintains Drew's non-diversification position, as well as his interest in substantial corpus distributions (partially terminating the Trust), were in direct conflict and in opposition to a remainderman who would want a trustee to responsibly preserve his future assets. While Drew might have been "entitled" to represent WAK, he could not do so because there existed a conflict of interest on non-diversification and Trust distributions. Drew was also advocating violation of the prudent investor rule (diversification), a breach of trust no remainderman would reasonably expect to be advanced on his behalf.

The Bank says Drew as father was entitled to represent his son. To the contrary, *see Matter of Gutterman*, 75 App. Div. 2d 699, 432 N.Y.S. 2d 511 (1980) holding family kinship should be accorded little weight in virtual representation for fear of a parent's paternalistic entitlement attitude.

26

To explain the existence of a conflict, Plaintiff suggests application of (Motion Memorandum at page 23, 24) the hostility test suggested (and condensed from various authorities) by Professor Begleiter ("Serve the Cheerleader . . .") as follows:

> Are the economic interests of the representor and the representee in the proceeding such that the representor is likely to make the same arguments the representee would make if the representee were a party to the proceeding?

Upon any reasonable application of this test to the Karo facts, Drew cannot be assumed to have advanced a breach of trust/non-diversification argument for his son.

For Virginia authority explaining "hostility" in an equity (sale of remainder interest) proceeding, see *Turner v. Barraud*, 102 Va. 324, 46 S.E. 318 (1904) which found an unrepresented party was not before the court under the doctrine of virtual representation because the parent's interest in the matter was "hostile" to its minor child.

Other elements of "hostility" existed between Drew and WAK to deny application of the doctrine: (a) Va. Code §§55-543.03 and .04 prohibits a presumptive remainderman (Drew) from representing an alternative remainderman (WAK) on trust termination issues because a distribution of principal is a form of partial trust termination. *See* UTC §304 (comments explaining), and *Loring*, id, at §8.41; (b) Drew's insistance on the Trust holding the Wachovia overconcentration for income at the risk of principal (because Trust income would substantially decline after payment of taxes and diversification of investments); and, (c) the Bank's LOR admission it could not bind a minor, and for this risk of non-representation requested from Toney and Drew a release and indemnity. This strongly implies the doctrine was not applicable because of a hostility or lack of similarity of interests between Drew and WAK.

27

The Bank attempts to eliminate "hostility" between Drew and WAK because they both had an interest in the Trust's investments is a non-sequitur on the order of: "All people have an interest in living." This rhetorical device simply does not follow, and fails to distinguish the careful distributions and analysis of "hostility" illustrated above.

**Authorities Distinguished.**

Defendant cites in this, and its previous memoranda, cases which do not support its virtual representation position:

1.      In *Estate of Lange*, 75 N.J. 464, 383 A.2d 1130 (1978), the court found virtual representation applicable in a litigation proceeding, holding *ultra vires* loans by a trustee served the interests of all present and future beneficiaries because the trustee loans sought to avoid an unfavorable tax result to the trust. Thus, *Lange* does not support the Bank's application of the doctrine because the court found no conflict between present and future trust beneficiaries.

2.      In *Estate of Putignano*, 82 Misc. 2d 389, 391 (N.Y. Sur. Ct. 1975) the court found in a court proceeding that present and future interests were identical and "adequately represented" (i.e., no conflict) in the proceeding. Note also this was a proceeding/judicial matter, not a transactional case.

3.      *Byer v. First National Bank*, 843 P.2d 53 (1992) approved application of the doctrine finding consent by adult beneficiaries to alteration of a trust investment policy exonerated the trustee because the adults were deemed to have acted in their children's interests. In *Byer*, the trust instrument granted authority to beneficiary parents (a very unusual trust provision) to act on behalf of their children. Thus, *Byer* is clearly distinguished and not authority in Karo.

28

4.    *In re Perkins Trust Estate*, 17 A. 255 (1934) found contingent remainderman bound by investment decisions directed and approved by an income beneficiary, but the life tenant had a general power of appointment the court found equivalent to a fee simple interest in the trust. In short, the remainderman had no rights higher than those of the controlling life tenant (fee simple). This case is distinguished from the Karo facts, and not applicable.

5.    *Estate of Fuller*, 291 NYS 2d 455, 57 Misc 2d 174 (1968) the court found, in a probate proceeding, virtual representation applicable because the remainder interests at issue were "adequately represented," another way of saying (as the court did): "There is no conflict." This case is distinguished from Karo in two ways: it is a judicial proceeding (not transactional); and, it finds adequate representation of the represented interests.

6.    *In re Estate of Abrams*, 662 NYS 2d 760, 292 AD 2d 450 (1997) (Slip Opinion 7480) held in a trust funding proceeding virtual representation proper because income and remainder interests were identical and not in conflict. Again a "proceeding" authority, and the court's finding of no conflict.

7.    *Paris v. Citizens Bank, Etc. Co.*, 172 Va. 111, 128, 200 S.E. 652, 658 (1939) is cited for the proposition that a beneficiary can consent to an action resulting in a loss. Drew's consent to the Wachovia stock concentration does not bind WAK because: (1) the LORs misrepresent Wachovia's legal duty to communicate with the co-trustee and beneficiaries regarding the continued quality, suitability and potential increase or decrease in the value of the Wachovia stock; (2) the LORs failed to disclose that when Wachovia was in a deadlock situation it had a duty to seek court guidance, instead of shifting responsibility to Drew and Toney; (3) Wachovia's management policies required a separate signature line on behalf of WAK to be

29

bound; (4) WAK could not be virtually represented by Drew prior to 2006; and, (5) because prior LORs were before 2006, it was inappropriate to defeat WAK's rights by incorporation of prior provisions LOR in the 2007 (last) LOR.

**Conclusion.**

For the reasons stated above, WAK moves the Court to deny Wachovia's Motion for Summary Judgment.

Respectfully submitted,

W.A.K., II, a minor,

By_____/s/_____
                 Joseph E. Blackburn, Jr.

_____/s/_____
Joseph E. Blackburn, Jr., Esquire
Virginia State Bar #13744
*Counsel for Plaintiff*
Blackburn, Conte, Schilling & Click, P.C.
300 West Main Street
Richmond, VA 23220
Telephone (804) 782-1111
Facsimile (804) 648-3914
E-mail: joeblackburn@bcscpc.com

Bowlman T. Bowles, Jr., Esquire (VSB #05268)
Churchill G. Bowles, Esquire (VSB #42619)
*Counsel for Plaintiff*
Bowles & Whitehead, PC
P. O. Box 12085
404 W. Franklin Street
P. O. Box 12085
Richmond, VA 23241-0085
Telephone (804) 780-0236
Facsimile (804) 780-9134

30

## CERTIFICATE

I certify that on March 26, 2010, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system which will then send a notification of such filing (NEF) to the following:

D. Alan Rudlin, Esquire, (VSB# 17010)
William P. Childress, Esquire, (VSB #72823)
*Counsel for Defendants*
Hunton & William LLP
Riverfront Plaza, East Tower
951 E. Byrd Street
Richmond, VA 23219
Telephone (804) 788-8200
Facsimile (804) 788-8218
E-Mail: arudlin@hunton.com
E-mail: wchildress@hunton.com

Paul M. Curley, Esquire, (VSB# 43974)
*Counsel for Third-Party Defendant*
Canfield Baer, LLP
2201 Libbie Avenue, Suite 200
Richmond, Virginia 23230
Telephone (804) 673-6600
Facsimile (804) 278-9530
E-Mail: pcurley@canfieldbaer.com

                                                    /s/
                                    Joseph E. Blackburn, Jr., Esquire
                                    Virginia State Bar #13744
                                    *Attorney for W.A.K., II, a minor*
                                    Blackburn, Conte, Schilling & Click, P.C.
                                    300 West Main Street
                                    Richmond, VA 23220
                                    Telephone (804) 782-1111
                                    Facsimile (804) 648-3914
                                    E-mail: joeblackburn@bcscpc.com

31

Westlaw.

Not Reported in F.Supp.2d, 2010 WL 3074393 (E.D.Va.)
(Cite as: 2010 WL 3074393 (E.D.Va.))

Page 1

**H**
Only the Westlaw citation is currently available.

United States District Court, E.D. **Virginia**,
Richmond Division.
W.A.K., II, A Minor, by Page S. **KARO**, His Next
Friend, Natural Guardian and Mother, Plaintiff,
v.
WACHOVIA BANK, N.A. et al., Defendants.

Civil Action No. 3:09CV575–HEH.
Aug. 5, 2010.

West KeySummary**Trusts 390** ⬅➤**268**

390 Trusts
   390IV Management and Disposal of Trust Property
      390k245 Actions Between, By, or Against Trustees
         390k268 k. Costs. Most Cited Cases
     Bank attorneys' vigorous defense of a novel claim
related to bank's alleged breach of fiduciary duty related
to an inter vivos residual trust, which was decided
without trial, did not justify attorneys' claim for 2,418.6
hours for attorney fees. Thus, a 15% reduction of the
hours claimed by the attorneys would be within the
bounds of reason. The case, although without
significant case law, lasted less than a year and involved
less than three hours of oral argument. **Virginia** Code
section 55–550.04.

Churchill G. Bowles, Bowles Affiliates PC, Joseph Earl
Blackburn, Jr., Blackburn Conte Schilling & Click PC,
Richmond, **VA**, for Plaintiff.

William Paul Childress, III, David Alan Rudlin, Hunton
& Williams LLP, Richmond, **VA**, for Defendants.

*MEMORANDUM OPINION*
**(Motion for Determination of Recoverability of
Attorneys' Fees)**
HENRY E. HUDSON, District Judge.
    Pursuant to the Court's Memorandum Opinion of
July 19, 2010, this matter is before the Court for

determination of the amount of costs, expenses, and fees
due to Defendant/Third–Party Plaintiff Wachovia Bank
N.A. ("Wachovia"). In the Court's previous opinion, the
Court found that an award of attorneys' fees to
Wachovia from the **Karo** Inter Vivos Residual Trust
("Trust") was appropriate pursuant to **Virginia** Code
section 55–550.04.

*I.*

    In the underlying claim, Plaintiff W.A.K. II
("W.A.K."), a minor and remainderman under the trust
agreement, sought to recover damages from Defendant/
Third–Party Plaintiff Wachovia Bank N.A.
("Wachovia"), a co-trustee, for an alleged breach of
fiduciary duty. On May 12, 2010, the Court granted
summary judgment on the underlying claims in favor of
Wachovia. Wachovia now seeks to recover its
associated fees, costs, and expenses from the Trust
pursuant to **Virginia** Code § 55–550.04.[FN1] In the
Court's July 19, 2010, opinion, the Court found that
Wachovia was permitted to recover its reasonable fees,
costs, and expenses from the Trust but deferred
determination of the amount due. Both sides have filed
briefs in support of their respective positions as to the
amount recoverable, and the Court heard oral argument
on July 27, 2010.

    FN1. Section 55–550.04 states in pertinent part:

        In a judicial proceeding involving the
administration of a trust, the court, as justice
and equity may require, may award costs and
expenses, including reasonable attorneys'
fees, to any party, to be paid by another party
or from the trust that is the subject of the
controversy.

    Va.Code § 55–550.04.

*II.*

    **Virginia** Code section 55–550.04 states that
attorneys' fees, if awarded, are limited to "reasonable
attorneys' fees." [FN2] In determining what amount is

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2010 WL 3074393 (E.D.Va.)
**(Cite as: 2010 WL 3074393 (E.D.Va.))**

reasonable, the Court "must first determine a lodestar figure by multiplying the number of reasonable hours expended times a reasonable rate." *Robinson v. Equifax Info. Svcs.,* 560 F.3d 235, 243 (4th Cir.2009). The Fourth Circuit has set out twelve " *Johnson* " factors to guide a district court in determining a reasonable number of hours and rate:

> FN2. W.A.K. argues that the amount of fees recoverable from the Trust can be set using equitable considerations, focusing on statute's use of the phrase "as justice and equity may require." Va.Code § 55–550.04. The Court finds that under a plain reading of the statute, equity is only a factor as to whether fees are awarded from a trust. If awarded, the amount of fees recoverable is guided by a reasonableness determination.

(1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases. *Spell v. McDaniel,* 824 F.2d 1380, 1402 n. 18 (4th Cir.1987).[FN3] "After determining the lodestar figure, the court then should subtract fees for hours spent on unsuccessful claims unrelated to successful ones." *Robinson,* 560 F.3d at 244 (citations omitted). Lastly, the Court then "awards some percentage of the remaining amount, depending on the degree of success enjoyed by the [fee applicant]." *Id.* (citations omitted).

> FN3. Wachovia argues that **Virginia** law controls in determining the reasonableness of attorneys fees. The Court believes that the

federal standard and the **Virginia** standard are so similar that use of the federal standard for "simplicity and straightforwardness" is warranted. *In re Abrams & Abrams,* 605 F.3d 238, 244 (4th Cir.2010).

*A. Johnson Factors*

*1. Time and Labor Expended*

"The party seeking an award of fees should submit evidence supporting the hours worked...." *Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). Excessive, redundant, and unnecessary hours should be excluded from the fee award. *Id.* at 434.

In support of its request, Wachovia has submitted billing records supporting a claim for 2,418.6 hours. This total consists of 828.9 hours billed by attorney Alan Rudlin, 1195.9 hours billed by attorney William Childress, and 393.8 hours billed by paralegal Benjamin Sherman. Wachovia argues that this number of hours was appropriate given the novelty and complexity of the controlling issues, the number of interrogatories and requests for production from the Plaintiff, the amount of documents to view in the case, and the number of depositions. Wachovia also filed two motions to exclude evidence and two motions *in limine* that the Court never ruled on because the case did not go to trial. Wachovia removed the case from state court, filed a motion to dismiss that was denied in large part, and succeeded at the summary judgment stage. The state action was filed on August 13, 2009, and summary judgment was entered in Wachovia's favor on July 19, 2010.

W.A.K. argues that the number of hours claimed by Wachovia is excessive for several reasons. W.A.K. contends that Wachovia "wasted time" on objections to interrogatories and document requests, particularly those that Wachovia was required by the Uniform Trust Code to produce. W.A.K. argues that such jousting over discovery was needless.

According to their affidavits, the attorneys for

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3074393 (E.D.Va.)
(Cite as: 2010 WL 3074393 (E.D.Va.))

Page 3

Plaintiff estimate that they spent approximately 1,100 hours on this case. They argue that their Wachovia counterparts overworked the case by expending more hours than was necessary. Wachovia contends that this case carried special significance because of the threat to its reputation as a fiduciary and the precedent it would set for similar litigation. On the other hand, W.A.K. counters that it should not have to bear the burden of paying for the costs of litigation attributed to preventing other lawsuits. While impugning Wachovia's reputation as a fiduciary was not W.A.K.'s intended goal in filing this lawsuit, such litigation, however, certainly had that foreseeable consequence. Moreover, it is equally logical that a significant adverse ruling would in all likelihood invite other similar litigation.

## 2. Novelty and Difficulty of the Questions Raised

Wachovia claims that the issues presented in this case raised complex issues of first impression, justifying the number of hours expended. Wachovia argues that it was litigating in uncharted waters as very few cases have addressed fiduciary duties under the Uniform Trust Code. Wachovia also lays the blame on Plaintiff for raising novel and "tenuously supported" theories of liability that took time to unravel and research.

W.A.K. takes a much different stance, arguing that fiduciary litigation is a far less complex area of law than Defendant contends. W.A.K. submits that the case was "simple and straightforward" and was "hardly 'intensive litigation.' "

As noted by the Court at oral argument, this litigation was complex, but not of the highest order. As seen in the Court's opinions, the issues turned largely on interpretation of the Trust agreement and disclosure/ waiver letters squared against the language of the Uniform Trust Code. The complexity of the analysis was heightened by the scarcity of caselaw guiding the application of the Trust Code. Although some of the legal issues addressed were intricate, the case did not merit placement in the highest percentile of complexity.

## 3. Skill Required to Properly Perforin the Legal Services Rendered

Wachovia argues that this was a challenging case to defend in large measure because of the unusual nature of Plaintiff's claims. The bank points out that a number of issues required the assistance of experts to fully grasp. For this reason and the arguments above, Wachovia believes this factor supports their fee request.

Plaintiff contends that the issues raised were fairly commonplace and did not require any specialized skill other than that typically required of commercial litigators. It should not be compared to patent or bankruptcy cases that require heightened skill and experience, as Wachovia suggests.

The Court again sees merit in the arguments raised by both sides. While this case was complex and necessitated the presence of experienced litigators on both sides, it did not require unique skill or experience.

## 4. The Attorneys' Opportunity Costs in Pressing the Instant Litigation

Wachovia states that case preparation required substantial time and that work on this case precluded the attorneys from working on other matters. The Court has no evidence to the contrary, and this factor weighs in favor of finding the requested fee reasonable.

## 5. The Customary Fee for Like Work

"[T]he burden rests with the fee applicant to establish the reasonableness of a requested rate." *Plyler v. Evatt,* 902 F.2d 273, 277 (4th Cir.1990). The applicant must produce evidence, in addition to his own affidavits, of the prevailing rate in the specific market for the type of work performed. *Id.*

In the present motion, Wachovia requests $595 per hour for the work performed by Alan Rudlin, the partner heading the litigation team, $270 to $320 per hour for the work performed by Bill Childress, the associate assigned to the case, and $128 per hour for work done by Benjamin Sherman, the paralegal. In support of these hourly rates, Wachovia submitted billing records for the two attorneys, affidavits from the two attorneys, and affidavits from Steven E. Baril, Esq. and James C. Roberts, Esq., two litigators practicing with other law firms in Richmond. Baril stated that the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3074393 (E.D.Va.)
**(Cite as: 2010 WL 3074393 (E.D.Va.))**

rates for Rudlin, Childress, and Sherman were "within the prevailing market rates" for attorneys and paralegals in the Richmond area with their respective levels of experience. Baril Decl. ¶ 28. Roberts stated that the rates for Rudlin and Childress were "reasonable and consistent with the rates charged by attorneys in this area during the relevant periods possessing the background, skill, and specialized experience of these attorneys for handling large civil cases of this nature." Roberts Decl. ¶ 11. Wachovia also submitted a declaration of Mr. Rudlin stating that the rates charged to Wachovia in this case were discounted from his, Mr. Childress's, and Mr. Sherman's usual rates of $695–$710, $375, and $175, respectively. Rudlin Decl. ¶¶ 4–5. As noted by Wachovia, the rates charged to paying clients by the petitioning attorneys can assist a court in determining the prevailing market rate. *Rum Creek Coal Sales, Inc v. Caperton,* 31 F.3d 169, 176 (4th Cir.1994). Wachovia also submitted evidence of fee awards in three bankruptcy cases in the Eastern District of **Virginia**, Richmond Division, that approved hourly rates in excess of those claimed by Rudlin and Childress.

In response, W.A.K. submitted declarations of the three attorneys who represented W.A.K. in the immediate case—Bowman T. Bowles, Jr., Churchill G. Bowles, and Joseph E. Blackburn. The three attorneys stated that, although they handled this case on a contingency fee basis, their standard hourly rates are $300 per hour, $150 per hour, and $300 per hour, respectively. W.A.K. also asks the Court to follow the decision in *Grissom v. The Mills Corp.,* 549 F.3d 313 (4th Cir.2008), which dealt with an award of attorneys' fees in an whistle-blower retaliation case in northern **Virginia**. *Id.* at 321–24. This Court's analysis, however, must be focused on the present-day prevailing rates for this type of case in the Richmond area, *Plyler,* 902 F.2d at 277, so comparison to the rates set in *Grissom* would be of limited value.

The Court believes that while the rates charged in this case appear to be high, Wachovia has met its burden of demonstrating that the rates charged by its attorneys are consistent with the prevailing rate in the

Richmond area for this type of legal work. The Court notes the absence of any evidence from Plaintiffs other than their own rates to counter the fees claimed by Wachovia's attorneys in their supporting affidavits.

**6. The Attorneys' Expectations at the Outset of the Litigation**
        Wachovia states that it intended, from the outset of the case, to recover its attorneys' fees from the Trust. Any attorneys' fees not recovered as a result of these proceedings, or from the third-party defendant Drew **Karo**, will presumably be paid by Wachovia. As such, the attorneys' expectation to be paid their full fee will be realized regardless of the Court's decision here. Accordingly, this factor carries no weight in determining the reasonableness of the fee.

**7. The Time Limitations Imposed by the Client or Circumstances**
        This factor is not relevant as applied to this case.

**8. The Amount in Controversy and the Results Obtained**
        "[T]he most critical factor in determining the reasonableness of a fee award is the degree of success obtained." *Doe v. Chao,* 435 F.3d 492, 506 (4th Cir.2006). Plaintiffs' suit sought recovery of more than $3 million. The Court granted Wachovia's motion for summary judgment, finding that Wachovia did not violate its duties as a trustee. The Court also granted Wachovia's motion to dismiss Plaintiffs' requests for punitive damages and a temporary restraining order. Although several parts of their motion to dismiss were denied, Wachovia eventually prevailed on all critical issues that were extensively litigated. [FN4] These considerations weigh in favor of finding the requested fee reasonable.

> FN4. Count III of the amended complaint that sought removal of Wachovia as a trustee was dismissed by consent of the parties.

**9. The Experience, Reputation, and Ability of the Attorneys**
        As Baril and Roberts' declarations attest, Alan Rudlin's excellent reputation within the legal

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3074393 (E.D.Va.)
**(Cite as: 2010 WL 3074393 (E.D.Va.))**

community is beyond dispute. This is further supported by the declarations of Rudlin and Childress outlining their impressive credentials. Their handling of this matter was skillful and professional. This factor weighs in favor of finding the requested rates reasonable.

*10. The Undesirability of the Case within the Legal Community*
There is no reason to conclude that this was an undesirable case. This factor is thus not relevant.

*11. The Nature and Length of the Professional Relationship Between Attorney and Client*
This factor has no material relevance in this case.

*12. Attorneys' Fees Awards in Similar Cases*
Because of the novelty of the issues, Wachovia submits that there are very few cases similar to this one. Wachovia does submit, however, that the fee requested here is consistent with other complex cases within the Fourth Circuit, submitting two cases for comparison. On review, the Court finds these cases distinguishable for a number of reasons. First, Wachovia points to *ABT Building Prods. Corp. v. Nat'l Fire Ins. Co. of Pittsburgh,* 472 F.3d 99 (4th Cir.2006), where the Fourth Circuit affirmed an award of nearly $2 million. As noted in the Fourth Circuit opinion, this case involved "nearly three years of extensive pre-trial proceedings" and resulted in a nine day jury trial with sixteen witnesses. *Id.* at 104. Wachovia also draws the Court's attention to *Loudermilk Services, Inc. v. Marathon Petroleum Co.,* 623 F.Supp.2d 713 (S.D.W.Va.2009), where the district court awarded $4.25 million in attorneys' fees. That case was a class action lawsuit that resulted in a $25 million settlement, and the attorneys' fees were taken from the settlement amount. *Id.* The *Loudermilk* court adopted a "hybrid" method for calculating attorneys' fees that started with a percentage of the class fund that is checked against a "rough lodestar analysis." *Id.* at 717. As Judge Goodwin noted, the attorneys billed over 20,000 hours, *id.* at 725, the case was litigated over the course of five years, and "was one of the most lengthy and complicated cases [he had] seen in [his] 12 year tenure on the federal bench." *Id.* at 721. The same cannot be said of the present case. This case lasted less than a year and involved less than

three hours of oral argument and no trial on the merits.

*B. Analysis*
Taking into account the twelve *Johnson* factors, the Court finds first that Wachovia has met its burden of establishing that the hourly rates it requested are consistent with the prevailing rates in the Richmond area for this type of legal work. This determination is based, in large part, on the representation by Wachovia that it would have paid this rate even if the fees not recoverable. The affidavits presented by Wachovia also support their contention that their quoted hourly rates are typical of what attorneys charge in this area for this type of legal work. Although the burden rests with Wachovia, W.A.K. has failed to provide any evidence to the contrary.

The Court additionally finds that the number of hours claimed by Wachovia is a bit excessive considering the nature of the litigation and the stage at which it was resolved. As the Court noted above, this was complex litigation, but not of the highest order. The case did not go to trial and consisted of only a few relatively short hearings before summary judgment was granted. As Judge Cacheris commented in a case decided last year, "[t]he Court believes that it would be quite unusual to award attorneys' fees approaching $900,000 for a case that did not require a full trial on the merits." *Corinthian Mortg. Corp. v. ChoicePoint Precision Mktg., LLC,* No. 1:07CV832, 2009 WL 36606 (E.D.Va. Jan. 5, 2009). The same observation applies to the case at hand.

Although the claims presented in this care were atypical, Wachovia failed to point out any fee awards in other cases arguably similar to this one. The two cases cited by Wachovia both consisted of extensive, multi-year litigation and cannot be reasonably compared to the present case. The Court agrees with W.A.K. that the vigorous manner in which the Wachovia attorneys litigated the case contributed in part to a somewhat excessive number of billable hours. The Court finds that a reduction of the hours claimed by Wachovia's attorneys of 15 percent will bring the hours expended on this case within the bounds of reason.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3074393 (E.D.Va.)
(Cite as: 2010 WL 3074393 (E.D.Va.))

The Court also believes that many of the fees charged for tasks performed by Mr. Sherman, the paralegal in this case, are not properly recoverable. As the Supreme Court stated, "purely clerical or secretarial tasks should not be billed at a paralegal rate, regardless of who performs them." *Missouri v. Jenkins by Agyei*, 491 U.S. 274, 288 n. 10, 109 S.Ct. 2463, 2472, 105 L.Ed.2d 229 (1989). Among the tasks reported by Mr. Sherman were making deliveries to attorneys, opposing counsel, and the Court, gathering rates for court reporters, and filing documents. After careful review of the records submitted by Wachovia, the Court believes a reduction of the hours attributed to Mr. Sherman should be reduced by 25 percent to account for clerical tasks to reach a reasonable number of hours.

These reductions yield the following lodestar calculations:

|  | Requested Hours | Adjusted Hours | Rate | Total |
|---|---|---|---|---|
| Alan Rudlin | 828.9 | 704.6 | $595 | $419,237 |
| William Childress | 827 | 703 | $270 | $189,810 |
|  | 368.9 | 313.6 | $320 | $100,352 |
| Benjamin Sherman | 393.8 | 295.4 | $128 | $37,811.20 |
|  |  |  | **TOTAL** | **$747,210.20** |

There were no unsuccessful claims unrelated to the successful ones, and Wachovia enjoyed a high degree of success in defending the litigation. Accordingly, the Court need not further reduce this number. *Robinson,* 560 F.3d at 244.

**C. Costs**

Wachovia requests $78,022.90 in costs expended during the course of this litigation. W.A.K.'s objects the charges for Plaintiffs experts, namely $48,895 charged by H & D Consulting (Thomas D. Hogan). W.A.K. noted that his lawyers contacted Hogan but did not hire him because they found his fee to be excessive. W.A.K. also indicates he spent a total of $14,000 on two experts. Additionally, as there was no trial, Mr. Hogan never testified. The Court finds that an expert fee approaching $50,000 for one month's of work and who was neither deposed nor testified appears facially to be on the high side. Plaintiff, however, has introduced no persuasive evidence to justify reduction of these figures.

W.A.K. also objected to $5,049 of the amount charged by another expert, Thorn McDaniel, but Wachovia provided additional documentation to support this claim.

*IV.*

For the above-listed reasons, the Court finds that an award of $825,233.10–$747,210.20 in attorneys' fees and $78,022.90 in costs-to be reasonable and appropriate in this case. To the extent possible, these costs and fees shall be recovered from the Trust.

An appropriate Order will accompany this Memorandum Opinion.

E.D.Va.,2010.
W.A.K. ex rel. Karo v. Wachovia Bank, N.A.
Not Reported in F.Supp.2d, 2010 WL 3074393 (E.D.Va.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

No. 10-2023

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

---

**W.A.K., II,** *by his next friend,* **PAGE KARO,**

*Plaintiff/Appellant,*

*v.*

**WACHOVIA BANK, N.A.**

*Defendant/Appellee.*

---

### On Appeal from the United States District Court
### For the Eastern District of Virginia
### Richmond Division

---

### PETITION FOR PANEL REHEARING

---

Joseph E. Blackburn, Jr.
**BLACKBURN, CONTE, SCHILING**
**& CLICK, P.C.**
300 West Main Street
Richmond, Virginia 23220
*Counsel for Plaintiff-Appellant*

Bowlman T. Bowles, Jr.
Churchill G. Bowles
**BOWLES AFFILIATES, P.C.**
404 West Franklin Street
Richmond, Virginia 23220
*Counsel for Plaintiff-Appellant*

April 13, 2011



EXHIBIT

10

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES……………………………………………    ii

INTRODUCTION AND STATEMENT OF PURPOSE…………………..    1

ARGUMENT……………………………………………………………    2

    I.    UPON TERMINATION OF THE KARO TRUST,
        THE DISTRICT COURT HAD NO JURISDICTION
        TO AWARD FEES AND COSTS……………………………    2

    II.   UPON TERMINATION OF KARO TRUST,
        WAK CONTINUES TO HAVE STANDING
        AS A DISCLAIMER TRANSFEREE………………………    4

CONCLUSION………………………………………………………….    5

CERTIFICATE OF SERVICE…………………………………………..    7

i

# TABLE OF AUTHORITIES

Page

**Case**:

*Fleming & Associates v. Newby & Tittle,*
    529 F.3d 631, 637-39 (5th Cir., 2008)…………………………………    3


**Statutes**

Virginia Code § 64.1-196.12(B)……………………………………….    4

Virginia Code § 64.1-196.12(F)……………………………………….    5

Fed. R. App. Procedure 40……………………………………………..    1

Local Rule 40……………………………………………………………..    1

## PETITION FOR PANEL REHEARING

WAK, II, by his next friend, Page Karo, pursuant to Fed. R. App. Procedure 40, as well as 4th Cir. Rule 40, petitions the Court for rehearing of the dismissal decision entered by a panel of this Court on April 1, 2011.

## INTRODUCTION AND STATEMENT OF PURPOSE

In the District Court, WAK moved for partial summary judgment alleging Trust mismanagement, and Wachovia denied liability. Wachovia also requested summary judgment for indemnification against third party defendant, William A. Karo (Drew). On May 12, 2010, the District Court granted Wachovia's summary judgment motion against WAK, and four days later the Trust income beneficiary (Toney Karo) died, terminating the Trust. On July 15, 2010, the District Court held Drew liable for fees and costs, and on August 5, awarded Wachovia attorneys' fees and costs against the Karo Trust. This matter was appealed to the Circuit Court on September 2, 2010, and on March 31, 2011, the Circuit Court dismissed WAK's appeal for lack of subject matter jurisdiction based upon authorities cited in Wachovia's motion to dismiss.

In denying WAK's appeal, the panel overlooked that upon the Trust's termination the District Court was divested of jurisdiction to later award legal fees

- 1 -

and costs.  It also overlooked that WAK, as a disclaimer transferee, possessed an interest in the Trust remainder.

In counsel's judgment, the panel's decision overlooked material facts and legal matters sufficient to warrant a rehearing.

<u>ARGUMENT</u>

I.    UPON TERMINATION OF THE KARO TRUST, THE DISTRICT COURT HAD NO JURISDICTION AWARD FEES AND COSTS

In its motion to dismiss for lack of subject matter jurisdiction (which this Court has now adopted as its basis for dismissal of this appeal), Wachovia correctly stated on page 9 that "WAK's suit is not one for individual damages; rather, it is a surcharge action to have Wachovia restore money to the Karo Trust." An *in rem* decision.  Wachovia also characterizes WAK's claims as "equitable."

The District Court granted Wachovia summary judgment against WAK's equitable claim.  Four days later Toney died.  At that moment, according to the effect of this Court's granting Wachovia's dismissal motion, the Trust terminated and its assets immediately vested in remainder.  Wachovia then moved the District Court for attorney's fees and costs of almost $900,000 against a trust that no longer existed.  WAK urged the District Court to assess fees and costs against Drew, and not the Trust.  Wachovia objected and requested assessment of fees and

- 2 -

costs against the Trust. The Court granted the motion and assessed $825,233.10 in fees and costs against the Trust which this Court has ruled did not then exist. If this Court has no jurisdiction now, then the District Court had no jurisdiction to assess fees and costs against a trust that did not exist. For authority that a district court has no jurisdiction to award fees after a trust termination see *Fleming & Associates v. Newby & Tittle*, 529 F.3d 631, 637-39 (5th Cir., 2008).

Wachovia first raised validity of Drew's disclaimer at the appeal level. Why did not Wachovia raise it after Toney's death prior to its motion for fees and costs? The answer is clear. Had Wachovia timely raised this issue below, the District Court would have ordered fees and costs assessed against Drew who would then know he must appeal if he wanted appellate review of such fees and costs. By waiting until Wachovia obtained a final order awarding it $825,233.10 in fees and costs against the Trust, and raising the disclaimer issue for the first time on appeal, the Trustee eliminated any appellate review of $825,233.10 in fees. That is not equitable, and this is an equity proceeding.

Wachovia points out in its motion it is counsel's duty to promptly bring a mootness issue before the Court. Counsel's billing research shows it researched the mootness issue within two weeks of Toney's death, two months before the

- 3 -

District Court awarded fees. (JA-822, 837). However, it never raised the issue in the fee hearing below, deciding to fulfill its duty to report mootness five months later on appeal, and in an effort to deny appellate review.

Because this Court dismissed WAK's appeal for lack of subject matter jurisdiction, at a minimum it should further clarify its ruling and hold that the District Court also lacked subject matter jurisdiction to award fees and costs against a trust that did not exist. A logical conclusion. Alternatively, it should reconsider the effect of its decision allowing Wachovia to raise for the first time the disclaimer issue at the Court of Appeals level. Wachovia wears two hats, one as the defendant, and the other as the Trustee. By waiting to raise the disclaimer issue upon appeal, it breached its duty as Trustee. Who is there other than Wachovia as trustee to defend the $825,233.10 fee claim if Wachovia can successfully defeat WAK's appeal based on standing. No one.

## II.    UPON TERMINATION OF KARO TRUST, WAK CONTINUES TO HAVE STANDING AS A DISCLAIMER TRANSFEREE

The Court's dismissal order appears to hold that Drew Karo's disclaimer is barred under Virginia Code § 64.1-196.12(B).

Even though Drew's disclaimer might be so barred, the disclaimer nevertheless resulted in a transfer of Drew's remainder interest to WAK upon

- 4 -

trust termination.    See Virginia Code § 64.1-196.12(F).    Therefore, WAK
continues to have a financial interest in this case and standing to pursue this
appeal.

## CONCLUSION

Wachovia's failure to promptly bring to the District Court's attention the
Karo Trust termination prior to an award of fees and costs withheld from the Court
an acknowledged duty and material fact this Court should not overlook.    This also
improperly permitted the Court to award fees and costs against a terminated trust,
and results in elimination of an appellate review of the fees and costs awarded.
This should not be permitted in an equitable proceeding.    Wachovia should be
estopped from such maneuvering.

The Court also overlooked that Virginia law treats Drew's "barred"
disclaimer as a transfer of Karo Trust assets to the remainder transferee (WAK),
who therefore has standing to appeal.

For the reasons herein stated, Appellant respectfully petitions for a
rehearing of this case.    Such action by this Court is respectfully requested.

Respectfully submitted,


By:  /s/ Joseph E. Blackburn, Jr.
            Of Counsel

Joseph E. Blackburn, Jr., Esquire
Virginia State Bar #13744
*Counsel for Plaintiff*
Blackburn, Conte, Schilling & Click, P.C.
300 West Main Street
Richmond, Virginia  23220
Telephone:  (804) 782-1111
Facsimile:   (804) 648-3914
E-mail:      joeblack@bcscpc.com

Bowlman T. Bowles, Jr., Esquire (VSB #05268)
Churchill B. Bowles, Esquire (VSB #42619)
*Counsel for Plaintiff*
Bowles Affiliates, P.C.
404 West Franklin Street
P. O. Box 12085
Richmond, Virginia  23241-0085
Telephone:  (804) 780-0236
Facsimile:   (804) 780-9134
E-mail:      bowwhite@aol.com

- 6 -

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. 10-2023          Caption: <u>W.A.K. v. Wachovia Bank, N.A.</u>

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney hereby certifies that on April 13, 2011 a true and correct copy of the foregoing Petition for Panel Rehearing was electronically filed with the Clerk of Court using the CM/ECF system, which will send a copy to the following counsel of record:

WILLIAM P. CHILDRESS, III
D. ALAN RUDLIN
Hunton & Williams, LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia  23219
(804-788-8200

Counsel for Appellees


I further certify that a copy of the foregoing was sent by first-class mail to:
Paul McCourt Curley, Esquire
Canfield Baer LLP
2201 Libbie Avenue, Suite 200
Richmond, Virginia  23230

*Counsel for William A. ("Drew") Karo*

FILED: March 31, 2011

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

_____

No. 10-2023

(3:09-cv-00575-HEH)

_____

W.A.K., II, a minor, who sues by Page S. Karo, his next friend, natural guardian
and mother,

        Plaintiff – Appellant,

v.

WACHOVIA BANK, N.A., Individually and as Co-Trustee of the Rosalie S. Karo
Trust u/a October 18, 1966,

        Defendant – Appellee,

and

FAYE K. HARRIS, individually, as Vice President and Trust Advisor, Wachovia
Bank, N.A.,

        Defendant,

v.

WILLIAM A. KARO,

        Third Party Defendant.

**EXHIBIT**

11

---

## ORDER

---

Upon consideration of submissions relative to appellee's motion to dismiss

appeal for lack of subject matter jurisdiction, the court grants the motion.

Entered at the direction of the panel:  Judge Niemeyer, Judge Keenan, and

Judge Wynn.

For the Court

/s/ Patricia S. Connor, Clerk

No. 10-2023

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

---

**W.A.K. II,** *by his next friend* **PAGE KARO,**
*Plaintiff/Appellant,*

*v.*

**WACHOVIA BANK, N.A.,**
*Defendant/Appellee.*

---

**On Appeal from the United States District Court
for the Eastern District of Virginia
Richmond Division**

---

## PLAINTIFF-APPELLANT'S RESPONSE TO DEFENDANT-
## APPELLEE'S MOTION TO DISMISS APPEAL AS NOT
## WITHIN THE JURISDICTION OF THE COURT

---

Joseph E. Blackburn, Jr.
**BLACKBURN, CONTE, SCHILLING
& CLICK, P.C.**
**300 West Main Street**
**Richmond, Virginia  23220**
*Counsel for Plaintiff-Appellant*

Bowlman T. Bowles, Jr.
**Churchill G. Bowles**
**BOWLES AFFILIATES, P.C.**
**404 West Franklin Street**
**Richmond, Virginia  23220**
*Counsel for Plaintiff-Appellant*



EXHIBIT
12

## I.    PRELIMINARY STATEMENT

Appellant WAK respectfully replies to Wachovia's motion for dismissal of this appeal claiming the Circuit Court lacks subject matter jurisdiction. Wachovia says this Court lacks jurisdiction because WAK lost standing by an intervening event during the proceedings, his grandfather's death on May 17, 2010. It contends death terminated the Trust, causing the trust remainder to pass to WAK's father, Drew. Thereafter, WAK had no interest in the trust, and lost standing in the outcome of the case.

The question this Court must consider is not the validity of Drew's disclaimer, but whether the death of the life tenant, Toney, discontinued any continuing justiciable economic interest of WAK in the trust.

Whether Drew's disclaimer is valid or invalid, the effect is the same: Virginia law caused the trust to pass around Drew to or in trust for WAK. Under the Virginia Disclaimer Act, a disclaimer is either valid or invalid. If valid, the disclaimed interest passes around the disclaimant to the next taker. If invalid, the Act provides for the disclaimed interest to pass around the disclaimant as a transfer to the next taker. See Va. Code § 64.1-196.12(F). Either way, valid disclaimer or not, WAK receives trust assets and has a continuing justiciable interest in the trust. Wachovia's motion to dismiss should be denied.

-2-

## II.   STATEMENT OF FACTS

WAK references Wachovia's "Background and Procedural History" and makes the following corrections and additions:

### A.   Corrections:

1.   Drew benefited only from trust discretionary distributions and received nothing from his disclaimed remainder interest. The right to receive discretionary distributions and a remainder interest are separate and distinct trust interests.

2.   Drew's 2008 declaratory judgment request was to seek a ruling on the validity of his father's disclaimer. Had Drew prevailed, the trust would have terminated with Drew owning the assets. He did not prevail. The court ruled the disclaimer of Toney invalid. Therefore, there was nothing for Drew to "accept."

### B.   Additions:

1.   The 2009 Karo trust modification to provide principal for Toney was occasioned by Wachovia's corporate financial failure and cessation of dividends. It also followed Wachovia Trust personnel suggestions of how to find funds to pay for Toney's increasing nursing home support.

2.   Wachovia's Brief exhibits unnecessary, irrelevant and prejudicial facts in an attempt to posture the Karo family as grasping, profligate and

-3-

dysfunctional. This Court should be mindful that Wachovia's failures enabled this

family's personal and financial problems. The central player in this saga is a 12 year

old minor who knew nothing of these circumstances, and had no control over

developments. Wachovia Bank, in its corporate and professional trustee capacities (as

the adult in control), massively failed this family. It is blatant disrespect for

Wachovia to attempt a transfer of its highly visible public image failure by

mischaracterizing this family as it has done here.

### III.    ISSUE PRESENTED

The issue presented is not the validity of Drew's disclaimer, but whether

the death of the life tenant, Toney, terminated any continuing justiciable economic

interest of WAK in the trust.

### IV.    ARGUMENT

### A.    DREW'S VALID DISCLAIMER PASSES ASSETS TO WAK

The Uniform Disclaimer of Property Interest Act is at Va. Code § 64.1-196.1-

.15. A disclaimer is a way to decline to accept a gift, bequest or other transfer, and

the effect is to cause the property to pass to the next beneficiary. The Act governs

who may disclaim, how to make a qualified disclaimer, and a disclaimer's effect.

Disclaimers are used to minimize tax and creditor issues, correct planning errors, and

provide planning flexibility. Because of the paucity of state cases on disclaimers,

federal tax law helps to interpret the Act.  There are several federal tax cases and IRS

private letter rulings (PLRs), and they are the best source of guidance and

explanation in this difficult area.  Wachovia agrees with this in footnote 5 on page 14

of its Brief.

An effective disclaimer must be: in writing; declared as such; describe the

interest disclaimed; be signed by the disclaimant; and, be delivered or filed as

required in the Act. A trust interest may be disclaimed even if the trust contains a

spendthrift provision Va. Code § 64.1-196.4(A). A disclaimant is barred from

accepting the interest prior to disclaiming it, and the assets must pass without

direction by the disclaimant.  However, a disclaimer may be made of any separate or

partial interest in a trust.  See Act at Va. Code §§ 64.1-196.4(A), (E) and .12.

On May 17, 2010, Toney's life interest terminated with his death and the trust

terms would have passed the trust remainder to Rosalie's only child, Drew, but

because Drew disclaimed the trust remainder on January 20, 2009, he is deemed to

have predeceased Toney and the remainder passed in further trust for Drew's only

child, WAK.  A disclaimant is deemed to have predeceased a terminating event. See

*Abbott v. Willey*, 253 Va. 88, 479 S.E.2d 528 (1997) where a widow's creditors

challenged the disclaimer of her deceased husband's life insurance proceeds.  The

court upheld the disclaimer because its provisions provided that the widow was

-5-

deemed to have predeceased her husband. Since Ms. Willey predeceased her

husband, her creditors could not reach the disclaimed insurance proceeds which then

passed to her children. *Abbott v. Willey* was decided under prior law, but the effect is

the same under the UDPIA provivisions.

As discussed above, answers to difficult disclaimer interpretations are found in

few state cases, so practitioners find the greatest analytical help from federal tax

cases and PLRs. The IRS has a large stake in taxpayers attempts to minimize gift

and estate taxes with disclaimers, so disclaimer tax analysis is given great credibility.

In analyzing a disclaimer issue under federal tax or PLR interpretations, referenced

state disclaimer statutes should be comparable to Virginia's UDPIA for binding

effect.

Wachovia argues Drew's acceptance of discretionary distributions bars his

disclaimer. This simply is not the law. Drew Karo disclaimed his remainder interest

and retained his right to discretionary principal distributions. The Act at Va. Code

§ 64.1-196.4(A), *Jewett v. Commissioner*, 455 U.S. 305 (1982) and PLRs 200516004

(2005) and 200953010 (2009) (Exhibits 1 and 2) authorize disclaimer of separate

trust interests.

Drew had the right under the UDPIA to retain a discretionary principal

distribution interest and disclaim his remainder interest. See the 2005 and 2009

-6-

PLRs. Also, see *Burns, Disclaiming Assets, Interests and Powers,* 2010 Institute on

Estate Planning at §§ 201.3(C) and 201.5(A) (Exhibit 3) confirming that a disclaimer

may be made of an undivided portion of any separate interest in property, even if the

disclaimant has another interest in the same property.

In the 2005 PLR, the IRS authorized a disclaimer analogous to Drew's trust

disclaimer when the trust beneficiary retained a discretionary distribution right while

simultaneously disclaiming the trust remainder.  The same issue was also considered

in the 2009 PLR, and the IRS again authorized a remainder interest disclaimer

allowing the taxpayer to retain the right to receive discretionary trust distributions.

Drew received trust discretionary benefits before and after his disclaimer.  The PLRs

authorize disclaimer of separate trust interests.  Separate discretionary trust principal

and remainder interests are recognized for disclaimer purposes at UDPIA § 64.1-

196.4(A) and (E).  Wachovia's assertion that Drew's retention of principal

distribution rights barred disclaimer of his remainder is incorrect.

Drew received trust benefits prior to his disclaimer and afterwards.  As in both

PLRs, the UPDIA permits a person to disclaim "in whole or in part, any interests in

or power over property."  UDPIA § 64.1-196.4(A).  Consistent with the right to

disclaim "any interest" the UDPIA's bars a disclaimer if the disclaimant "accepts the

interest <u>sought to be disclaimed</u>." (emphasis added).  UDPDIA § 64.1-196.12(b)(i).

-7-

When considered together, these provisions clearly indicate that different interests can be separately disclaimed and accepted.

The 2005 and 2009 PLRs, and the UDPIA permit retention of a distribution right while authorizing the disclaimer of a remainder interest. These interests are separate and a retention of one does not cause disclaimer of the other to be invalid. Act § 64.1-196.12(B)(i) and (ii). Thus, Drew's receipt of principal distributions from the separate trust discretionary interest was not a receipt of a portion of the remainder. *See, Burns "Disclaiming Assets, Interests and Powers"* at § 201.3(c), *Id.*

Wachovia also argues that Drew encumbered his interest in the trust. This argument totally contradicts what Wachovia has previously admitted. In Request for Admissions 13, Wachovia admitted that Drew "has not ever pledged, assigned or otherwise used his contingent trust remainder interest in the trust (prior to his disclaimer) in connection with any loan or other credit arraignment (sic) with Wachovia." See Exhibit 4, Admission 13. Wachovia now contradicts this admission on page 14.

Wachovia also argues Drew's filing a Declaratory Judgment action to declare his father's disclaimer valid somehow amounts to Drew accepting his contingent remainder interest. This would be true had the Court found the disclaimer valid, but the Circuit Court of Richmond declared Toney's disclaimer invalid. Thus, Drew was

-8-

never able to "accept" the remainder interest. Wachovia says these were personal acts by Drew and somehow amounted to acceptance or control of the trust remainder. The Richmond Circuit Court found otherwise when it declared Toney's disclaimer invalid for all purposes. Exhibit 5. An attempt is not consummation, and the Richmond Court confirmed this.

The *Kolb* case cited by Wachovia is inapplicable. *Kolb* found that listing a remainder interest on a financial statement facilitated a beneficiary loan. Drew listed nothing regarding his trust interest on any LORs or financial statement. Exhibit 4, Admission 13, by Wachovia admits Drew did not encumber or pledge his remainder interest prior to his disclaimer, consequently Wachovia cannot now claim Drew's LOR was an encumberance. An indemnification is not an encumbrance or act of control, particularly when the remainder interest was not mentioned in the LOR indemnification.

Wachovia next argues that a disclaimer is a transfer and was therefore barred by the trust's spendthrift provision. Wachovia overlooks the Virginia Disclaimer Act at § 64.1-196.4(A) which specifically provides that a beneficiary may disclaim an interest in a trust containing a spendthrift provision. The transfer Wachovia contemplates under Va. Code § 55-541.02 covers transfers, not a disclaimer which is

-9-

a negative action, or, refusal to accept.  The Disclaimer Act at § 64.1-196.4(G) also

provides that a disclaimer is not a transfer, assignment or release.

For the foregoing reasons, Drew's January 20, 2009 disclaimer is valid, and

upon Toney's death the trust passed by disclaimer around Drew to WAK who

continues to have an interest in the trust and this appellate litigation.  His standing

continues.  Acceptance by Drew of trust discretionary benefits were separate from

the trust's remainder interest.  None of Drew's purported loans or other actions to

assist his father were benefits obtained from his remainder interest.  Drew's

acceptance of discretionary benefits from the trust's separate discretionary

distribution interest did not invalidate his disclaimer.

## B.    INVALID DISCLAIMER TRANSFERS ASSETS TO WAK

Wachovia correctly summarizes disclaimer basics in its Brief pages 10 and 11.

Because it then postures this inquiry entirely on the validity of Drews disclaimer, it

overlooks a very important and necessary inquiry into result of an invalid disclaimer.

See Va. Code § 64.1-196.12(F) which says that if an attempted disclaimer is invalid,

it nevertheless "takes effect as a transfer" of the interest sought to be disclaimed.

Thus, even if Drew's disclaimer was invalid, it transfers the trust around Drew to

WAK.  Wachovia mistakenly assumes the Disclaimer Act prohibits disclaimers in

trusts with spendthrift provisions. Disclaimers are permitted. See Va. Code § 64.1-196.4(A).

Wachovia's Brief asserts Drew's invalid disclaimer is a transfer prohibited by the trust's spendthrift provision. Thus, the transfer is a nullity. This overlooks the Disclaimer Act at § 64.1-196.4(A) which authorizes disclaimers in trusts containing spendthrift provisions. The Bank reads Va. Code § 64.1-196.12(F) to characterize a barred disclaimer as a transfer. This section provides to the contrary. It states: "A disclaimer . . . which is barred . . . takes effect as a transfer of the interest disclaimed . . . " The sentence describes the effect of a barred disclaimer, but it does not characterize a disclaimer as a transfer. Thus, Drew's barred disclaimer is defined and operates as a "disclaimer: which effects a transfer of the disclaimed assets around Drew to WAK upon Toney Karo's death. WAK's standing in this matter continues.

## C. IF WAK IS WITHOUT STANDING, COURT MUST VACATE JUDGMENT AND REMAND FOR DISMISSAL

If this Court finds that WAK has no standing in this appeal, the final judgment of the District Court must be vacated and the case remanded to the District Court with directions to dismiss as moot.

Wachovia argues the trust terminated and WAK lost his justiciable interest therein on May 17, 2010, the day Toney died. Therefore, May 17, 2010 is when this case became moot. The District Court entered its summary judgment order on

May 12, 2010 which Wachovia has previously acknowledged was not a final order. The District Court later entered orders awarding third-party judgment against Drew and attorney's fee and costs as a final Order on August 5 and 25, 2010. Therefore, the case was moot before entry of a final judgment.

When a case becomes moot before rendering a final judgment by a District Court, "vacatur and dismissal is automatic." *Golden v. Bartholow*, 166 F.3d 710, (5th Cir. 1999) (citing *Iron Honor Society v. Heckler*, 464 U.S. 67, 104 S.ct. 373, 376 (1983). A moot case presents no Article III case or controversy, and a court has no constitutional jurisdiction to resolve the issues it presents. *Id.*

Therefore, this court must vacate all of the District Court's prior judgments and remand with directions to dismiss if it finds that the trust was terminated on May 17, 2010, two months before the entry of final judgment in this matter.

However, if the Court does not find the trust terminated, this Court retains jurisdiction and can properly consider this matter in this appeal.

## CONCLUSION

For the reasons stated herein, WAK requests this Court to dismiss Wachovia's Motion to Dismiss this appeal. IF, however, the Court finds WAK's lack of standing occurred on May 17, 2010, the date of Toney Karo's death, it should declare this case

-12-

moot, vacate the District Court's prior judgments, and remand the case to the District

Court for dismissal.


Respectfully submitted,


By:_____/s/_____
                                    Counsel

Joseph E. Blackburn, Jr., Esquire
Virginia State Bar #13744
*Counsel for Plaintiff*
Blackburn, Conte, Schilling & Click, P.C.
300 West Main Street
Richmond, VA  23220
Telephone (804) 782-1111
Facsimile (804) 648-3914
E-mail: joeblackburn@bcscpc.com



Bowlman T. Bowles, Jr., Esquire (VSB #05268)
Churchill G. Bowles, Esquire (VSB #42619)
*Counsel for Plaintiff*
Bowles Affiliates, PC
P. O. Box 12085
404 W. Franklin Street
P. O. Box 12085
Richmond, VA  23241-0085
Telephone (804) 780-0236
Facsimile (804) 780-9134

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

**No. 10-2023**          **Caption:  WAK v. Wachovia Bank, N.A.**

### CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that on November 15, 2010, a true and

correct copy of the foregoing Response to Defendant-Appellee's Motion to Dismiss

Appeal was electronically filed with the Clerk of Court using the CM/ECF system

and a copy was <u>hand</u> <u>delivered</u> to the following counsel of record:

> D. Alan Rudlin, Esquire (VSB# 17010)
> William P. Childress, Esquire (VSB# 72823)
> Hunton & Williams
> Riverfront Plaza, East Tower
> 951 East Byrd Street
> Richmond, Virginia 23219
> Telephone: (804) 788-8200
> Facsimile:  (804) 788-8218
> *Counsel for Defendants*

I further certify that a copy of the foregoing was sent by first-class mail to:

> Paul McCourt Curley, Esquire, (VSB# 43974)
> Canfield Baer, LLP
> 2201 Libbie Avenue, Suite 200
> Richmond, Virginia 23230
> *Counsel for Third-Party Defendant*

> _____/s/_____
> Joseph E. Blackburn, Jr., Esquire
> Counsel for Plaintiff
> Dated:  November 15, 2010

No. 10-2023

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

---

**W.A.K. II**, *by his next friend* **PAGE KARO**,
*Plaintiff/Appellant*,

v.

**WACHOVIA BANK, N.A.**,
*Defendant/Appellee.*

---

**On Appeal from the United States District Court
for the Eastern District of Virginia
Richmond Division**

---

## DEFENDANT-APPELLEE'S REPLY TO OPPOSITION TO MOTION TO DISMISS APPEAL AS NOT WITHIN THE JURISDICTION OF THE COURT

---

**D. Alan Rudlin**
**William P. Childress**
**HUNTON & WILLIAMS LLP**
**951 East Byrd Street**
**Richmond, Virginia  23219**

*Counsel for Defendant-Appellee*

EXHIBIT
13

After the district court had made its rulings below that are the subject of this appeal, the death of Defendant-Appellee "W.A.K.'s" grandfather triggered the issue of the validity of W.A.K.'s father's pre-litigation Trust disclaimer. In turn, this called into serious question W.A.K.'s legal standing as a result. Mindful of its obligations to bring jurisdictional questions to the Court's attention, Wachovia Bank, N.A. ("Wachovia") filed its motion to dismiss ("Motion").

W.A.K.'s opposition brief is unresponsive to the arguments and authorities presented in the Motion. W.A.K.'s contention his standing exists "valid disclaimer or not" is plainly incorrect.

## 1.  Drew Karo Accepted Principal Distributions Prior to Disclaiming.

Contrary to W.A.K.'s argument, Wachovia does not contend that Drew Karo's disclaimer is barred because separate trust interests can never be disclaimed under Virginia law. Rather, Drew Karo, by both word and deed, previously accepted the same interest he later sought to disclaim. After purporting to disclaim, he continued to seek and accept the benefits of the "disclaimed" interest. By law, a disclaimer is "the refusal to accept an interest in or power over property." Va. Code § 64.1-196.1. Once a beneficiary accepts principal distributions from a trust, he may not thereafter say that he has refused to accept the very property (in this case, the remaining trust principal) from which those distributions were made. Va. Code § 64.1-196.12(B). "The receipt and use of

payments or distributions from the trustee will nearly always be conclusive of acceptance of the trust." George Gleason Bogert, *Law of Trusts and Trustees* § 172 (rev. 2d. ed. Supp. 2009). This is exactly what Drew Karo attempted to do – he requested and received distributions of principal from the Karo Trust, both before and after "disclaiming" his interest in whatever principal might remain in the trust at Toney Karo's death.[1]

W.A.K. argues the disclaimer is valid because IRS Private Letter Rulings ("PLRs") establish that "a disclaimer may be made of an undivided portion of any separate interest in property, even if the disclaimant has another interest in the same property." Opp'n. Br. at 7. First, federal law prohibits PLRs from being used or cited as precedent. 26 U.S.C. § 6110(j)(3). Moreover, the PLRs W.A.K. cites do not stand for any proposition other than that a person may disclaim separate interests in property, which Wachovia does not deny. These PLRs actually support a finding that Drew Karo's disclaimer is barred, based on both his prior and continued acceptance of distributions from the Trust's corpus.[2]

---

[1] Wachovia does not argue that a person may not disclaim "in whole or in part, any interest in or power over property" under Virginia law. Va. Code § 64.1-196.4(A). But W.A.K.'s argument, without case authority, is that Drew Karo can continue to accept current-principal distributions from the Karo Trust while "refusing to accept" a future interest in whatever trust principal he has not previously received. It would be illogical to allow such a disclaimer, as the "disclaimant" could still reach the very property he has "disclaimed" by way of current principal distributions.

[2] *See* PLRs 200953010, 200516004 (favorable rulings based on assumption that the taxpayers had not previously accepted the benefits of the disclaimed interests and would not accept the benefits of the disclaimed interests afterwards).

## 2.    Drew Karo Accepted the Property By Suing to Obtain It.

W.A.K. also contends the Court should ignore the salient fact that Drew Karo previously filed a separate lawsuit seeking to obtain the very trust property he later purportedly disclaimed.  W.A.K.'s argument is that Drew Karo's prior legal action to get the Trust corpus is irrelevant because his attempt failed.  *See* Opp'n. Br. at 8-9.  Acceptance that will defeat a later disclaimer, however, is measured by the conduct and intent of the beneficiary, not by ultimate success in gaining possession of the property.  *In re Kolb*, 326 F.3d 1030, 1036 (9th Cir. 2003) (holding that an interest can be accepted without a beneficiary actually obtaining vested ownership of the underlying property).  If a beneficiary's conduct implies an intent to direct or control the property for his benefit, he is deemed to have accepted the property and is barred from disclaiming it.  *See Niklason v. Ramsey*, 353 S.E.2d 783, 784 (Va. 1987); George Gleason Bogert, *Law of Trusts and Trustees* § 171 ("The right to disclaim may be barred if the beneficiary by words or conduct has accepted the gift interest in one or more of a number of ways.").

Drew Karo intended to obtain the Karo Trust assets for himself as the remainder beneficiary when he affirmatively asked a state court to order the distribution of the Trust assets to himself.  Through the same counsel who now represent W.A.K. here, Drew Karo then repeatedly told the state court that the trust corpus rightfully belonged to him, and that the state court should order the property

-3-

turned over to him immediately. Now citing no authority, W.A.K says Drew Karo's earlier attempts to gain possession of the remainder "don't count" because they were judicially rejected. This "no win, no disclaimer" style of advocacy finds no support in the law.

### 3. Drew Karo Encumbered the Property Prior to Disclaiming.

Recognizing a critical legal weakness in his position, W.A.K. claims that Wachovia is estopped from contending that Drew Karo's disclaimer is barred as the result of a voluntary encumbrance because Wachovia admitted in discovery "that Drew Karo did not pledge his remainder interest." Opp'n. Br. at 9. This is not true, and is contradicted by the very exhibit W.A.K. filed with his opposition brief. Request for Admission 13 relates only to whether Drew Karo pledged or assigned his interest to Wachovia in order to obtain credit from Wachovia. Wachovia has not argued that Drew Karo previously pledged his interest in the Karo Trust as collateral to obtain credit from Wachovia.

Rather, Wachovia has informed the Court that Drew Karo obtained a loan from the Karo Trust and entered into indemnification agreements related to the Karo Trust's administration. By obtaining a loan from the Karo Trust (not from Wachovia), the common law of trusts holds that an equitable lien thereby attached to Drew Karo's interest in the Trust to secure repayment of that loan. *See*

-4-

Restatement of Trusts (Second) § 251 cmts. a-d (1959).  This transaction encumbered his beneficial interest.  *Id.*

Moreover, the common law of trusts also holds than an equitable lien attached to Drew Karo's interest in the Karo Trust when he executed indemnification agreements related to the administration of the Trust.  *Id.* § 256 cmt. d.  Equitable liens need not be expressly contracted for because they attached to Drew Karo's beneficial interest by operation of law.  Either encumbrance barred a subsequent disclaimer for purposes of Virginia Code § 64.1-196.12.

### 4.    A Barred Disclaimer Divests W.A.K. of Standing.

W.A.K. argues he has maintained his standing even if Drew Karo's disclaimer is barred under Virginia law.  W.A.K.'s contention here is that there is no difference between a barred disclaimer and a valid disclaimer under Virginia law.  Opp'n. Br. at 11 ("Drew's barred disclaimer is defined and operates as a disclaimer.").  Such a conclusion would require the Court to ignore the plain terms of the Virginia Code.  Simply put, a barred disclaimer is a transfer, not a disclaimer.

Virginia law provides that a "disclaimer made under [the Disclaimer Act] is not a transfer, assignment, or release."  Va. Code § 64.1-196.4(G).  The corollary to this is that a "disclaimer of an interest in property, which is barred by this section, takes effect *as a transfer* of the interest disclaimed[.]"  *See* Va. Code

§ 64.1-196.12(F).  Read together, these two statutes clearly show the illogic of W.A.K.'s argument that a disclaimer that is barred by Virginia law is nevertheless a disclaimer made under the Disclaimer Act.

A spendthrift provision is "a term of a trust that restrains both voluntary and involuntary transfer of a beneficiary's interest." Va. Code § 55-541.03.  Therefore, under Virginia law, "[a] beneficiary may not transfer an interest in a trust in violation of a valid spendthrift provision." Va. Code § 55-545.02.  Despite this, the Disclaimer Act allows a beneficiary to make a _valid_ disclaimer in spite of a spendthrift provision that would otherwise preclude alienation.  This is because a valid disclaimer is not considered a "transfer, assignment, or release." Va. Code § 64.1-196.4(A), (G).  In other words, a spendthrift clause has no effect on a person's ability to refuse to accept (disclaim) a beneficial interest in a trust, but does prohibit the transfer of that interest once it has been accepted.  By contrast, a disclaimer that is barred under the Disclaimer Act "takes effect as a transfer." Va. Code § 64.1-196.12.

There is no dispute that the Karo Trust contained a spendthrift provision at the time Drew Karo made his purported disclaimer.  If his disclaimer is barred, it operates as a transfer from Drew Karo to W.A.K. _Id._  However, because the Karo Trust's spendthrift clause prohibited any manner of alienation, any act that

operates as a transfer is null and void as a matter of Virginia law. *Blackwell v. Virginia Trust Co.,* 14 S.E.2d 301, 304 (Va. 1941).

The spendthrift restraints of the Karo Trust precluded any subsequent transfer of Drew Karo's interest. *See Jackson v. Fid. & Deposit Co.,* 608 S.E.2d 901, 906 (Va. 2005). Consequently, if Drew Karo's disclaimer is found by the Court to be invalid, W.A.K.'s only interest in the Karo Trust was as a discretionary current beneficiary and a contingent remainder beneficiary. Upon Toney Karo's death, W.A.K.'s interest in the Karo Trust as a current beneficiary terminated immediately, and the remainder vested in Drew Karo, thereby divesting W.A.K. of standing.

Even if the Court were to ignore the plain meaning of the statute by accepting W.A.K.'s double-speak that a "barred disclaimer" is still a "disclaimer" and not the kind of "transfer" precluded by a spendthrift provision, W.A.K.'s appeal still requires dismissal. By arguing his standing persists despite a barred disclaimer, W.A.K. seeks standing that is derivative of Drew Karo's "transferred" interest in the Karo Trust. That is, he attempts to recover as an assignee of Drew Karo, and not in his own right. *See, e.g., United States Fidelity & Guaranty Co. v. Bartlett,* 231 U.S. 237, 243 (1913); *see also Warth v. Seldin,* 422 U.S. 490, 499, (1975). Even assuming such a transfer would provide a basis of standing under the circumstances, this is not the posture W.A.K. litigated this case in the district court.

-7-

Indeed, W.A.K. vigorously contested that any of the defenses that barred Drew
Karo's claims as a beneficiary could be asserted against him because his beneficial
status was independent of Drew Karo's.  *See* Dist. Ct. Doc. No. 51 at 27-32.

Because Drew Karo survived termination of the Trust, W.A.K.'s beneficial
status was permanently extinguished.  The Trust's assets vested in Drew Karo – to
the exclusion of all others.  Consequently, whether it has been transferred or not,
Drew Karo's interest is all that remains.  W.A.K. cannot now switch horses in the
Court of Appeals, claim to derive standing from Drew Karo, and thereby obtain a
recovery Drew Karo could not obtain in his own right.

## 5.    A Finding that W.A.K. Lacks Standing Does Not Warrant the Broad Relief Requested by W.A.K.

W.A.K. contends that this Court "must vacate all of the District Court's prior
judgments ... if it finds the trust was terminated on May 17, 2010." Opp'n Br. at
12.  Specifically, W.A.K. contends the Court should vacate not only the order
granting Wachovia summary judgment on W.A.K.'s breach of fiduciary duty
claims, but that it should also vacate the orders granting Wachovia summary
judgment on the third-party complaint, and the order granting Wachovia's attorney
fees.  Vacatur is not applied mechanically, but is to be based on equitable
considerations.  *See U.S. Bancorp Mortgage Co. v. Bonner Mall P'ship*, 513 U.S.
18, 24 (1994).  There is no basis for the broad relief requested by W.A.K.

Assuming Drew Karo's disclaimer was invalid, the district court had subject matter jurisdiction over W.A.K.'s claims until W.A.K. was divested of standing by Toney Karo's death. As such, the court retained continuing jurisdiction to award fees and costs. If a district court loses jurisdiction over the main claims in a suit because a plaintiff is divested of standing, the district court retains jurisdiction to "consider collateral issues." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 395 (1990). "Motions for costs or attorney's fees are independent proceedings supplemental to the original proceeding," and thus the an award of costs and attorney's fees is not a judgment on the merits of an action for which there is no jurisdiction. *Id.* (omitting internal quotations marks). "Where a court is divested of its subject matter jurisdiction over the substantive claim by virtue of intervening mootness," the court has equitable jurisdiction to award attorney's fees and costs. *Samsung Elecs. Co. v. Rambus, Inc.*, 398 F. Supp. 2d 470, 482-483 (E.D. Va. 2005) (holding "a determination of mootness of the action on the merits [does not] preclude an award of attorney's fees..." for lack of jurisdiction).[3] The district court

---

[3] "No Article III case or controversy is needed with regard to attorney's fees as such, because they are but an ancillary matter over which the district court retains equitable jurisdiction even when the underlying case is moot. Its jurisdiction outlasts the 'case or controversy.'" *Zucker v. Occidental Petroleum Corp.*, 192 F.3d 1323, 1329 (9th Cir. 1999); *see also Carter v. Veterans Admin.*, 780 F.2d 1479, 1481 (9th Cir. 1986) ("attorney fee issues are ancillary to the underlying action and survive independently under the court's equitable jurisdiction" when a claim is mooted); *Dahlem v. Board of Educ.*, 901 F.2d 1508, 1511 (10th Cir. 1990) ("the expiration of the underlying cause of action does not moot a controversy over attorney's fees already incurred"); *Williams v. Alioto*, 625 F.2d 845, 848 (9th Cir. 1980).

had jurisdiction to award costs and fees. The district court's order awarding fees and costs based on Virginia law cannot be vacated as W.A.K. requests.

The district court also had jurisdiction to enter judgment for Wachovia on its claim against Drew Karo. No intervening mootness related to W.A.K.'s claims operated to divest the district court of jurisdiction over the third-party complaint. There was subject matter jurisdiction over W.A.K.'s claims when the third-party complaint was filed. Accordingly, the district court obtained jurisdiction over the third-party complaint and this jurisdiction continued without regard to the underlying claims. *First Golden Bancorporation v. Weiszmann*, 942 F.2d 726, 731 (10th Cir. 1991). Moreover, the third party complaint had an independent jurisdictional basis under the diversity statute. W.A.K. has no basis to request an unappealed order on the third-party complaint be vacated.

If the Court determines Drew Karo's disclaimer is invalid, Wachovia submits that the order granting summary judgment should not be vacated. Rather, the order should be modified pursuant to 28 U.S.C. § 2106, thereby dismissing W.A.K.'s claims based on his lack of a cognizable interest in the Karo Trust.

For the foregoing reasons, as well as those grounds stated in its Motion, Wachovia respectfully requests W.A.K.'s appeal be dismissed as outside the jurisdiction of the Court because he has been divested of standing.

**WACHOVIA BANK, N.A.**


/s/
_____

D. Alan Rudlin (VSB # 17010)
William P. Childress (VSB # 72823)
**HUNTON & WILLIAMS LLP**
951 E. Byrd Street
Richmond, Virginia 23219
Phone: 804-788-8200
Fax: 804-788-8218
Email: arudlin@hunton.com
Email: wchildress@hunton.com

*Counsel for Appellee Wachovia Bank, N.A.*

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**No. 10-2023**          **Caption:**     <u>W.A.K. v. Wachovia Bank, N.A.</u>

## CERTIFICATE OF SERVICE

The undersigned attorney herby certifies that on  November 22, 2010 a true and correct copy of the foregoing Reply to Appellant's Opposition to the Motion to Dismiss was electronically filed with the Clerk of Court using the CM/ECF system, which will send a copy to the following counsel of record:

Joseph E. Blackburn, Jr., Esq.
Blackburn, Conte, Schilling & Click, PC
300 West Main Street
Richmond, Virginia 23220
Telephone: 804-782-1111
Facsimile: 804-648-3914

Bowlman T. Bowles, Jr., Esq.
Churchill G. Bowles, Esq.
404 W Franklin Street
Richmond, Virginia  23241
Telephone: 804-780-0236
Facsimile: 804-780-9134

*Counsel for Appellant*

I further certify that a copy of the foregoing was sent by first-class mail to:
Paul McCourt Curley, Esq.
Canfield Baer LLP
2201 Libbie Avenue, Suite 200
Richmond, VA 23230

*Counsel for William A. ("Drew") Karo*

/s/ _____

D. Alan Rudlin
Attorney for Appellee               Dated: November 22, 2010

-12-

# M E M O R A N D U M

TO:        Karo Disclaimer File

FROM:      Bowlman T. Bowles, Jr.

DATE:      February 17, 2010

RE:

Following Drew's disclaimer of his Trust Remainder Interest on February 20, 2009, the Bank has referred to this as a "purported" disclaimer.  The following is an analysis, and the conclusion is that because it is a "barred disclaimer" it is not a transfer (though referred to as "taking effect as a transfer") the disclaimer is valid.

1.      The Trust was modified on December 20, 2008 to add a spendthrift and discretionary distribution clause for Toney.  Drew executed and filed with the Bank his disclaimer on February 20, 2009.

2.      §64.1-196.12(F) provides that a "barred disclaimer takes effect as a transfer of the interest disclaimed".  §64.1-196.4(A) provides that a disclaimer is valid even if the trust document has a spendthrift clause.  The rational is that a disclaimer is not a "transfer".  The question then becomes whether a "barred disclaimer" is a "transfer" or a disclaimer that takes effect as a transfer, a subtle difference, but one that depends on the definition of and the statutory use of the word "disclaimer". If the drafters had intended to rule out as a barred disclaimer under (F) they would have used the term "invalid disclaimer".

EXHIBIT

14

3.     §55-545.02(B) (UTC) says that a spendthrift clause restrains a "transfer" of a trust interest. Since a "disclaimer" is not a "transfer" §55-545.02 does not apply to prevent a disclaimer (it only prevents "transfers").

4.     "Alienate" is defined in Blacks as a sale or conveyance, and since a barred disclaimer is the act of refusing acceptance it is not an "alienation". This permits the barred disclaimer to be effective as a transfer even though the Trust spendthrift language prohibits an "alienation".

5.     Read again §196.12(F) (the last sentence) and note the term "disclaimer" is used three times, and in a way that elevates a barred disclaimer above an alienation or gift. See also §64.1-196.4(G) which provides that a "disclaimer under this chapter is not a transfer, assignment or release". The use of "disclaimer" three times in the last sentence of (F) seems to cause assets to pass by disclaimer by defining it as either a valid or barred disclaimer, but nevertheless a disclaimer, particularly when you factor in the modifying words "takes effect as". The draftsmen could have said that a barred disclaimer is a transfer. Why ad "takes effect as" unless you intend a distinction. This analysis becomes tedious but on balance I think the statute intended to in effect honor the barred disclaimer while not treating it as a "transfer".

6.     In summary, I think the Karo disclaimer while "barred" nevertheless takes effect as a disclaimer and a transfer is effected to Andrew notwithstanding: (1) the spendthrift clause which prohibits alienation; and, (2) the UTC spendthrift provision which also bars "transfers" but not disclaimers.

## BANKRUPTCY ISSUES

What would be the affect of a judgment against Drew (on his LOR indemnity) and could the bankruptcy court can attach Drew's remainder interest passing to Andrew.

For further guidance, see UTC §55-545.02(C) which provides that a beneficiary may not "transfer" a trust interest if there is a spendthrift clause, and a creditor of the beneficiary may not reach the interest or a distribution by the trustee before its receipt by the beneficiary.

Query whether Drew's disclaimer is or may be part of his bankruptcy estate.

In 1999 the Supreme Court in Drye v. U.S., 528, U.S. 49 (1999) held that a disclaimer does not avoid a federal tax lien under IRC §6321, stating that Congress meant to reach every interest in property that a taxpayer might have and noted that inheritances and devises are not included in §6334(A) when it lists the properties exempt from tax liens.

More recently, the 9th Circuit declined to extend the holding in Drye in the bankruptcy context. In Re: Costas, 555 F.3rd 790 (9th Circuit 2009) held that a disclaimer was not a transfer of property within the meaning of the bankruptcy code and the disclaimed property was not a part of the bankruptcy estate.

The bankruptcy trustee in Costas argued that the Court's rational in Drye should be applied because the disclaimants power to "in effect" guide the disposition of the property should be recognized as an interest in property for bankruptcy purposes. The Court, however, distinguished Drye because the tax lien was in place prior to the execution of the disclaimer. In Costas the disclaimer was executed prior to the disclaimants filing the petition for bankruptcy. Accordingly, retroactive divestment of the property interest occurred prior to the bankruptcy. The Court also pointed out that

3

<u>Drye</u> was limited to tax lien cases only. This would apply by analogy to Karo

because he also disclaimed prior to taking bankruptcy.

**KUTAK ROCK LLP**

SUITE 800
BANK OF AMERICA CENTER
1111 EAST MAIN STREET

RICHMOND, VA 23219-3500

804-644-1700
FACSIMILE 804-783-6192

www.kutakrock.com

ATLANTA
CHICAGO
DENVER
DES MOINES
FAYETTEVILLE
IRVINE
KANSAS CITY
LITTLE ROCK
LOS ANGELES
MINNEAPOLIS
OKLAHOMA CITY
OMAHA
PHILADELPHIA
RICHMOND
SCOTTSDALE
WASHINGTON
WICHITA

ALISON W. FEEHAN
alison.feehan@kutakrock.com
(804) 644-1700

May 5, 2014

**VIA E-MAIL**

Charles H. Krumbein, Esq.
Krumbein & Associates, PLLC
1650 Willow Lawn Drive
Richmond, VA 23230

Re:   *In re William Andrew Karo*
      Case No. 13-33011

Dear Mr. Krumbein:

I represent the Chapter 7 trustee in this case along with Loc Pfeiffer. We received the response of William Andrew Karo (the "Debtor"), in response to the Order of the Court entered April 4, 2014 (the "Order") in the above-referenced matter. The Debtor's responses are deficient and not a single document has been produced.

The Order requires the Debtor to "produce all documentary evidence in its actual or constructive possession (or provide a written response to counsel explaining the effort to locate the documents, the reason for the lack of production and the location or disposition of the documents to the extent documents cannot be produced) . . . ." (emphasis added). The Debtor cannot simply say he does not possess documents. For example, did the Debtor make an effort to obtain the bank statements? Did the Debtor call his other lawyers to obtain the papers related to trust litigation? Did the Debtor contact his employer to obtain employment-related documents? While his personal separation from his wife is unfortunate, the Debtor is seeking to discharge his debts and, accordingly, must take affirmative steps to obtain and provide information regarding his financial affairs.

With regard to request numbers 6 & 7, be advised that the Office of the United States Trustee is separate and distinct from the Chapter 7 trustee, so any response to their office is not a response to the trustee or its counsel in this case. Moreover, the Office of the United States Trustee has advised that they are only in receipt of one federal tax return from 2012, two statements from a savings account and and only five months of SunTrust bank statements – not as represented.

4820-0122-0122.1

EXHIBIT
tabbies®
*15*

KUTAK ROCK LLP

Charles Krumbein, Esq.
May 5, 2014
Page 2

With regard to request number 5, given the straight forward nature of this request and the fact that the subject was also discussed at length during the Debtor's 341 hearing, please respond or explain the nature of your confusion.

This letter is our attempt to "meet and confer" in good faith to resolve this matter without burdening the Court with motion practice. **If the Debtor intends to provide further responses, we request that you respond to this letter no later than the close of business on May 7, 2014**.

Please feel free to contact me if you would like to discuss any of these issues further. Otherwise, I thank you for your attention to this matter and look forward to receiving your supplementary responses.

Sincerely,

Alison W. Feehan

cc (via e-mail):  Shannon Franklin Pecoraro, Esq.
                 Robert A. Canfield
                 Loc Pfeiffer, Esq.

4841-5086-0058.1

### Krumbein & Associates, PLLC
• 1650 Willow Lawn Drive, Suite 200 • Richmond, Virginia 23230 •
• 804.673.4358 •
Main Faxline 804 234 1159
• www.krumbein.com • email: charlesh@krumbein.com

May 27, 2014

Charles H. Krumbein, Esq.
Itzhak Friedlander, 1936-2002
Larry Cohn 1940-2007

Alison W Feehan, Esq.

And

Churchill G Bowles, Esq.

In Re: Karo 13-33011 KRH

Dear Ms Freehan and Mr. Bowles,

This letter is to make the debtor's position clear regarding attorney client privilege.  I have interviewed the debtor at least 6 times about the events regarding Mr. Bowles and this representation.  I do not understand the relationship between the debtor and Mr. Bowles. Some of my failure to understand is lack of complete facts, some is I am not as knowledgeable as Ms Feehan seems to be.

So out of an abundance of caution the debtor believes Mr. Bowles was not his attorney.

I first was exposed to Bankruptcy law in 1968.  There were no Judges, only Referees.  Maybe I have not kept up.  I am really impressed with Ms Feehan's knowledge and skill.  But we do not always agree.  For example her position is that the debtor has a duty to pay for and obtain documents described in a subpoena and not in his possession.  That does not make sense to me and I do not agree.  The debtor cannot afford for me to write the memo so we will wait for Ms Feehan's memo or the Judge's opinion.

I have had frequent consultations with the debtor.  He has no money and can't pay me for this portion of this case.  Accordingly, I must make do.  In Ms Feehan's letter she states, "The debtor will waive attorney client privilege".

### NOTICE NOTICE NOTICE NOTICE
No one, including Ms Feehan, has the authority to speak for the debtor or debtor's counsel.

The debtor will consider waiving a privilege when such privilege is proven to exist and after Ms Feehan or a Judge has considered the relevant law on the debtor's privilege and waiver thereof.  It's what careful lawyers do.  That is most likely why Mr. Bowles has objected.  In light of my disagreement with Ms Feehan on the debtor's duty to cooperate and obtain documents not in his possession I remain skeptical of Ms Feehan's "demand".

I think once the party holding the document subpoenaed objects the burden shifts to the requestor to prove the objection is not well founded.  I have described my limitations and they are great.  You may find Judge Hudson's opinion in US V Moazzini interesting.  In that case I asserted privilege.  Judge Hudson found some records not privileged and others privileged.  I asserted the attorney client privilege even though I thought the privilege was dubious.  My job and maybe Mr. Bowles's job is to follow all the rules, not just the convenient ones, and to protect his client.  The facts in that case were vastly different from the instant case.  That was criminal; this civil.  That was a factual situation wherein the debtor had no expectation of privilege, that is not the case here and so on and so forth.

The debtor intends to be as helpful and cooperative as possible with the trustee, but not blindly.  His cooperation is and will be within the law and rules, he may make exception where it is in his best interest to make an exception.

Cordially,

Charles H Krumbein

**KUTAK ROCK LLP**

SUITE 800
BANK OF AMERICA CENTER
1111 EAST MAIN STREET
RICHMOND, VA 23219-3500

804-644-1700
FACSIMILE 804-783-6192

www.kutakrock.com

ATLANTA
CHICAGO
DENVER
DES MOINES
FAYETTEVILLE
IRVINE
KANSAS CITY
LITTLE ROCK
LOS ANGELES
MINNEAPOLIS
OKLAHOMA CITY
OMAHA
PHILADELPHIA
RICHMOND
SCOTTSDALE
WASHINGTON
WICHITA

ALISON W. FEEHAN
alison.feehan@kutakrock.com
(804) 644-1700

May 15, 2014

**VIA EMAIL**

Robert A. Canfield, Esq.
Canfield, Baer & Heller, LLP
2201 Libbie Avenue, Suite 200
Richmond, VA 23230

      Re:    *In re William Andrew Karo*

Dear Mr. Canfield:

I represent the Chapter 7 trustee in this case along with Loc Pfeiffer. We received the response of Page Karo, in response to the Order of the Court entered April 4, 2014 (the "Order") in the above-referenced matter. The response is deficient in certain respects.

As an initial matter, we have not received an itemized response although it appears that Mrs. Karo has not produced documents in response to each category. The Order requires Mrs. Karo to "produce all documentary evidence in its actual or constructive possession (or provide a written response to counsel explaining the effort to locate the documents, the reason for the lack of production and the location or disposition of the documents to the extent documents cannot be produced) . . . ." (emphasis added). We look forward to receiving an itemized response.

Additional specific deficiencies identified to date in Mrs. Karo's production are noted as follows:

(1) 106 of the pages produced were entirely blank. Please verify that we should have received so many blank pages.

(2) Scant email correspondence has been produced. The Order requires your client to produce all communications, specifically including emails, with her counsel or counsel for the Debtor. Few, if any, emails have been produced with Joseph E. Blackburn, Jr., Esq. or your firm. Again, in your written response your client is required to provide a written response explaining "the reason for the lack of production." If she is attempting to claim an attorney-client privilege or other protection, you need to state such.

4837-3512-6299.1

**EXHIBIT**

16

**KUTAK ROCK LLP**

Robert Canfield
May 15, 2014
Page 2

(3) No federal or state tax returns have been produced for the years 2010-2012.  The one tax return that has been produced (2013) is missing Form 1041 (Schedule I). Moreover, the 2013 Virginia state return (together with all schedules and attachments) was copied in horizontal without being reduced, resulting in all of the pages being cut off.  The same copying mistake impacted the following federal worksheets, rendering all of these copies incomplete: Salaries & Wages Report, Two Year Comparison Report (page 1 and Schedule C), Tax Return History Report (both pages).  Please produce the 2010-2012 returns and reproduce the 2013 materials that are incomplete.  Since the 2013 tax return was prepared by a CPA, he should be able to readily facilitate this request.

(4) Mrs. Karo is required to produce all documents containing a list of all of her assets in the last four years.  At a minimum, she would have had to prepare such a list for any financial aid application.

(5) Mrs. Karo is required to produce all documents regarding any trust for which she is trustee or for which any member of her family is beneficiary.  We understand that there is a trust for her minor son, and yet no documents such as the trust agreement, annual reports or accountings have been produced.

(6) The financial statements produced were deficient in a number of respects as detailed below:

- AST Investor Services, account ST7-006998, we have only one statement, namely, May 2013.  If this brokerage account was used at any other time, we are missing the statements.

- BB&T Bright Banking, account 157456024, we are missing the following statements and pages:
  o No account statements produced for 2009-2011, January – November 2012, June 2013, and October 2013
  o Missing pages for the following statements: December 2012 (page 6), January 2013 (page 6), February 2013 (pages 3-5), March 2013 (page 6), April 2013 (pages 5-6), May 2013 (page 6), July 2013 (page 8)

- BB&T Bright Banking, account 153953716, we are missing the following statements and pages:
  o No account statements produced for 2009-2011, January – May 2012, July 2013
  o Missing pages for the following statements: June 2012 (page 2), July 2012 (page 2), August 2012 (page 2), September 2012 (pages 2-4), October 2012 (page 2),

**KUTAK ROCK LLP**

Robert Canfield
May 15, 2014
Page 3

November 2012 (page 2), December 2012 (page 2), February 2013 (pages 2 & 4), March 2013 (page 2), April 2013 (page 2), May 2013 (page 2), June 2013 (pages 2-4)

- BB&T, account 0000251772568/0005532049182, we are missing the following statements and pages:
  - No account statements produced for 2009-2012, January 2013, March – August 2013
  - Missing pages for the following statements: September 2014 (page 4), October 2013 (page 4)

- Cole Credit Property Trust, account 150125454, we are missing the following statements:
  - No account statements produced for 2009-2011, January – June 2012, August – November 2012

- Commonwealth Financial Network, account B3S-436135, we are missing the following statements and pages:
  - No account statements produced for 2009-2011, January – November 2012, January – July 2013
  - Missing pages for the following statements: December 2012 (pages 3 & 4), August 2013 (pages 5 & 6), September 2013 (pages 5 & 6), December 2013 (page 8), and January 2014 (page 6)

- Commonwealth Financial, account B37-388076, we are missing the following statements:
  - No account statements produced for 2009-2011, January – June 2012, August – December 2012, January – September 2013, November – December 2013

- First Allied Adv Sel/Corestone, account HF3-007316 , we are missing the following statements and pages:
  - No account statements produced for 2009-2011, January – April, 2012, July 2012, April – December 2013
  - Missing pages for the following statements: June 2012 (pages 2-14), October 2012 (page 3), December 2012 (page 2)

- First Allied, account HF3-007290, we have been provided only three statements. We are missing the following statements:
  - No account statements produced for 2009-2012, April – December 2013

- First Allied, account NW7-158228, we have been provided only one statement, namely February 2013. We are missing the following statements:

**KUTAK ROCK LLP**

Robert Canfield
May 15, 2014
Page 4

  ○ No account statements produced for March – December 2013

- First Allied, account HF3-007308, we are missing the following statements:
  ○ No account statements produced for 2009-2012, April 2013, July 2013, November 2013

- FS Investment Corporation, account 150049647, we are missing the following statements:
  ○ No account statements produced for 2009-2011, January – September 2012, January – June 2013, October – December 2013

- Pershing LLC, account LRM-236632, we are missing the following pages:
  ○ Statements only produced for May 2010 and January and February 2011.
  ○ Missing pages for the following statements: January 2011 (pages 1, 2, 7 & 8), May 12, 2011 Revised tax information (pages 1, 2, 3 & 4)

- Charles Schwab, account 8951-7498, we have only been provided one statement.  We are missing the following statements and pages:
  ○ No account statements produced for 2009-2010, 2012-2013, January – March 2011, May – December 2011
  ○ Missing pages for the March 18, 2011 trade confirmation (pages 1-2)

- Charles Schwab, account 7212-4077, we have only been provided two statements.  We are missing the following statements:
  ○ No account statements produced for 2009-2012, January – November 2013

- Charles Schwab, account 5591-0482, we have only been provided three statements.  We are missing the following statements:
  ○ No account statements produced for 2009-2012, January – November 2013

- Wachovia, account 1079186537537/4361061106624338, we are missing the following statements and pages:
  ○ No account statements produced for January – May 2009 and no statements produced after July 2009.
  ○ Missing pages for the following statement: July 2009 (pages 2-3)

- Wells Fargo Prime Equity, account 4386-5607-1001-6972, we are missing the following statements:
  ○ Only one statement was produced for January 2011.  All other statements are missing.

**KUTAK ROCK LLP**

Robert Canfield
May 15, 2014
Page 5

This letter is our attempt to "meet and confer" in good faith to resolve this matter without burdening the Court with motion practice. **If Mrs. Karo intends to provide further responses, we request that you respond to this letter no later than the close of business on May 29, 2014**.

Please feel free to contact me if you would like to discuss any of these issues further. Otherwise, I thank you for your attention to this matter and look forward to receiving your supplementary responses.

Sincerely,

Alison W. Feehan

cc:    Loc Pfeiffer, Esq.

4837-3512-6299, v. 1

4837-3512-6299.1

# CANFIELD | BAER LLP

## ATTORNEYS & COUNSELORS AT LAW

2201 Libbie Avenue
Suite 200
Richmond, Virginia 23230
T 804-673-6600 | F 804-673-6604
www.canfieldbaer.com

June 4, 2014

*Sent via U.S. Mail and Facsimile*

Alison W. Feehan
Kutak Rock LLP
Bank of America Center, Ste. 800
1111 E. Main Street
Richmond, Virginia 23219-3500

**Fax:** (804) 783-6192

**Re:    Page Karo**

Dear Ms. Feehan,

Per your request for an itemized response to your discovery inquiry, please see below:

(1) All documentation was photocopied on both sides to ensure that you received each document in its entirety and that nothing was inadvertently left out.

(2) Any email correspondence between Ms. Karo and her counsel is privileged and confidential. Further, any e-mails between my office and Mr. Krumbein are confidential the common interest doctrine.

(3) The 2013 tax return has been recopied and is enclosed. The 2010, 2011, and 2012 tax returns were given to Mr. Karo's counsel by Mr. Karo.

As for your other requests, Ms. Karo has produced everything that she could locate.

Very truly yours,

Robert A. Canfield
*Managing Partner*

RAC/kk
Enclosures

EXHIBIT
17

**Feehan, Alison W.**

| | |
|---|---|
| **From:** | Kathleen Kruck <kkruck@canfieldbaer.com> |
| **Sent:** | Wednesday, June 11, 2014 10:58 AM |
| **To:** | Feehan, Alison W. |
| **Subject:** | Response to Discovery Inquiry #1 |
| **Attachments:** | SKMBT_50014061107130.pdf; SKMBT_50014061107140.pdf; SKMBT_50014061109150.pdf |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Dear Ms. Feehan,

If you would kindly confirm that you received my fax yesterday that included Mr. Canfield's May 12th response, I would appreciate it.

Attached, please find the 2010 and 2011 tax returns. Due to the size of the files, the 2012 return will be e-mailed separately, along with the recopied material. There was one document that we could not locate but, as it is public record, you should be able to access the document yourself. I have marked it so you know which one it is.

We will also be mailing you supplemental discovery documents this week.

As to your request for a more specific itemized response, Ms. Karo is not obligated to request copies of the documentation, only to provide what she has. She has done this. Ms. Karo does not know where the missing documents are. If we knew where they were, we would have sent them.

Our privilege log is also attached.

Kathleen C. Kruck
Paralegal to Robert A. Canfield, Esq.
and Hunter R. Wells, Esq.
Canfield, Baer & Heller, LLP
2201 Libbie Avenue, Ste. 200
Richmond, Virginia 23230
Phone: (804) 673-6600
Fax: (804) 673-6604
kkruck@canfieldbaer.com

EXHIBIT
18

B257 (Form 257 – Subpoena to Produce Documents, Information, or Objects or To Permit Inspection in a Bankruptcy Case or Adversary Proceeding) (12/13)

# UNITED STATES BANKRUPTCY COURT

_____ Eastern _____ District of _____ Virginia _____

In re  WILLIAM ANDREW KARO
_____
                Debtor

*(Complete if issued in an adversary proceeding)*

Case No.  13-33011-KRH

Chapter  7

_____
                Plaintiff

v.

_____
                Defendant

Adv. Proc. No.  _____

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A BANKRUPTCY CASE (OR ADVERSARY PROCEEDING)

To:  Bowles Affiliates PC, c/o Bowlman T. Bowles, Jr., Registered Agent, 404 W. Franklin St., Richmond, VA 23241
*(Name of person to whom the subpoena is directed)*

☒ *Production*: **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

See Exhibit A attached hereto.

| PLACE                                                             | DATE AND TIME  May 13, 2014 at 1:00PM |
|-------------------------------------------------------------------|----------------------------------------|
| Kutak Rock LLP, 1111 E. Main Street, Suite 800, Richmond, VA 23219 | or by agreement with Alison W. Feehan, Esq. |

☐ *Inspection of Premises*: **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| PLACE | DATE AND TIME |
|-------|----------------|
|       |                |

        The following provisions of Fed. R. Civ. P. 45, made applicable in bankruptcy cases by Fed. R. Bankr. P. 9016, are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and 45(g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:  4/30/14
_____

                CLERK OF COURT

                                        OR

_____                _____
  *Signature of Clerk or Deputy Clerk*                *Attorney's signature*

The name, address, email address, and telephone number of the attorney representing *(name of party)*
Special Counsel for Bruce Robinson, Trustee  , who issues or requests this subpoena, are:
Alison W. Feehan, Esq., Kutak Rock LLP, 1111 E. Main Street, Ste. 800, Richmond, VA 23219  804-644-1700

                **Notice to the person who issues or requests this subpoena**
If this subpoena commands the production of documents, electronically stored information, or tangible things, or the inspection of premises before trial, a notice and a copy of this subpoena must be served on each party before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

**EXHIBIT**
19

B257 (Form 257 – Subpoena to Produce Documents, Information, or Objects or To Permit Inspection in a Bankruptcy Case or Adversary Proceeding) (Page 2)

## PROOF OF SERVICE
**(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)**

I received this subpoena for *(name of individual and title, if any)*: _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of  $ _____ .

My fees are $ _____ for travel and $_____ for services, for a total of $_____ .


I declare under penalty of perjury that this information is true and correct.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*


Additional information concerning attempted service, etc.:

B257 (Form 257 – Subpoena to Produce Documents, Information, or Objects or To Permit Inspection in a Bankruptcy Case or Adversary Proceeding) (Page 3)

## Federal Rule of Civil Procedure 45(c), (d), (e), and (g) (Effective 12/1/13)
### (made applicable in bankruptcy cases by Rule 9016, Federal Rules of Bankruptcy Procedure)

**(c) Place of compliance.**

*(1) For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  (A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  (B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
    (i) is a party or a party's officer; or
    (ii) is commanded to attend a trial and would not incur substantial expense.

*(2) For Other Discovery.* A subpoena may command:
  (A) production of documents, or electronically stored information, or things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  (B) inspection of premises, at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

*(1) Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

*(2) Command to Produce Materials or Permit Inspection.*
  (A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  (B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    (i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    (ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

*(3) Quashing or Modifying a Subpoena.*
  (A) *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    (i) fails to allow a reasonable time to comply;
    (ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
    (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    (iv) subjects a person to undue burden.
  (B) *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    (i) disclosing a trade secret or other confidential research, development, or commercial information; or

    (ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  (C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    (i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    (ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

*(1) Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  (A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  (B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  (C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  (D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

*(2) Claiming Privilege or Protection.*
  (A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    (i) expressly make the claim; and
    (ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  (B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.** The court for the district where compliance is required – and also, after a motion is transferred, the issuing court – may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it

---

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013)

## EXHIBIT "A" TO SUBPOENA

Bowles Affiliates PC (formerly known as Bowles & Whitehead, P.C.)
Bowlman T. Bowles, Jr., Registered Agent,
404 West Franklin St.
Richmond, VA 23241
(804) 780-0236
Fax: (804) 780-9134

The following definitions, rules of construction, claims of privilege and document requests are a part of, and are incorporated into, the preceding subpoena as though the same were stated therein:

## DEFINITIONS AND INSTRUCTIONS

1.      "You" refers to Bowles Affiliates PC (formerly known as Bowles & Whitehead, P.C.), the entity to whom this subpoena is directed, as the successor to and its agents, employees, representatives, attorneys and/or anyone acting on behalf of the foregoing.

2.      "Debtor" means William Andrew Karo, and all other persons acting or purporting to act on his behalf, including agents, representatives, attorneys and/or anyone acting on behalf of the foregoing.

3.      The term "person" means any natural person, individual, proprietorship, partnership, corporation, limited liability company, association, organization, joint venture, firm, other business enterprise, governmental body, group of natural persons or other entity.

4.      "Document" means any written, printed, typed, e-mailed, recorded, transcribed, photographed, electronic or graphic matter or other means of preserving thought or expression and all tangible things from which information can be processed or transcribed, including the originals and all non-identical copies, whether different from the original by reason of any notation made on such copy or otherwise, including, but not limited to, correspondence, memoranda, notes, messages, letters, telegrams, teletype, telefax, bulletins, meetings or other communications, interoffice and intra-office telephone calls, diaries, chronological data, minutes, books, reports, studies, summaries, pamphlets, printed matter, charts, ledgers, invoices, worksheets, receipts, returns, computer printouts, prospectuses, financial statements, schedules, affidavits, contracts, cancelled checks, statements, transcripts, statistics, surveys, magazine or newspaper articles, releases (and any and all drafts, alterations and modifications, changes and amendments of any of the foregoing), graphic or aural records or representations of any kind (including without limitation photographs, microfiche, microfilm, videotape, records and motion pictures) and electronic, mechanical or electric records or representations of any kind (including without limitation tapes, cassettes, discs and records).

5.      The term "all documents" means every document or group of documents as above defined that are known to you or that can be located or discovered by reasonably diligent efforts.

6.    The term "relating to" means pertaining to, affecting, involving or being connected to.

7.    As used herein the singular shall include the plural, the plural shall include the singular, and the masculine, feminine, and neuter shall include each of the other genders.

8.    If you cannot respond to any of the following requests in full, respond to the extent possible, specifying the reasons why you are unable to respond in full, and provide whatever information you have concerning the unproduced documents or portions of documents, including the location of each document identified and the source or sources from which the documents or portions thereof may be obtained.

9.    If any document that is responsive to a request is no longer complete or has been altered, state in what respect the document is incomplete or altered and explain the reasons therefor. If any such document is no longer in existence or no longer in your possession, custody, or control, state the disposition of the document, the reasons for such disposition, the date of the disposition, the identity of the person ordering, authorizing, or supervising such disposition, the person performing the disposition, the substance or the contents of the document disposed of, and the identity of all persons having knowledge of the contents thereof.

10.    If you choose to withhold any documents from production on the grounds of privilege or the like, you must, in addition to identifying the documents so withheld, provide a privilege log or schedule containing for each such document:

(a)    a description of the type and contents of each such document claimed to be privileged and its date and current custodian and present location;

(b)    the name, occupation and capacity of the document's author;

(c)    the name, occupation and capacity of the each addressee of the document;

(d)    the name, occupation and capacity of each other person who obtained the document or a copy thereof or to whom the document was disseminated or who was informed of the document's contents; and

(e)    the privilege(s) claimed and, for each privilege claimed, a statement of the factual basis for applicability of the privilege.

## DOCUMENTS TO BE PRODUCED

1.    Your entire file, including all emails and other documents, relating to your representation of the Debtor through and including April 1, 2011.

LAW OFFICES

## BOWLES AFFILIATES

A PROFESSIONAL CORPORATION

P. O. BOX 12085

RICHMOND, VIRGINIA 23241

BOWLMAN T. BOWLES, JR.
CHURCHILL G. BOWLES

404 WEST FRANKLIN STREET
(804) 780-0236
FAX (804) 780-9134
BOWWHITE@AOL.COM

May 22, 2014

**VIA FACSIMILE: 783-6192 and U. S. MAIL**

Alison W. Feehan, Esquire
Kutak Rock LLP
1111 East Main Street
Suite 800
Richmond, Virginia 23219

        Re:    William Andrew Karo
               Case No.: 13-33011-KRH

Dear Alison:

        Thank you for the extension of time in responding to the Subpoena to this Firm.
Given ethical considerations concerning Mr. Karo's attorney/client relationship with this
Firm, our objection to the Subpoena is enclosed.

        Thank you for your patience and cooperation and please call me to discuss the
Subpoena when you have the opportunity.

                        Very truly yours,

                        *Churchill G. Bowles*

                        Churchill G. Bowles

CGB:dp
Enclosure
cc:    Mr. William Andrew Karo
       Robert A. Canfield, Esquire (via facsimile and U. S. Mail)
       Charles H. Krumbein, Esquire, (via facsimile and U. S. Mail)

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

In re:  William Andrew Karo                    Case No.  13-33011-KRH
                                               Chapter 7

OBJECTION TO SUBPOENA TO PRODUCE DOCUMENTS,
INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION
OF PREMISES IN A BANKRUPTCY CASE

Bowles Affiliates, P.C. ("Bowles Affiliates"), by counsel, states the following as its

objection to the Subpoena to Produce Documents ("Subpoena) filed by Bruce Robinson,

Trustee ("Trustee"), under Bankruptcy Rule 9016 of the Federal Rules of Bankruptcy

Procedure.

1.      Bowles Affiliates was served with the Subpoena on April 30, 2014.  An

        extension of time to respond was granted by the Trustee's counsel, Alison W.

        Feehan, Esquire.  (Exhibit A).

2.      The Subpoena requests Bowles Affiliates "entire file" relating to the debtor,

        William Andrew Karo ("Mr. Karo").

3.      Bowles Affiliates represented Mr. Karo from August, 2008 through early

        2009.  Available documents include pleadings from a declaratory judgment

        matter and other/related documents.  Most information concerns the Rosalie

        S. Karo Trust, not personal information concerning Mr. Karo.

---

Churchill G. Bowles (VSB #42619)
Bowlman T. Bowles, Jr. (VSB #05268)
BOWLES AFFILIATES, P.C.
P. O. Box 12085
Richmond, Virginia 23241
Telephone: (804) 780-0236
Facsimile: (804) 780-9134
Email:    Churchillbowles@yahoo.com

**EXHIBIT**
**20**

18047809134

4.      Given the breadth of the Subpoena and its request for representation

materials from over five years ago, Bowles Affiliates inquired about the

relevance and  necessity of requested documents.

5.      However, the Trustee's counsel did not withdraw or limit the request.

6.      Therefore, Bowles Affiliates objects to the Subpoena for the following

reasons:

a.      Bowles Affiliates objects on the basis of attorney-client privilege.

b.      Bowles Affiliates objects because it is unclear what is being requested.

To the extent that any of the requested information is privileged,

Bowles Affiliates objects to it.

c.      Bowles Affiliates objects because any documents are not relevant to

this proceeding and the Subpoena scope is broader than permitted

under the Rules of Bankruptcy Procedure.

d.      Bowles Affiliates objects to the Subpoena because there is no legal

basis to turn over the documents.

e.      Bowles Affiliates objects on the basis of work product doctrine.

f.      Bowles Affiliates objects because significant available documents can

be obtained from the Richmond Circuit Court where a disclaimer

proceeding took place in the fall of 2008.

---

Churchill G. Bowles (VSB #42619)
Bowlman T. Bowles, Jr. (VSB #05268)
BOWLES AFFILIATES, P.C.
P. O. Box 12085
Richmond, Virginia 23241
Telephone: (804) 780-0236
Facsimile: (804) 780-9134
Email:    Churchillbowles@yahoo.com

WHEREFORE, Bowles Affiliates, P.C. requests that this Court to modify or quash

the Subpoena filed pursuant to Federal Rule of Bankruptcy Procedure 9016 and to award any

further relief that this Court may deem necessary.

BOWLES AFFILIATES, P.C.

By: _____

Churchill G. Bowles (VSB #42619)
Bowlman T. Bowles, Jr. (VSB #05268)
BOWLES AFFILIATES, P.C.
P. O. Box 12085
Richmond, Virginia  23241
Telephone:    (804) 780-0236
Facsimile:    (804) 780-9134
Email:    Churchillbowles@yahoo.com
Date: May 22, 2014

-3-

## CERTIFICATE OF SERVICE

I certify that on the 22nd day of May, 2014, a copy of the foregoing Objection was sent

by facsimile and mailed by regular mail, postage prepaid to all necessary parties:

Alison W. Feehan, Esquire
Kutak Rock LLP
1111 East Main Street
Suite 800
Richmond, Virginia  23219

Robert A. Canfield, Esquire
Canfield Baer & Heller LLP
2201 Libbie Avenue
Suite 200
Richmond, Virginia  23230

Charles H. Krumbein, Esquire
Krumbein & Associates, PLLC
1650 Willow Lawn Drive, Suite 201
Richmond, Virginia  23230

-4-

**KUTAK ROCK LLP**

SUITE 800
BANK OF AMERICA CENTER
1111 EAST MAIN STREET

RICHMOND, VA 23219-3500

804-644-1700
FACSIMILE 804-783-6192

www.kutakrock.com

ATLANTA
CHICAGO
DENVER
DES MOINES
FAYETTEVILLE
IRVINE
KANSAS CITY
LITTLE ROCK
LOS ANGELES
MINNEAPOLIS
OKLAHOMA CITY
OMAHA
PHILADELPHIA
RICHMOND
SCOTTSDALE
WASHINGTON
WICHITA

ALISON W. FEEHAN
alison.feehan@kutakrock.com
(804) 644-1700

May 23, 2014

**VIA E-MAIL**

Churchill G. Bowles, Esq.
Bowles Affiliates, P.C.
P.O. Box 12085
Richmond, VA 23241

     Re:    William Andrew Karo
           <u>Case No.: 13-33011-KRH</u>

Dear Churchill:

    I am in receipt of your objection to the subpoena. To the extent that you assert an attorney-client privilege, please provide a privilege log without further delay as referenced in my May 9, 2014 correspondence regarding your requested extension.

    Also, please be advised that the Debtor has advised that he intends to waive privilege. And, as you know, to the extent that any conversations included third parties, such as Debtor's wife, they would not be privileged.

    I look forward to receipt of your privilege log or production.

               Sincerely,

               Alison W. Feehan

cc:    Charles Krumbein (*via email*)
       Loc Pfeiffer (*via email*)

**Feehan, Alison W.**

| | |
|---|---|
| **From:** | Dodge, Jennifer A. |
| **Sent:** | Friday, June 06, 2014 3:54 PM |
| **To:** | bcanfield@canfieldbaer.com |
| **Cc:** | Feehan, Alison W.; Pfeiffer, Loc |
| **Subject:** | In re William Andrew Karo; Case No. 13-33011 |
| **Attachments:** | Karo documents.PDF |

Dear Mr. Canfield:

As you are aware, I represent the Chapter 7 trustee in this case along with Loc Pfeiffer.  I am writing in response to your letter of June 4, 2014 regarding Mrs. Karo's response to the Order of the Court entered April 4, 2014 (the "Order") in this matter.

You indicate that Mrs. Karo justifies her failure to comply with the Order in reliance on the attorney-client privilege.  Please provide a privilege log to support this contention.

Provide copies of the 2010, 2011 and 2012 tax returns.  Even if these returns were given to Mr. Karo's counsel, that does not satisfy Mrs. Karo's obligation to comply with the Order.

Attached are documents produced by your firm that reflect copying problems.  As you can see, they are not legible and need to be reproduced.

Provide a supplemental production regarding the multiple documents including the previously itemized financial statements that were partially copied or missing altogether.

As to each category specified in the Order, provide an itemized response.  It is insufficient for Mrs. Karo to state without explanation that "Ms. Karo has produced everything that she could locate."  The Order requires Mrs. Karo to "provide a written response to counsel explaining the effort to locate the documents, the reason for the lack of production and the location or disposition of the documents to the extent documents cannot be produced . . . ."  For example, has she requested copies of her bank statements?  Has she asked her accountant for copies of the tax returns?

This letter is our second attempt to "meet and confer" in good faith to resolve this matter without burdening the Court with motion practice.  **If Mrs. Karo intends to provide further responses, we request that you respond to this letter no later than the close of business on June 9, 2014**.

Alison W. Feehan
Kutak Rock LLP
Bank of America Center
1111 East Main Street, 8th Floor
Richmond, Virginia 23219
804 343-5205 (phone)
804 783-6192 (fax)

B257 (Form 257 – Subpoena to Produce Documents, Information, or Objects or To Permit Inspection in a Bankruptcy Case or Adversary Proceeding) (12/13)

# UNITED STATES BANKRUPTCY COURT

_____ Eastern _____ District of _____ Virginia _____

In re   WILLIAM ANDREW KARO
_____
            Debtor

_(Complete if issued in an adversary proceeding)_

_____

_____
            Plaintiff
                v.
_____
            Defendant

Case No.   13-33011-KRH   _____

Chapter   _____ 7 _____

Adv. Proc. No.   _____

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A BANKRUPTCY CASE (OR ADVERSARY PROCEEDING)

To:   Canfield, Baer & Heller, LLP, c/o Paul McCourt Curley, Registered Agent, 3504 Plank Road, Fredericksburg, VA 22407
                        _(Name of person to whom the subpoena is directed)_

☒ _Production_: **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:
            See Exhibit A attached hereto.

| PLACE   Kutak Rock LLP, 1111 E. Main Street, Suite 800, Richmond, VA 23219 | DATE AND TIME  May 22, 2014 at 1:00PM or by agreement with Alison W. Feehan, Esq. |
|---|---|

☐ _Inspection of Premises_: **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| PLACE | DATE AND TIME |
|---|---|
| | |

        The following provisions of Fed. R. Civ. P. 45, made applicable in bankruptcy cases by Fed. R. Bankr. P. 9016, are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and 45(g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:  5/8/14  _____

            CLERK OF COURT

                                    OR

_____            _____
_Signature of Clerk or Deputy Clerk_                    _Attorney's signature_

The name, address, email address, and telephone number of the attorney representing _(name of party)_
Special Counsel for Bruce Robinson, Trustee   , who issues or requests this subpoena, are:
Alison W. Feehan, Esq., Kutak Rock LLP, 1111 E. Main Street, Ste. 800, Richmond, VA 23219  804-644-1700
                **Notice to the person who issues or requests this subpoena**
If this subpoena commands the production of documents, electronically stored information, or tangible things, or the inspection of premises before trial, a notice and a copy of this subpoena must be served on each party before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

**EXHIBIT**

_tabbies_

_21_

B257 (Form 257 – Subpoena to Produce Documents, Information, or Objects or To Permit Inspection in a Bankruptcy Case or Adversary Proceeding) (Page 2)

# PROOF OF SERVICE
### (This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)

I received this subpoena for *(name of individual and title, if any)*: _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the
witness the fees for one day's attendance, and the mileage allowed by law, in the amount of  $ _____ .

My fees are $ _____ for travel and $_____ for services, for a total of $_____ .


I declare under penalty of perjury that this information is true and correct.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*


Additional information concerning attempted service, etc.:

B257 (Form 257 – Subpoena to Produce Documents, Information, or Objects or To Permit Inspection in a Bankruptcy Case or Adversary Proceeding) (Page 3)

## Federal Rule of Civil Procedure 45(c), (d), (e), and (g) (Effective 12/1/13)
### (made applicable in bankruptcy cases by Rule 9016, Federal Rules of Bankruptcy Procedure)

**(c) Place of compliance.**

*(1) For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
(i) is a party or a party's officer; or
(ii) is commanded to attend a trial and would not incur substantial expense.

*(2) For Other Discovery.* A subpoena may command:
(A) production of documents, or electronically stored information, or things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
(B) inspection of premises, at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

*(1) Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

*(2) Command to Produce Materials or Permit Inspection.*
(A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
(B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

*(3) Quashing or Modifying a Subpoena.*
(A) *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
(i) fails to allow a reasonable time to comply;
(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
(iv) subjects a person to undue burden.
(B) *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
(i) disclosing a trade secret or other confidential research, development, or commercial information; or

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
(C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

*(1) Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
(A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
(B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
(C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
(D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

*(2) Claiming Privilege or Protection.*
(A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
(i) expressly make the claim; and
(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
(B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g)** **Contempt.** The court for the district where compliance is required — and also, after a motion is transferred, the issuing court — may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013)

## EXHIBIT A TO SUBPOENA

**Canfield, Baer & Heller, LLP**
Paul McCourt Curley, Registered Agent
3504 Plank Road
Fredericksburg, VA 22407

## DEFINITIONS AND INSTRUCTIONS

1.      "You" refers to **Canfield, Baer & Heller, LLP**, the entity to whom this subpoena is directed, and its agents, employees, representatives, attorneys and/or anyone acting on behalf of the foregoing.

2.      "Debtor" means **William Andrew Karo**, and all other persons acting or purporting to act on his behalf, including agents, representatives, attorneys and/or anyone acting on behalf of the foregoing.

3.      The term "person" means any natural person, individual, proprietorship, partnership, corporation, limited liability company, association, organization, joint venture, firm, other business enterprise, governmental body, group of natural persons or other entity.

4.      "Document" means any written, printed, typed, e-mailed, recorded, transcribed, photographed, electronic or graphic matter or other means of preserving thought or expression and all tangible things from which information can be processed or transcribed, including the originals and all non-identical copies, whether different from the original by reason of any notation made on such copy or otherwise, including, but not limited to, correspondence, memoranda, notes, messages, letters, telegrams, teletype, telefax, bulletins, meetings or other communications, interoffice and intra-office telephone calls, diaries, chronological data, minutes, books, reports, studies, summaries, pamphlets, printed matter, charts, ledgers, invoices, worksheets, receipts, returns, computer printouts, prospectuses, financial statements, schedules, affidavits, contracts, cancelled checks, statements, transcripts, statistics, surveys, magazine or newspaper articles, releases (and any and all drafts, alterations and modifications, changes and amendments of any of the foregoing), graphic or aural records or representations of any kind (including without limitation photographs, microfiche, microfilm, videotape, records and motion pictures) and electronic, mechanical or electric records or representations of any kind (including without limitation tapes, cassettes, discs and records).

5.      The term "all documents" means every document or group of documents as above defined that are known to you or that can be located or discovered by reasonably diligent efforts.

6.      The term "relating to" means pertaining to, affecting, involving or being connected to.

7.      As used herein the singular shall include the plural, the plural shall include the singular, and the masculine, feminine, and neuter shall include each of the other genders.

8.      If you cannot respond to any of the following requests in full, respond to the extent possible, specifying the reasons why you are unable to respond in full, and provide whatever information you have concerning the unproduced documents or portions of documents, including the location of each document identified and the source or sources from which the documents or portions thereof may be obtained.

9.      If any document that is responsive to a request is no longer complete or has been altered, state in what respect the document is incomplete or altered and explain the reasons therefor. If any such document is no longer in existence or no longer in your possession, custody, or control, state the disposition of the document, the reasons for such disposition, the date of the disposition, the identity of the person ordering, authorizing, or supervising such disposition, the person performing the disposition, the substance or the contents of the document disposed of, and the identity of all persons having knowledge of the contents thereof.

10.     If you choose to withhold any documents from production on the grounds of privilege or the like, you must, in addition to identifying the documents so withheld, provide a privilege log or schedule containing for each such document:

        (a)     a description of the type and contents of each such document claimed to be privileged and its date and current custodian and present location;
        (b)     the name, occupation and capacity of the document's author;
        (c)     the name, occupation and capacity of the each addressee of the document;
        (d)     the name, occupation and capacity of each other person who obtained the document or a copy thereof or to whom the document was disseminated or who was informed of the document's contents; and
        (e)     the privilege(s) claimed and, for each privilege claimed, a statement of the factual basis for applicability of the privilege.

## DOCUMENTS TO BE PRODUCED BY YOU

1.      Your entire file, including all emails and other documents, relating to your representation of the Debtor through and including April 1, 2011.

## CERTIFICATE OF SERVICE

I hereby certify that on May 8, 2014, a true and correct copy of the *Subpoena for Canfield, Baer & Heller,* LLP to Produce Documents was served via electronic mail and/or first-class mail, postage prepaid, on the following parties:

William Andrew Karo
430 N. Parham Road
Henrico, VA 23229

Charles H. Krumbein, Esq.
Email: charlesh@krumbein.com
Counsel for Debtor

Robert A. Canfield, Esq.
Email: bcanfield@canfieldbaer.com

Shannon Franklin Pecoraro, Esq.
Email: shannon.franklin@usdoj.gov

**KUTAK ROCK LLP**

By: _____
Loc Pfeiffer, VSB #39632
Alison W. Feehan, VSB #35225
1111 East Main Street, Suite 800
Richmond, VA 23219
804-644-1700
loc.pfeiffer@kutakrock.com
alison.feehan@kutakrock.com
*Special Counsel for Bruce Robinson, Trustee*

# CANFIELD | BAER LLP

### ATTORNEYS & COUNSELORS AT LAW

2201 Libbie Avenue
Suite 200
Richmond, Virginia 23230
T 804-673-6600 | F 804-673-6604
www.canfieldbaer.com

May 12, 2014

Alison W. Feehan, Esq.
Kutak Rock LLP
111 E. Main Street, Ste. 800
Richmond, Virginia 23219

Re:    **William Andrew Karo**
       **Bankr. Case No. 13-33011-KRH**

Dear Ms. Feehan,

I have received the subpoena you have issued to Canfield, Baer & Heller, LLP in the above-named case. As our firm does not represent the debtor, we have no documents to produce pursuant to your request. Further, your request asks for privileged information that would not be produced eve if it were in our possession, which it is not. Please let this letter serve as our formal response to your subpoena.

Very truly yours,

Robert A. Canfield
*Managing Partner*

RAC/kk

CANFIELD, BAER & HELLER LLP
A PROFESSIONAL LIMITED LIABILITY PARTNERSHIP

**EXHIBIT**

22

**Feehan, Alison W.**

| | |
|---|---|
| **From:** | Kathleen Kruck <kkruck@canfieldbaer.com> |
| **Sent:** | Wednesday, June 18, 2014 12:48 PM |
| **To:** | Feehan, Alison W. |
| **Subject:** | RE: Response to Subpoena |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Per Mr. Canfield, this question has already been responded to and we trust that any further inquiries as to this matter will be made to Paul Curley.

Kathleen C. Kruck
Paralegal to Robert A. Canfield, Esq.
and Hunter R. Wells, Esq.
Canfield, Baer & Heller, LLP
2201 Libbie Avenue, Ste. 200
Richmond, Virginia 23230
Phone: (804) 673-6600
Fax: (804) 673-6604
kkruck@canfieldbaer.com

**From:** Feehan, Alison W. [mailto:Alison.Feehan@KutakRock.com]
**Sent:** Monday, June 16, 2014 1:25 PM
**To:** Kathleen Kruck; bcanfield@canfieldbaer.com
**Cc:** Dodge, Jennifer A.; Pfeiffer, Loc
**Subject:** RE: Response to Subpoena

Have you searched?  He used a Canfield email address.  Since your firm has a domain address, you have an email system somewhere, even if it is in the cloud.  How do you access email now (Microsoft, Gmail)?

Alison W. Feehan
Kutak Rock LLP
Bank of America Center
1111 East Main Street, 8th Floor
Richmond, Virginia 23219
804 343-5205 (phone)
804 783-6192 (fax)

**From:** Kathleen Kruck [mailto:kkruck@canfieldbaer.com]
**Sent:** Monday, June 16, 2014 11:18 AM
**To:** Feehan, Alison W.
**Subject:** RE: Response to Subpoena

We do not back up our e-mails. Once they are deleted off our computers, we do not have access to them.

Kathleen C. Kruck
Paralegal to Robert A. Canfield, Esq.

1



EXHIBIT
23

and Hunter R. Wells, Esq.
Canfield, Baer & Heller, LLP
2201 Libbie Avenue, Ste. 200
Richmond, Virginia 23230
Phone: (804) 673-6600
Fax: (804) 673-6604
kkruck@canfieldbaer.com

---

**From:** Feehan, Alison W. [mailto:Alison.Feehan@KutakRock.com]
**Sent:** Monday, June 16, 2014 11:14 AM
**To:** Kathleen Kruck
**Subject:** RE: Response to Subpoena

You don't have a server?  You don't backup your emails?


Alison W. Feehan
Kutak Rock LLP
Bank of America Center
1111 East Main Street, 8th Floor
Richmond, Virginia 23219
804 343-5205 (phone)
804 783-6192 (fax)

---

**From:** Kathleen Kruck [mailto:kkruck@canfieldbaer.com]
**Sent:** Monday, June 16, 2014 11:13 AM
**To:** Feehan, Alison W.
**Subject:** RE: Response to Subpoena

We do not have anything like that. The only way to pull up old e-mails would be on Paul's computer if he hasn't deleted it, and he took his equipment with him when he left. You will have to get that information from Paul.

Kathleen C. Kruck
Paralegal to Robert A. Canfield, Esq.
and Hunter R. Wells, Esq.
Canfield, Baer & Heller, LLP
2201 Libbie Avenue, Ste. 200
Richmond, Virginia 23230
Phone: (804) 673-6600
Fax: (804) 673-6604
kkruck@canfieldbaer.com

---

**From:** Feehan, Alison W. [mailto:Alison.Feehan@KutakRock.com]
**Sent:** Thursday, June 12, 2014 11:26 AM
**To:** bcanfield@canfieldbaer.com
**Cc:** Kathleen Kruck; Pfeiffer, Loc
**Subject:** RE: Response to Subpoena

Please let us know the status of emails (on your firm's server) that are responsive to the subpoena.

Alison W. Feehan
Kutak Rock LLP
Bank of America Center
1111 East Main Street, 8th Floor
Richmond, Virginia 23219
804 343-5205 (phone)
804 783-6192 (fax)

---

**From:** Kathleen Kruck [mailto:kkruck@canfieldbaer.com]
**Sent:** Wednesday, June 11, 2014 11:27 AM
**To:** Feehan, Alison W.
**Subject:** RE: Response to Subpoena

For any information regarding the past representation of the Debtor, you would have to contact Paul Curley, who is no longer with this firm. It is our understanding that all of his client files were taken with him when he left approximately a year ago. He is now employed at Allen & Allen, should you wish to contact him.

Kathleen C. Kruck
Paralegal to Robert A. Canfield, Esq.
and Hunter R. Wells, Esq.
Canfield, Baer & Heller, LLP
2201 Libbie Avenue, Ste. 200
Richmond, Virginia 23230
Phone: (804) 673-6600
Fax: (804) 673-6604
kkruck@canfieldbaer.com

---

**From:** Feehan, Alison W. [mailto:Alison.Feehan@KutakRock.com]
**Sent:** Wednesday, June 11, 2014 11:15 AM
**To:** bcanfield@canfieldbaer.com
**Cc:** Kathleen Kruck; Dodge, Jennifer A.; Pfeiffer, Loc
**Subject:** Response to Subpoena

Dear Mr. Canfield, I am in receipt of your response to the subpoena directed to Canfield Baer regarding the representation of the Debtor William Karo. In the response you state your firm does not represent the Debtor (present tense) and that any materials would be privileged if they were in your possession, which you state they are not. Please note that the subpoena is directed to your firm's past representation of the Debtor and specifically limited to documents "through and including April 1, 2011." From the pleadings before the Fourth Circuit it appears your firm represented the Debtor at least through March 31, 2011. If Canfield Baer intends to provide a further response, please let me know no later than close of business today. Thank you

Alison W. Feehan
Kutak Rock LLP
Bank of America Center
1111 East Main Street, 8th Floor
Richmond, Virginia 23219
804 343-5205 (phone)
804 783-6192 (fax)

## Feehan, Alison W.

**Subject:** FW: Karo Talk

-----Original Message-----
**From:** Charles Krumbein [charlesh@krumbein.com]
**Sent:** Monday, May 12, 2014 12:33 PM Central Standard Time
**To:** Pfeiffer, Loc
**Subject:** Karo Talk

I have spoken with my client and he agrees to any informal talk that you think would help the trustee.  he believes that he has a duty to assist the trustee and he will discharge that duty.
You asked if he would waive attorney client privilege.  He continues to think the "bo" bowles was not his lawyer.  I do not know, therefore I cannot advise him.  We will begin  today to answer your request by notifying Bob Canfield of out intention so that he can think this through on behalf of his client.
When you are ready we can meet on a thursday.  Mr Karo tells me he is seeking a new friend and today he has no place to live.
Shame on you Ms Feehan and Ms Pecaro for abusing the helpless.



**EXHIBIT**
24

Privilege Log- Page Karo

| Type | Author | Recipient | Date | Description | Subject Matter | Purposes Prepared/Communicated |
|---|---|---|---|---|---|---|
| E-Mail | Charles Krumbein | Robert A. Canfield | 4/18/2014 Re: Karo 2004 | | Client relations; production of documents; litigation planning | Joint Defense Ideas/common interest doctrine |
| E-Mail | Charles Krumbein | Robert A. Canfield | 5/12/2014 Bowles Subpoena | | Attorney-Client Privilege of Bowles | prepared as part of defense/common interest doctrine |
| E-Mail | Robert A. Canfield | Charles Krumbein | 5/14/2014 re:Bowles Subpoena | Response to Krumbein's e-mail | Attorney-Client Privilege of Bowles | prepared as part of defense/common interest doctrine |
| E-Mail | Kathleen C. Kruck | Page Karo | 6/9/2014 Update | | Discovery Material Production | Privileged Communication regarding discovery production/trial prep |
| E-Mail | Kathleen C. Kruck | Page Karo | 6/9/2014 Discovery Update | | Discovery Material Production | Privileged Communication regarding discovery production/trial prep |



**EXHIBIT**

tabbies

_25_